## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- x
                                                          :
In re                                                     :    **Chapter 11**
                                                          :
**GBI SERVICES, LLC**, *et al.*,                          :    **Case No. 25–12089 (CTG)**
                                                          :
Debtors.[1]                                               :    **(Joint Administration Requested)**
                                                          :
---------------------------------------------------------- x

**MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING AND (VI) GRANTING RELATED RELIEF**

GBI Services, LLC, and certain of its affiliates, as debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases, respectfully represent as follows:[2]

### Relief Requested

1.      By this motion (this "**Motion**"), pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506(c) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1(b), 4001-2, 9006-1, and 9013 of the Local Rules of the United States

---

[1]    The last four digits of GBI Services, LLC's tax identification number are 0771.  A complete list of the Debtors in the chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/GBIServices.  The Debtors' mailing address is 3801 PGA Boulevard, Suite 565, Palm Beach Gardens, FL 33410.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the First Day Declaration, the Interim Order or the DIP Credit Agreement (each as defined below), as applicable.

Bankruptcy Court for the District of Delaware (the "**Local Bankruptcy Rules**"), the Debtors seek entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "**Interim Order**") and a final order (the "**Final Order**," and, together with the Interim Order, the "**DIP Orders**"):

(a) authorizing the Debtors to obtain postpetition financing ("**DIP Financing**") on a superpriority, senior secured basis, subject to the terms and conditions set forth in that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement attached as <u>Exhibit 1</u> to the Interim Order (as amended, restated, supplemented, or otherwise modified from time to time, the "**DIP Credit Agreement**"), by and among Nicklaus Companies, LLC (the "**DIP Borrower**"), the other Debtors (each, a "**DIP Guarantor**" and, together with the DIP Borrower, the "**DIP Loan Parties**"), and FundNick, LLC ("**FundNick**" or the "**DIP Lender**"), in an aggregate principal amount not to exceed $17,000,000 (the "**DIP Facility**" and the commitments in respect thereof, the "**DIP Commitments**"), pursuant to which (i) up to $10,000,000 of the DIP Commitments (the "**Interim DIP Loans**") shall be available upon entry of the Interim Order and (ii) up to $7,000,000 of the DIP Commitments (the "**Final DIP Loans**," together with the Interim DIP Loans, the "**DIP Loans**") shall be available upon entry of the Final Order, in each case, on the terms and conditions set forth in the applicable DIP Order and the DIP Credit Agreement;

(b) authorizing the DIP Guarantors to guarantee the DIP Loans and the other DIP Obligations (as defined below);

(c) authorizing the Debtors to execute, deliver and perform under the DIP Credit Agreement and all other loan documentation related to the DIP Facility, including, without limitation, as applicable, security agreements, pledge agreements, control agreements, mortgages, deeds, charges, guarantees, promissory notes, intercompany notes, certificates, instruments, intellectual property security agreements, notes, and such other documents that may be reasonably requested by the DIP Lender, in each case, as amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and the applicable DIP Order (collectively, together with the DIP Credit Agreement and any other Credit Documents (as defined in the DIP Credit Agreement), the "**DIP Loan Documents**");

(d) authorizing the Debtors to incur loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees, costs, expenses and other liabilities, and all other obligations (including indemnities and similar obligations, whether contingent or absolute) due or payable under the DIP Loan Documents (collectively, the "**DIP Obligations**"), and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

(e) authorizing the Debtors to refinance the Prepetition Priority Bridge Loan Obligations (as defined in the Interim Order) into DIP Obligations;

(f) subject to the Carve-Out (as defined in the Interim Order), granting to the DIP Lender, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations of the Debtors;

(g) granting to the DIP Lender valid, enforceable, non-avoidable and automatically perfected liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on all prepetition and postpetition property of the Debtors' estates other than Avoidance Actions (as defined in the Interim Order) and all proceeds thereof and, upon entry of the Final Order, any Avoidance Proceeds (as defined in the Interim Order), in each case, subject to the Carve-Out;

(h) upon entry of the Final Order, waiving with respect to the Prepetition Collateral and the DIP Collateral (each as defined in the Interim Order and together, the "**Collateral**") (a) the Debtors' right to surcharge the Collateral pursuant to section 506(c) of the Bankruptcy Code, and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(i) upon entry of the Final Order, waiving the equitable doctrine of "marshaling" and other similar doctrines (i) with respect to the DIP Collateral for the benefit of any party other than the DIP Lender and (ii) with respect to any of the Prepetition Collateral for the benefit of any party other than the Prepetition Secured Parties;

(j) authorizing the Debtors to use proceeds of the DIP Facility solely in accordance with the DIP Orders and the DIP Loan Documents;

(k) authorizing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Loan Documents as such become earned, due and payable to the extent provided in, and in accordance with, the DIP Loan Documents;

(l) subject to the restrictions set forth in the DIP Loan Documents and the DIP Orders, authorizing the Debtors to use the Prepetition Collateral, including Cash Collateral, of the Prepetition Secured Parties and to provide adequate protection to the Prepetition Secured Parties for any diminution in value of their interests in the Prepetition Collateral (including Cash Collateral), including, without limitation, any diminution in value resulting from the imposition of the automatic stay under section 362 of the Bankruptcy Code (the "**Automatic Stay**"), the Debtors' use, sale, or lease of the Prepetition Collateral (including Cash Collateral), and the priming of its interests in the Prepetition Collateral (including Cash Collateral);

(m) vacating and modifying the Automatic Stay to the extent set forth herein to the extent necessary to permit the Debtors, the DIP Lender and the Prepetition Secured Parties to implement and effectuate the terms and provisions of the Interim Order,

3

the DIP Loan Documents and, upon entry, the Final Order and to deliver any notices of termination described below and as further set forth herein;

(n) authorizing the DIP Lender and the Prepetition Secured Parties (as defined in the Interim Order), to take all commercially reasonable actions to implement and effectuate the terms of the Interim Order;

(o) waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order and, upon entry, the Final Order; and;

(p) scheduling a final hearing (the "**Final Hearing**") to consider final approval of the DIP Facility and use of Cash Collateral pursuant to the Final Order, as set forth in the DIP Motion and the DIP Loan Documents filed with this Court.

2.      In support of this Motion, the Debtors submit the *Declaration of Phil Cotton in Support of First Day Relief* (the "**First Day Declaration**"), the *Declaration of Philip Cassel in Support of Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "**Cassel Declaration**"), and the *Declaration of Richard Wu in Support of Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling A Final Hearing, and (VI) Granting Related Relief* (the "**Wu Declaration**"), each filed contemporaneously herewith.

## **Background**

3.      On November 21, 2025 (the "**Petition Date**"), the Debtors each commenced with the Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized

to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

4.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Local Bankruptcy Rule 1015-1.

5.      The Debtors are industry leaders in golf-course design, the development of golf and real estate communities, and the marketing and licensing of lifestyle products worldwide under the iconic Jack Nicklaus™ and Golden Bear™ brands.  The Debtors have commenced their chapter 11 cases to address the Debtors' prepetition funded debt, litigation and other liabilities and to effectuate a comprehensive restructuring, which may be implemented through a chapter 11 plan and/or sale of substantially all of the Debtors' assets.

6.      Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the First Day Declaration.

**<u>Jurisdiction and Venue</u>**

7.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      Pursuant to Local Bankruptcy Rule 9013-1(f), the Debtors consent to entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## Concise Statement Pursuant to Bankruptcy Rule 4001

9.     Pursuant to Bankruptcy Rules 4001(b), (c), and (d), the following is a concise statement and summary of the proposed material terms of the DIP Credit Agreement and DIP Orders:[3]

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| **Parties to the Proposed DIP Facility**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | **DIP Borrower**: Nicklaus Companies, LLC, in its capacity as a debtor and debtor in possession under chapter 11 of the Bankruptcy Code.<br><br>**DIP Guarantors**: The Subsidiaries of the DIP Borrower listed in the Preamble of the DIP Credit Agreement.<br><br>**DIP Lender:** FundNick, LLC<br><br>*See* DIP Credit Agreement, Preamble |
| **Borrowing Limits**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(i)(A)* | Subject to the terms and conditions set forth in the DIP Credit Agreement and upon entry of the Interim Order, DIP Lender will advance an Interim DIP Loan in an amount not to exceed $7,000,000 and upon entry of the Final Order, will advance an additional term loan in an amount not to exceed $10,000,000, which Final DIP Loan will be funded in draws in Dollars on the date specified in the applicable Borrowing Request submitted following a request pursuant to Section 2.7 of the DIP Credit Agreement in accordance with the then-in-effect Approved Budget (after giving effect to any Permitted Variances).<br><br>*See* DIP Credit Agreement § 2.1; Appendix A |
| **Budget**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(iii)* | The initial Approved Budget is attached hereto as <u>Exhibit A</u> to the DIP Credit Agreement.  Any Proposed Budget submitted by the Debtor that is in form and substance acceptable to DIP Lender and approved in writing by the DIP Lender, in its sole discretion, shall become the "**Approved Budget**".<br><br>*See* DIP Credit Agreement § 1.1 "**Approved Budget**" |
| **Interest Rates**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(i)(B)* | Interest on the principal balance of the DIP Loan, shall be payable at a per annum rate which shall be 850 basis points (8.50%).<br><br>*See* DIP Credit Agreement § 1.1 "**DIP Rate**"; § 2.5 |

---

[3]   The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced. To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control. Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Credit Agreement or the Interim DIP Order, as applicable

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | |
| **Maturity Date**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | The earliest to occur of (i) the date that is 150 days after the Petition Date; (ii) the date of consummation of any sale or disposition of all or substantially all of the Debtors' assets; (iii) the date of substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court; and (iv) the date of acceleration of all the DIP Loan and the termination of the DIP Commitments upon the occurrence and during the continuance of an Event of Default (as defined below); *provided* that the dates in clauses (i) and (ii) may be extended with the prior written consent of DIP Lender, in its sole discretion.<br><br>*See* DIP Credit Agreement § 1.1 "**Maturity Date**". |
| **Repayment Features / Roll-Up**<br><br>*Local Bankruptcy Rule 4001-2(a)(i)(O)* | Subject to the terms of the applicable Financing Orders, the Debtors shall use the proceeds of the Interim DIP Loan to repay or refinance all Prepetition Priority Bridge Loan Obligations on the Closing Date.<br><br>*See* DIP Credit Agreement § 7.20; Interim Order § 2(c) |
| **Conditions Precedent to Closing and Lending**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(i)(E)* | The obligation of DIP Lender to make available the initial disbursements of the DIP Loan on the Closing Date is subject to the satisfaction of customary conditions on or before the Closing Date including the following:<br><br>a) Initial Approved Budget. The Debtors shall have timely delivered to DIP Lender and its advisors the Initial Approved Budget or any update thereto that are acceptable to DIP Lender in its sole discretion;<br><br>b) Bankruptcy Court orders.<br><br>    i.   (A) The Bankruptcy Court shall have entered the Interim Order, (B) the Interim Order shall not have been stayed, vacated, or reversed, nor modified or amended without DIP Lender and Borrower's consent, and (C) the Debtors shall be in compliance in all respects with the Interim Order.<br><br>    ii.  The Bankruptcy Court shall have approved the repayment of the Prepetition Priority Bridge Loan Obligations as set forth in the Interim Order.<br><br>c) Fees and Expenses. All reasonable and documented fees and out-of-pocket expenses (whether incurred prepetition or post-petition) of the Lender Professionals that have been invoiced relating to the Chapter 11 Cases, the DIP Loan, the Prepetition Priority Bridge Loan Facility and the Prepetition Junior Term |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | Loan Facility and such invoice has been delivered to the Debtors at least one (1) Business Day before the Interim Closing Date, shall have been paid in full (or will be paid in connection with such Interim DIP Loan draw) in accordance with the terms of the Interim DIP Order. |
| | *See* DIP Credit Agreement § 5.1. |
| **Events of Default**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(i)(M)* | a) the entry of the entry of an interim or final order with respect the DIP Loan, granting approval of this Agreement in form or substance that is not reasonably acceptable to DIP Lender;<br><br>b) the failure of the Final DIP Order to have been entered by January 9, 2026;<br><br>c) except as provided in clause (u), failure by the Debtors to be in compliance in all material respects with provisions of this Agreement (subject to (x) a two (2) Business Day grace period for delivery of the Bi-Weekly Reports and Bi-Weekly Budget Variance Reports and (y) a three (3) Business Day grace period for compliance with Section **Error! Reference source not found.** hereof);<br><br>d) any request made to the Bankruptcy Court by the Debtors (or the Debtors' failure to contest any request made by a third party, including by timely filing opposition papers with the Bankruptcy Court) for the reversal, modification, amendment, stay, reconsideration or vacatur of any Financing Order;<br><br>e) any request made to the Bankruptcy Court by the Debtors (or the Debtors' failure to contest any request made by a third party, including by timely filing opposition papers with the Bankruptcy Court) for entry of an order of the Bankruptcy Court charging any of the Collateral under section 506(c) of the Bankruptcy Code against DIP Lender;<br><br>f) failure of any representation or warranty to be true and correct in all material respects (or, to the extent qualified by "materiality" or Material Adverse Effect, in all respects) when made;<br><br>g) the filing of any application by any Debtor (other than the application for financing provided by a third party which seeks authority to pay all of the Obligations in full in cash upon the closing of such financing) for the approval of (or an order is entered by the Bankruptcy Court approving) any claim arising under Section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest or other lien in any of the Chapter 11 Cases which is *pari passu* with or senior to the DIP Liens or DIP |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | Superpriority Claims, excluding (a) the Carve-Out, (b) liens arising under the Financing Orders, liens pursuant to any other financing agreement made with the prior written consent of DIP Lender, and Prepetition Permitted Liens, or (c) as provided in the "first day" motions, that are reasonably acceptable to the DIP Lender; provided that it shall be an Event of Default to pay any cash after the Closing Date to collateralize any surety bond or letters of credit without the prior written consent of the DIP Lender; <br><br> h) the Debtors commence (or support) any action (other than an action permitted by the Financing Orders) against DIP Lender, the Prepetition Priority Bridge Lender or any of their agents or employees, to challenge, subordinate, recharacterize or avoid any claims or obligations arising, or liens granted, under the Credit Documents or Prepetition Priority Bridge Loan Documents or any other action against DIP Lender or Prepetition Priority Bridge Lender; <br><br> i) the entry of an order by the Bankruptcy Court in favor of any Creditors' Committee, any ad hoc committee or any other party in interest, (a) granting such party standing to pursue any claims against DIP Lender or the Prepetition Secured Parties, (b) sustaining an objection to claims of DIP Lender or the Prepetition Secured Parties or (c) avoiding any liens held by DIP Lender or the Prepetition Secured Parties; *provided*, that the foregoing shall not be deemed to prohibit the investigation or action by any such Debtor of any Liens pursuant to the Prepetition Junior Term Loan Facility in accordance with the terms of the applicable Financing Orders; <br><br> j) any Debtor commences (or supports) any action (other than an action permitted by the Financing Orders) against the Prepetition Junior Term Lender or any of its agents or employees, to challenge, subordinate, recharacterize or avoid any claims or obligations arising, or liens granted, under the Prepetition Junior Term Loan Documents or any other action against any Prepetition Junior Lender; *provided*, that the foregoing shall not apply to any action by the Debtor to avoid any liens held by the Prepetition Junior Term Lender; <br><br> k) (a) the Debtors file any pleading in any court (or fail to contest any pleading filed by a third party in any court, including by timely filing opposition papers with the Bankruptcy Court) seeking entry of an order to revoke, reverse, stay, vacate, amend, supplement or otherwise modify any Credit Document, or the disallowance of any Obligations, in whole or in part, unless otherwise agreed to by DIP Lender, or (b) any material |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | provision of any Credit Document, or any other order of the Bankruptcy Court approving the Debtors' use of Cash Collateral (as defined in the Financing Orders), shall for any reason cease to be valid and binding; |
| | l) without the prior written consent of DIP Lender, the filing with the Bankruptcy Court of a motion seeking approval of a sale of all or substantially all assets of the Debtors under Section 363 of the Bankruptcy Code that does not provide for payment in full of all Obligations, all Prepetition Priority Bridge Loan Obligations, and the Prepetition Junior Term Loan Obligations (such consent to apply solely with respect to the sale of "Collateral" (as defined in the Prepetition Junior Term Loan Documents) that the Debtors' Investigation has concluded is subject to the valid, perfected and unavoidable liens of the Prepetition Junior Term Lender and such payment up to the value of such "Collateral" as determined by an order of the Bankruptcy Court); |
| | m) the appointment in any of the Chapter 11 Cases of a trustee, receiver, examiner or responsible officer with enlarged powers (beyond those set forth in Sections 1106(a)(3) and (a)(4) of the Bankruptcy Code) relating to the operation of the business of any Debtor; |
| | n) the granting of any motion filed by a creditor or other party in interest seeking relief from the automatic stay in the Chapter 11 Cases with respect to any portion of the Collateral with an aggregate value in excess of $250,000 other than a motion seeking relief from the automatic stay that seeks only to recover from, or enforce rights or remedies with respect to, proceeds of insurance policies; |
| | o) termination of the Interim DIP Order or the Final DIP Order, as applicable, other than as a result of the satisfaction in full of the Obligations; |
| | p) the conversion of any Chapter 11 Case into a case pursuant to Chapter 7 of the Bankruptcy Code; |
| | q) the termination of any of the Debtors' exclusive right to propose a plan of reorganization under Chapter 11 of the Bankruptcy Code; |
| | r) a dismissal of any of the Chapter 11 Cases; |
| | s) without the prior written consent of DIP Lender, a request by the Debtors to use cash collateral or to obtain financing under Section 364 of the Bankruptcy Code (other than the DIP Loan), |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | unless such financing would indefeasibly repay in full in cash all obligations under the DIP Loan upon consummation thereof; |
| | t) the filing of any motion seeking approval of a sale of any Collateral (other than any sale permitted under Article **Error! Reference source not found.** hereof); |
| | u) failure to pay (A) principal in full when due, including without limitation, on the Maturity Date, or (B) interest or other Obligations in full within three (3) Business Days after the same becomes due; or |
| | v) failure to timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order: (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code); (ii) converting the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code; or (iii) dismissing the Chapter 11 Cases. |
| | *See* DIP Credit Agreement § 9.1. |
| **Carve Out**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(i)(F)* | <u>Carve-Out</u>. As used in this Interim Order, the "**Carve-Out**" means the sum of (i) all unpaid fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all unpaid reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, final order, procedural order, or otherwise, all accrued and unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and the Creditors' Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") at any time before or on the first business day following delivery by the DIP Lender of a Carve-Out Notice (as defined below), and any monthly, restructuring, sale, success, or other transaction fees (but excluding any tail fees) that is earned or payable to a Debtor Professional prior to the date of delivery of a Carve-Out Notice, whether allowed by the Court prior to or after delivery of a Carve-Out Notice (the "**Pre-Carve-Out Notice Amount**"), and for each Committee Professional, up to the amounts set forth in the Approved DIP Budget (less amounts already paid); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $200,000, in each case incurred after the first business day following |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | delivery by the DIP Lender of the Carve-Out Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve-Out Notice Amount**").  For purposes of the foregoing, "**Carve-Out Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Lender to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve-Out Notice Cap has been invoked. <br><br>*See* Interim Order ¶ 4. |
| **Priority of Claims and Liens; Collateral** <br><br> *Bankruptcy Rule 4001(c)(1)(B)(i)* | <u>DIP Collateral</u>.  collectively, all assets of the Debtors (and their bankruptcy estates) of any nature whatsoever and wherever located, whether first arising prior to or following the Petition Date, now owned or hereafter acquired, including (i) all accounts; (ii) all chattel paper; (iii) all deposit accounts; (iv) all documents; (v) all equipment; (vi) all general intangibles; (vii) all goods; (viii) all instruments; (ix) all inventory; (x) all investment property; (xi) all intellectual property; (xii) [reserved]; (xiii) all commercial tort claims; (xiv) all letter-of-credit rights; (xv) all money; (xvi) all books and records pertaining to the foregoing; (xvii) to the extent not otherwise included, all proceeds, products, accessions, rents and profits of any and all of the foregoing and all supporting obligations, collateral security and guarantees given by any person with respect to any of the foregoing; (xviii) all other Collateral (including Pledged Collateral and Registered Intellectual Property Collateral) in each case as defined in the Prepetition Priority Bridge Loan Credit Documents; (xix) all aircrafts, airframes, engines, propellers, spare parts, and other aircraft components; (xx) subject to entry of the Final DIP Order, all Avoidance Proceeds (but not Avoidance Actions themselves); (xxi) all proceeds, whether by settlement, judgment or otherwise, arising from or relating to any litigation, arbitration, administrative proceeding or other legal action (other than avoidance actions) in which the DIP Borrower or any of the DIP Guarantors is or may become a party, including, but not limited to, all monetary awards, settlements, compensation, damages, penalties or any other form of payment or relief that the DIP Borrower or any DIP Guarantor receives or is entitled to receive as a result of such legal actions, including, but not limited to, any proceeds or other payments related to claims asserted against any legal professionals; and (xxii) all products, offspring, profits and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, including any and all proceeds of any insurance (including any business interruption and property |

RLF1 34181772v.10

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | insurance), indemnity, warranty or guaranty payable to such Debtor from time to time with respect to any of the foregoing.<br><br>DIP Liens.  As security for the DIP Obligations, effective and automatically and properly perfected upon the date of this Interim Order and without the necessity of the execution, recordation or filing by the Debtors or the DIP Lender of mortgages, security agreements, control agreements, pledge agreements, financing statements, intellectual property filings or other similar documents, notation of certificates of title for titled goods or other similar documents, instruments, deeds, charges or certificates, or the possession or control by the DIP Lender of, or over, any DIP Collateral, without any further action by the DIP Lender, the following valid, binding, continuing, enforceable and non-avoidable security interests and liens (all security interests and liens granted to the DIP Lender, pursuant to this Interim Order and the DIP Loan Documents, the "**DIP Liens**") on all DIP Collateral are hereby granted to the DIP Lender; *provided* that notwithstanding anything herein to the contrary, the DIP Liens shall be (i) subject and junior to the Carve-Out in all respects, (ii) senior in all respects to the Prepetition Liens and (iii) senior in all respects to the Adequate Protection Liens:<br><br>    a) **Liens on Unencumbered Property**.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, automatically fully-perfected first priority senior security interest in and lien upon all tangible and intangible prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, is not subject to (i) a valid, perfected and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, including, without limitation, any and all unencumbered cash of the Debtors and any investment of cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, goodwill, causes of action, insurance policies and rights, claims and proceeds from insurance, commercial tort claims and claims that may constitute commercial tort claims (known and unknown), chattel paper (including electronic chattel paper and tangible chattel paper), interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, equity |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
|  | interests of subsidiaries, joint ventures and other entities, wherever located, and the proceeds, products, rents and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise (the "**Unencumbered Property**"), in each case other than the Avoidance Actions (but, for the avoidance of doubt, subject to entry of the Final Order, "Unencumbered Property" shall include Avoidance Proceeds).<br><br>**Liens Junior to Certain Prepetition Liens**.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, automatically fully perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of each of the Debtors, which shall be immediately junior and subordinate to (i) valid, perfected and non-avoidable senior liens (other than the Primed Liens (as defined herein)) in existence immediately prior to the Petition Date and permitted by the terms of the **Prepetition Priority Bridge Loan Credit Documents**, and (ii) valid and non-avoidable senior liens (other than the Primed Liens) in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date, as permitted by section 546(b) of the Bankruptcy Code and the terms of the **Prepetition Priority Bridge Loan Credit Documents**; _provided_ that nothing in the foregoing clauses (i) and (ii) shall limit the rights of the DIP Lender under the DIP Loan Documents to the extent such liens are not permitted thereunder; and<br><br>b) **Liens Priming Prepetition Liens**.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, automatically fully-perfected first priority senior priming security interest in and lien upon all tangible and intangible prepetition and postpetition property of the Debtors subject to the Prepetition Liens, regardless of where located, regardless whether or not any liens on such assets are voided, avoided, invalidated, lapsed or unperfected (the "**Priming Liens**"), which Priming Liens shall prime in all respects the interests of the Prepetition Secured Parties arising from the current and future liens of the Prepetition Secured Parties (including, without limitation, the Adequate Protection Liens granted to the Prepetition Secured Parties) (the "**Primed Liens**").<br><br>_See_ Interim Order ¶¶ 6, 7. |
| **Adequate Protection**<br><br>_Bankruptcy Rule 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii)_ | Prepetition Adequate Protection Liens. The Prepetition Secured Parties are hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | agreements) in the amount of the Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all of the DIP Collateral (the "**Adequate Protection Liens**"), in each case senior to all other liens but subject and subordinate only to (A) the DIP Liens, (B) the Carve-Out, and (C) the respective Prepetition Permitted Prior Liens. |
| | Section 507(b) Claims.  The Prepetition Secured Parties are hereby granted, subject to the Carve-Out, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases as provided for in section 507(b) of the Bankruptcy Code in the amount of the Adequate Protection Claims, with, to the fullest extent permitted under the Bankruptcy Code, and subject to the next sentence, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**507(b) Claims**"), which 507(b) Claims shall be payable from all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding Avoidance Actions, but including, subject to entry of the Final Order, Avoidance Proceeds).  The 507(b) Claims shall be subject and subordinate only to the Carve-Out and the DIP Superpriority Claims.  Except to the extent expressly set forth in this Interim Order, the Final Order or the DIP Loan Documents, the Prepetition Secured Parties shall not receive or retain any payments, property or other amounts in respect of the 507(b) Claims unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) have indefeasibly been paid in cash in full and all DIP Commitments have been terminated. |
| | Fees and Expenses of Professionals.  Subject to Paragraph 12 of this Interim Order, the Debtors shall pay as adequate protection on a current basis all reasonable and documented fees, costs and expenses of professionals retained by the Prepetition Priority Bridge Loan Lender and Prepetition Junior Term Loan Lender, whether incurred prior to or after the Petition Date, which professionals shall be limited to (i) Maynard Nexsen PC, (ii) Young Conaway Stargatt & Taylor, LLP, and (iii) any required local counsel, subject to the consent of the Debtors (not to be unreasonably withheld) (such professionals, collectively, the "**Lender Professionals**"; the items payable pursuant to this subparagraph (c) are referred to as the "**Adequate Protection Fees and Expenses**"). |
| | *See* Interim Order ¶ 13. |
| **Marshalling** | Subject to entry of the Final Order granting such relief, in no event shall the DIP Lender or the Prepetition Secured Parties be subject to the |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| *Local Bankruptcy Rule 4001-2(a)(i)(X)* | equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, the Prepetition Loans, or the Prepetition Collateral. Further, subject to entry of the Final Order, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Secured Parties with respect to proceeds, products, offspring or profits of any Prepetition Collateral.<br><br>*See* Interim Order ¶ 9. |
| **Debtors' Stipulations**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(iii); Local Bankruptcy Rule 4001-2(a)(i)(Q)* | Subject only to the limitations contained in Paragraph 17 of the Interim Order, the Debtors admit, stipulate and agree that:<br><br>a) *Prepetition Priority Bridge Loan Facility.* Pursuant to that certain Credit Agreement, dated as of November 14, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "**Prepetition Priority Bridge Loan Credit Agreement**" and, together with all related Credit Documents (as defined therein), the "**Prepetition Priority Bridge Loan Credit Documents**" and the loans issued pursuant thereto, the "**Prepetition Priority Bridge Loans**"), by and among Nicklaus Companies, LLC, as borrower, and the Debtors acting as guarantors thereunder (collectively in such capacities, the "**Prepetition Priority Bridge Loan Obligors**") and FundNick, LLC (in such capacity, the "**Prepetition Priority Bridge Loan Lender**"), the Prepetition Priority Bridge Loan Lender has extended the Prepetition Priority Bridge Loans for the benefit of the Prepetition Priority Bridge Loan Obligors.<br><br>b) *Prepetition Priority Bridge Loan Obligations.* The Prepetition Priority Bridge Loan Obligors are lawfully indebted and liable to the Prepetition Priority Bridge Loan Lender without defense, challenge, objection, claim, counterclaim, or offset of any kind, in the aggregate principal amount as of the Petition Date of not less than $3,730,000 in principal amount of senior loans, including accrued and unpaid interest thereon (for the avoidance of doubt, excluding any make whole or similar premium), plus premiums, costs, fees, expenses, and any other amounts, liabilities, or obligations of whatever nature, whenever arising or accruing (whether before or after the Petition Date), that may be due, owing, or chargeable in connection therewith, in each case, as and to the extent provided in the Prepetition Priority Bridge Loan Credit Documents (collectively, the "**Prepetition Priority Bridge Loan Obligations**").<br><br>c) *Prepetition Priority Bridge Loan Liens.* Prior to the Petition Date, to secure the Prepetition Priority Bridge Loan Obligations, |

RLF1 34181772v.10

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | the Prepetition Priority Bridge Loan Obligors granted the Prepetition Priority Bridge Loan Lender valid, binding, non-avoidable, properly perfected and enforceable first priority continuing liens on and security interests in the "Collateral" as defined in the Prepetition Priority Bridge Loan Credit Agreement, including, for the avoidance of doubt, Cash Collateral (such liens and security interests collectively, the "**Prepetition Priority Bridge Loan Liens**", and such collateral the "**Prepetition Priority Bridge Loan Collateral**"). |
| | d) *Validity, Perfection and Priority of Prepetition Priority Bridge Loan Liens and Prepetition Priority Bridge Loan Obligations.* The Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition Priority Bridge Loan Liens on the Prepetition Priority Bridge Loan Collateral were valid, binding, enforceable, non-avoidable and properly perfected and were granted to the Prepetition Priority Bridge Loan Lender for fair consideration and reasonably equivalent value; (b) the Prepetition Priority Bridge Loan Liens were senior in priority over any and all other liens on the Prepetition Priority Loan Collateral, subject only to certain senior liens permitted under the Prepetition Priority Bridge Loan Credit Documents (solely to the extent any such liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Priority Bridge Loan Liens as of the Petition Date, the "**Prepetition Priority Bridge Loan Permitted Prior Liens**"); (c) the Prepetition Priority Bridge Loans constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Priority Bridge Loan Obligors, enforceable in accordance with the terms of the applicable Prepetition Priority Bridge Loan Credit Documents; and (d) no offsets, recoupments, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Priority Bridge Loan Liens or Prepetition Priority Bridge Loans exist, and no portion of the Prepetition Priority Bridge Loan Liens or Prepetition Priority Bridge Loans is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (e) the Debtors waive, discharge, and release any right to challenge any of the Prepetition Priority Bridge Loans, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the Prepetition Priority Bridge Loan Liens securing the Prepetition Priority Bridge Loans. |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | e) *Release of Prepetition Priority Lender Parties.* Each of the Debtors and the Debtors' estates, on its and their own behalf and on behalf of its and their respective past, present and future predecessors, heirs, successors, subsidiaries, and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the Prepetition Priority Bridge Loan Lender (solely in its respective capacity as such) and each of its respective affiliates, subsidiaries, and Representatives (as defined herein) (each solely in their respective capacities as such) (collectively, the "**Prepetition Priority Bridge Loan Released Parties**"), from any and all (a) obligations and liabilities to the Debtors (and their successors and assigns) and (b) claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract or tort or under any state or federal law or otherwise, in each case arising out of or related to (as applicable) the Prepetition Priority Bridge Loan Credit Documents, the DIP Loan Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions and agreements reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter can or may have against any of the Prepetition Priority Bridge Loan Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order. <br><br> f) *Prepetition Junior Term Loan Facility.* Pursuant to that certain Credit Agreement, dated as of November 14, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "**Prepetition Junior Term Credit Agreement**" and, together with all related Credit Documents (as defined therein), the "**Prepetition Junior Term Loan Documents**" and the loans issued pursuant thereto, the "**Prepetition Junior Term Loans**") by and among ), by and among Nicklaus Companies, LLC, as borrower, and the Debtors acting as guarantors thereunder (collectively, in such capacities, the "**Prepetition Junior Term Loan Obligors**") and PMP NICK, LLC (formerly known as Emigrant GB, LLC) (in such capacity, the |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | "**Prepetition Junior Term Loan Lender**"), the Prepetition Junior Term Loan Lender has extended the Prepetition Junior Term Loans for the benefit of the Prepetition Junior Term Loan Obligors.   The "**Prepetition Loan Documents**" consist of the Prepetition Priority Bridge Loan Credit Documents and Prepetition Junior Term Loan Documents; the "**Prepetition Loans**" consist of the Prepetition Priority Bridge Loans and the Prepetition Junior Term Loan; the "**Prepetition Secured Parties**" consist of the Prepetition Priority Bridge Loan Lender and the Prepetition Junior Term Loan Lender. |
| | g) *Prepetition Junior Term Loan Obligations*.  The Prepetition Junior Term Loan Obligors are lawfully indebted and liable to the Prepetition Junior Term Loan Lender without defense, challenge, objection, claim, counterclaim, or offset of any kind, in the aggregate amount as of the Petition Date of not less than $452,080,733, for principal and accrued and unpaid interest thereon (for the avoidance of doubt, excluding any make whole or similar premium), plus premiums, costs, fees, expenses, and any other amounts, liabilities, or obligations of whatever nature, whenever arising or accruing (whether before or after the Petition Date), that may be due, owing, or chargeable in connection therewith, in each case, as and to the extent provided in the Prepetition Junior Term Loan Documents (collectively, the "**Prepetition Junior Term Loan Obligations**").  The "**Prepetition Secured Obligations**" consist of the Prepetition Priority Bridge Loan Obligations and (subject to any successful Challenge, as provided for in Paragraph 17 of this Interim Order) the Prepetition Junior Term Loan Obligations. |
| | h) *Prepetition Junior Term Loan Liens*.  Prior to the Petition Date, to secure the Prepetition Junior Term Loan Obligations, the Prepetition Junior Term Loan Obligors granted the Prepetition Junior Term Loan Lender valid, binding, non-avoidable, properly perfected and enforceable first priority continuing liens on and security interests in the "Collateral" as defined in the Prepetition Junior Term Loan Agreement, including, for the avoidance of doubt, Cash Collateral (such liens and security interests collectively, the "**Prepetition Junior Term Loan Liens**", and such collateral the "**Prepetition Junior Term Loan Collateral**").  The "**Prepetition Liens**" shall consist of the Prepetition Priority Bridge Loan Liens and (subject to any successful Challenge, as provided for in Paragraph 17 of this Interim Order) the Prepetition Junior Term Loan Liens; the "**Prepetition Collateral**" shall consist of the Prepetition Priority Bridge Loan Collateral and (subject to any successful |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
|  | Challenge, as provided for in Paragraph 17 of this Interim Order) the Prepetition Junior Term Loan Collateral.  For the avoidance of doubt, the Prepetition Junior Term Loan Liens and the Prepetition Junior Term Loan Collateral shall exclude (i) any lien and all rights in Collateral that has been voided after a Challenge, or has been agreed in writing by the Prepetition Junior Term Loan Lender to be void or voidable, and (ii) the Collateral against which such lien or security interest attaches. |
|  | i) *Validity, Perfection and Priority of Prepetition Junior Term Loan Liens and Prepetition Junior Term Loan Obligations*.  The Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition Junior Term Loan Liens on the Prepetition Junior Term Loan Collateral were valid, binding, enforceable, non-avoidable and properly perfected and were granted to the Prepetition Junior Term Loan Lender for fair consideration and reasonably equivalent value; (b) the Prepetition Junior Term Loan Liens were senior in priority over any and all other liens on the Prepetition Junior Term Loan Collateral, subject only to (1) the Prepetition Junior Term Loan Liens and (2) certain senior liens permitted under the Prepetition Junior Term Loan Documents (solely to the extent any such liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Junior Term Loan Liens as of the Petition Date, the "**Prepetition Junior Term Loan Permitted Prior Liens**" and with the Prepetition Priority Bridge Loan Permitted Prior Liens, the "**Prepetition Permitted Prior Liens**"); (c) the Prepetition Priority Bridge Loans constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Junior Term Loan Obligors, enforceable in accordance with the terms of the applicable Prepetition Junior Term Loan Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Junior Term Loan Liens or Prepetition Junior Term Loans exist, and no portion of the Prepetition Junior Term Loan Liens or Prepetition Junior Term Loans is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (e) the Debtors waive, discharge, and release any right to challenge any of the Prepetition Junior Term Loans, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the Prepetition Junior Term Loan Liens securing the Prepetition Junior Term Loans. |

RLF1 34181772v.10

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
|  | j) *Release of Prepetition Junior Term Loan Lender Parties.* Effective as of the expiration of the Challenge Period (as defined herein) and subject to any Challenge (as defined herein) brought in accordance with Paragraph 17 of this Interim Order, each of the Debtors and the Debtors' estates, on its and their own behalf and on behalf of its and their respective past, present and future predecessors, heirs, successors, subsidiaries, and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the Prepetition Junior Term Loan Lender (solely in its respective capacity as such) and each of its respective affiliates, subsidiaries, and Representatives (as defined herein) (each solely in their respective capacities as such) (collectively, the "**Prepetition Junior Term Loan Released Parties**"), from any and all (a) obligations and liabilities to the Debtors (and their successors and assigns) and (b) claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract or tort or under any state or federal law or otherwise, in each case arising out of or related to (as applicable) the Prepetition Priority Bridge Loan Documents, the DIP Loan Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions and agreements reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter can or may have against any of the Prepetition Junior Term Loan Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order.<br><br>*See* Interim Order ¶ G. |
| **Waiver or Modification of Automatic Stay**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(iv)* | Immediately upon the occurrence and during the continuation of an Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of the DIP Loan Documents and this Interim Order, including the Remedies Notice Period for the exercise of remedies other than the following (i) the DIP Lender may declare, which declaration shall be in writing and delivered by email and overnight mail to the Debtors, any Creditors' Committee, and the U.S. Trustee (any such declaration shall be referred to herein as a "**Termination Declaration**" and the date on which a Termination |

| Bankruptcy Rule | Summary of Material Terms |
| --- | --- |
| | Declaration is delivered, the "**Termination Date**") (A) all DIP Obligations owing under the DIP Loan Documents to be immediately due and payable, (B) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the DIP Facility, (C) termination of the DIP Facility and the DIP Loan Documents as to any future liability or obligation of the DIP Lender, but without affecting any of the DIP Liens or the DIP Obligations, and (D) the Termination Declaration shall be deemed a Carve-Out Trigger Notice to the DIP Borrower; and (ii) the DIP Lender or, subject to Paragraph 7(a) of this Interim Order, the Prepetition Secured Parties may declare a termination, reduction or restriction on the ability of the Debtors to use Cash Collateral by delivering a Termination Declaration, and the right of the Prepetition Secured Parties to terminate, reduce, or restrict the use of Cash Collateral shall continue following termination of the DIP Credit Agreement, with each reference to "Event of Default" deemed a reference to the Events of Default under the DIP Credit Agreement as of the date of this Interim Order.  The Automatic Stay in the Chapter 11 Cases otherwise applicable to the DIP Lender is hereby modified so that five (5) calendar days after a Termination Date (the "**Remedies Notice Period**"):  (a) the DIP Lender shall be entitled to exercise all of its rights and remedies in accordance with the DIP Loan Documents and this Interim Order to satisfy the DIP Obligations, DIP Superpriority Claims, and DIP Liens, including (subject to (i) funding the Carve-Out and Professional Fees Escrow Account in accordance with Paragraph 4 of this Interim Order, and (ii) payment of all accrued but unpaid wages and benefits to the Debtors' employees incurred prior to and through the expiration of the Remedies Notice Period) (w) freeze or sweep monies or balances in the Debtors' accounts; (x) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Lender against the DIP Obligations; (y) enforce any and all rights against DIP Collateral, including, without limitation, foreclosure on all or any portion of the DIP collateral, occupying the Debtors' premises, sale or disposition of the DIP Collateral; and (z) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Loan Documents or applicable law and (b) subject to the foregoing clause (a), the entry of the Final DIP Order, and to any Challenge, the Prepetition Secured Parties shall be entitled to exercise their rights and remedies to the extent available in accordance with the applicable Prepetition Loan Documents and this Interim Order with respect to the Debtors' use of Cash Collateral.  During the Remedies Notice Period, the Debtors and other parties in interest shall be entitled to seek (and the DIP Lender and Prepetition Secured Parties shall consent to) an emergency hearing within the Remedies Notice Period with the Court.  Unless the Court orders otherwise prior to the |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | expiration of the Remedies Notice Period, the Automatic Stay as to the DIP Lender and the Prepetition Secured Parties shall automatically be terminated at the end of the Remedies Notice Period without further notice or order.  Upon expiration of the Remedies Notice Period, absent order of the Court to the contrary, the DIP Lender and the Prepetition Secured Parties shall be permitted to exercise all remedies set forth herein, and in the DIP Loan Documents and Prepetition Documents, and as otherwise available at law without further order of or application or motion to this Court consistent with this Interim Order.<br><br>*See* Interim Order ¶ 7(e). |
| **Milestones**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(i)(H)* | Borrower and its Subsidiaries each agree that they shall take all actions necessary to cause each of the following to occur:<br><br>a) no later than five (5) Business Days after the Petition Date, the Interim DIP Order shall be entered by the Bankruptcy Court;<br><br>b) no later than December 12, 2025, the Debtors shall file one or more motions seeking entry of orders authorizing and approving bid and sale procedures for all or substantially all of the Debtors' assets (the "**Bidding Procedure Motion**"), in form and substance reasonably acceptable to DIP Lender;<br><br>c) no later than January 9, 2026, the Final DIP Order shall be entered by the Bankruptcy Court; and<br><br>d) no later than January 9, 2026, the Bankruptcy Court shall have entered one or more orders, in form and substance reasonably acceptable to DIP Lender, approving the bid and sale procedures requested in the Bidding Procedure Motion following the Petition Date.<br><br>*See* DIP Credit Agreement § 7.11. |
| **Effect of Debtors' Stipulations on Third Parties / Challenges**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(iii)* | <u>No Challenge to Stipulations Regarding Prepetition Priority Loan Facility</u>.  The Debtors' stipulations, admissions, agreements and releases contained in Paragraphs G(a) through (e) of this Interim Order shall be binding upon the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases and any other person or entity acting or seeking to act on behalf of the Debtors' estates in all circumstances and for all purposes upon the entry of this Interim Order. |

| Bankruptcy Rule | Summary of Material Terms |
| --- | --- |
| | <u>Third Party Challenges to Remaining Stipulations</u>.  The stipulations, admissions, agreements and releases contained in Paragraphs G(f) through (j) of this Interim Order shall be binding upon the Debtors and all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases and any other person or entity acting or seeking to act on behalf of the Debtors' estates in all circumstances and for all purposes unless (a) the Debtors, such committee, or any other party in interest with requisite standing (in each case, to the extent requisite standing is obtained pursuant to an order of this Court entered prior to the expiration of the Challenge Period (as defined herein) and subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so) has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, inter alia, in this paragraph) by no later than 75 calendar days after entry of this Interim Order (such time period, the "**Challenge Period**"), (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Junior Term Loan Obligations or the Prepetition Junior Term Loan Liens, or (B) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "**Challenges**") against the Prepetition Junior Term Loan Lender or its subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (each, a "**Representative**" and, collectively, the "**Representatives**") in connection with matters related to the Prepetition Junior Term Loan Documents, the Prepetition Junior Term Loan Obligations, the Prepetition Junior Term Loan Liens and the Prepetition Junior Term Loan Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter.  In the event that a chapter 7 or chapter 11 trustee is appointed prior to the end of the Challenge Period, the Challenge Period solely for such chapter 7 or chapter 11 trustee shall be extended to the longer of (A) the remaining Challenge Period or (B) the date that is twenty-one (21) calendar days following the appointment of such trustee.<br><br><u>Debtors' Challenge Rights for Remaining Stipulations</u>.  For the avoidance of doubt, the Debtors' stipulations, admissions, agreements and releases contained in Paragraphs G(f) through (j) of this Interim Order shall be binding upon the Debtors and any successor thereto |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors), unless: (a) the Debtors institute a Challenge before the expiration of the Challenge Period and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter. Notwithstanding the foregoing, the Debtors may also revoke, limit or modify any Stipulation set forth in Paragraphs G(f) through (j) of this Interim Order with the express written consent of the Prepetition Junior Term Loan Lender. For the avoidance of doubt, the special committee of the Board of Managers of Nicklaus Companies, LLC (the "Special Committee") is empowered and authorized to investigate the matters contemplated in the stipulations, agreements, and releases contemplated in paragraphs G(f) through (j), and has waived no rights, claims, causes of action, or otherwise on account of the filing of the DIP Motion, entry of this Interim Order, or entry into any DIP Document. <br><br> *See* Interim Order ¶ 17. |
| **Indemnification** <br><br> *Bankruptcy Rule 4001(c)(1)(B)(ix)* | The Debtors shall indemnify DIP Lender (and any sub-agent thereof) and each Related Party of any of the foregoing Persons (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the reasonable out-of-pocket fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any Person (including any Obligor) other than such Indemnitee or its Related Parties arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Credit Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) the Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by any Debtor, or any Environmental Liability related in any way to Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by Borrower or any of its Subsidiaries, and regardless of whether any Indemnitee is a party thereto, *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee, |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | (y) result from a claim brought by any Debtor against an Indemnitee for a material breach of such Indemnitee's obligations hereunder or under any other Credit Document, if such Debtor has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction, or (z) arise out of any investigation, litigation or proceeding that does not involve an act or omission by Borrower or any Subsidiary of Borrower and arises solely from a dispute among Indemnitees (except when and to the extent that one of the parties to such dispute was acting in its capacity as an agent, arranger, bookrunner or other agency capacity and, in such case, excepting only such party). Section 10.2 shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim. <br><br> *See* DIP Credit Agreement § 10.2(b). <br><br> <u>Indemnification</u>.  The Prepetition Secured Parties and the DIP Lender have acted in good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens, any challenges or objections to the DIP Facility or the use of Cash Collateral, the DIP Loan Documents, and all other documents related to and all transactions contemplated by the foregoing.  Accordingly, without limitation to any other right to indemnification, the Prepetition Secured Parties and the DIP Lender shall be and hereby are indemnified (as applicable) as provided in the Prepetition Loan Documents and DIP Loan Documents, as applicable, including, without limitation, Section 10.2 of the DIP Credit Agreement.  The Debtors agree that no exception or defense in contract, law, or equity exists as of the date of this Interim Order to any obligation set forth, as the case may be, in this Paragraph 20 or otherwise in the DIP Loan Documents or in the Prepetition Loan Documents to indemnify and/or hold harmless the DIP Lender or the Prepetition Secured Parties, as the case may be, and any such defenses that may be in existence as of the date of this Interim Order are hereby waived. <br><br> *See* Interim Order ¶ 20 |
| **Section 506(c) Waiver** <br><br> *Bankruptcy Rule 4001(c)(1)(B)(x); Local Bankruptcy Rule 4001-2(a)(i)(V)* | Subject to entry of the Final Order granting such relief, except to the extent of the Carve-Out, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or |

RLF1 34181772v.10

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | recovered from (i) the DIP Collateral (including Cash Collateral) with respect to the DIP Lender or (ii) the Prepetition Collateral (including Cash Collateral) with respect to the Prepetition Secured Parties, pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender or the Prepetition Secured Parties, as applicable, and no consent shall be implied from any other action, inaction or acquiescence by the DIP Lender or the Prepetition Secured Parties, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Lender or the Prepetition Secured Parties to any charge, lien, assessment or claims against the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise. <br><br> *See* DIP Credit Agreement § 8 |
| **Liens on Avoidance Actions** <br><br> *Bankruptcy Rule 4001(c)(1)(B)(xi); Local Bankruptcy Rule 4001-2(a)(i)(U)* | The DIP Collateral shall not include liens on Avoidance Actions. However, upon entry of the Final Order, the DIP Liens, Adequate Protection Liens and Superpriority Claims shall attach to proceeds on avoidance actions. <br><br> *See* Interim Order ¶ 6(d) |

| | |
|---|---|
| Fees<br><br>*Bankruptcy Rule 4001(c)(1); Local Bankruptcy Rule 4001-2(a)(i)(B)* | <u>Payment and Review of Lender Professional Fees</u>.  The Debtors are authorized and directed to pay the DIP Fees and Expenses and the Adequate Protection Fees and Expenses (as defined below). Subject to the review procedures set forth in this paragraph 12, the Lender Professionals shall not be required to file applications with the Court or and their fees and expenses shall not be subject to allowance or review by the Court.  The Lender Professionals shall not be required to comply with the U.S. Trustee's fee guidelines with respect to their fees and expenses; however, any time that any such professional seeks payment of fees and expenses from the Debtors from the period from the Interim Closing Date to confirmation of a chapter 11 plan, each such professional shall provide summary copies of its invoices (including aggregate amounts of fees and expenses and total amount of time on a per-professional basis), which are not required to contain time detail and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, to counsel to the Debtors, counsel to the Creditors' Committee, and the U.S. Trustee (together, the "Review Parties"); provided, however, that the provision of such invoices shall not constitute a waiver of the attorney client privilege or of any benefits of the attorney work product doctrine or any other evidentiary privilege or protection recognized under applicable law; and provided, further that, the Review Parties shall have the right to request additional details regarding the services rendered and expenses incurred by such professionals (each, an "Information Request").  Any objections raised by any Review Party with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the applicable Lender Professional within ten (10) calendar days after receipt (the "Review Period"), which shall not be extended by the delivery of an Information Request.  If no written objection is received by 12:00 p.m., prevailing Eastern Time, on the last date of the Review Period, the Debtors shall pay such invoices within five (5) business days.  If an objection to a Lender Professional's invoice is received within the Review Period, the Debtors shall promptly pay the undisputed portion of the invoice without the necessity of filing any pleading with the Court, and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually.  Notwithstanding the foregoing, the Debtors are authorized and directed to pay, on or prior to the Closing Date (as defined in the DIP Credit Agreement), any and all costs, fees, expenses of the Lender Professionals required to be paid under the DIP Credit Agreement as a condition to the Closing Date occurring and without subjecting such amount to a Review Period.<br><br>*See* Interim Order ¶ 12 |

| Bankruptcy Rule | Summary of Material Terms |
| --- | --- |
| | <u>Fees and Expenses</u>. All reasonable and documented fees and out-of-pocket expenses (whether incurred prepetition or post-petition) of the Lender Professionals that have been invoiced relating to the Chapter 11 Cases, the DIP Loan, the Prepetition Priority Bridge Loan Facility and the Prepetition Junior Term Loan Facility and such invoice has been delivered to the Debtors at least one (1) Business Day before the Interim Closing Date, shall have been paid in full (or will be paid in connection with such Interim DIP Loan draw) in accordance with the terms of the Interim DIP Order.<br><br>*See* DIP Credit Agreement § 5.1(i)<br><br><u>Costs and Expenses</u>. The Debtors shall pay (i) all reasonable and documented out of pocket professional fees, cost and expenses incurred by DIP Lender and its Affiliates (on account of the reasonable and documented out-of-pocket fees, charges and disbursements of the Lender Professionals of the DIP Lender) relating to the Chapter 11 Cases, this Agreement and the DIP Loan and (ii) all reasonable and documented out of pocket expenses incurred by DIP Lender (on account of the reasonable and documented out-of-pocket fees, charges and disbursements of the Lender Professionals of the DIP Lender) in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Credit Documents, including its rights under Section 10.2, or (B) in connection with the Loan made hereunder, including all such reasonable and documented out of pocket expenses incurred during any workout, restructuring or negotiations in respect of the Loan; in each case, subject to the terms of the applicable Financing Orders, including any required notice and objection periods set forth in the applicable Financing Order; provided, that such payment shall be payable upon receipt by Borrower of a summary invoice and without the requirement for Bankruptcy Court approval. A copy of each such summary invoice without narratives or individual billers, for fees, costs and expenses of the DIP Lender shall be provided by the DIP Lender to the Debtors, the U.S. Trustee and counsel to the creditors committee (if any).<br><br>*See* DIP Credit Agreement § 10.2 |

**The Debtors' Prepetition Funded Debt**

10.    As summarized below, the Debtors have approximately $493 million of outstanding funded indebtedness obligations comprised of approximately (i) (a) $145 million in borrowings under the Prepetition Junior Term Loans  and (b) $8.5 million under the Prepetition

Revolving Credit Facility, each of which were entered into in connection with the May 2007 Transaction, (ii) approximately $307 million of payment-in-kind notes ("**PIK Notes**") paid to the Prepetition Junior Term Loan Lender under the Prepetition Junior Term Loans, (iii) $15.6 million payable pursuant to the Prepetition Master Note and Prepetition Aircraft Financing Facility, (iv) $3.2 million payable under the Prepetition A/R Facility, and (v) $3.7 million under the Prepetition Priority Bridge Loan. The estimated aggregate outstanding amount of each debt obligation is as follows:

| Debt Instrument | Outstanding<br>(in millions USD) as of 11/16/25 |
|---|---|
| 2007 Prepetition Junior Term Loan Agreement (including PIK Notes) | $462,248,071 |
| 2007 Prepetition Revolving Credit Facility | $8,482,356 |
| 2006 Prepetition Aircraft Financing Facility | $968,110 |
| 2021 Prepetition Master Note | $14,587,891 |
| 2011 Prepetition A/R Facility | $3,156,057 |
| 2025 Prepetition Priority Bridge Loan Credit Agreement | $3,730,000 |
| Total | $493,172,485 |

### The Debtors' Prepetition and Postpetition Liquidity Needs

11.     As is set forth in greater detail in the First Day Declaration, the Company has been embroiled in a multi-year litigation with Mr. Nicklaus that recently resulted in a $50 million Jury Award against the Company.  That award paired with the Company's substantial long-term funded debt obligations and litigation costs has significantly impacted the Company's liquidity, and as a result, as of the Petition Date, the Company is substantially over-levered and unable to address its debt obligations and litigation. These factors have significantly limited the financial flexibility that the Debtors require to invest in and grow their businesses and the ability to translate brand value into significant revenue growth.

12.     As discussed in greater detail in the First Day Declaration, after the Jury Award, the Company retained various advisors to explore strategic alternatives, including options to manage its funded debt, litigation, and other liabilities.  The Board also formed the Special Committee and appointed two independent and disinterested managers to the Board and the Special Committee and delegated broad authority to the Special Committee to oversee the Company's restructuring efforts.

13.     Soon after the Company engaged advisors and formed the Special Committee, it became clear that any strategic alternative, transaction or restructuring, including a potential chapter 11 filing, would require additional funding beyond the Company's cash and operating receipts.  Given the Company's existing capital and debt structure and urgent need for additional financing, the Company's existing lenders were a natural choice to solicit their interest in providing the Company with much-needed funding.

14.     To that end, the Company, at the direction of the Special Committee, engaged with FundNick to gauge its interest in providing financing that would stabilize the Company and provide the Company with the time needed to consider which strategic alternative was the optimal path forward for the Company while it defended the Florida Action.  In response, the Company received a proposal from FundNick for a multiple draw term loan facility (the "**Prepetition Priority Bridge Loans**") with an initial funded amount of approximately $3.1 million and a delayed draw commitment of $2.4 million.  The Prepetition Priority Bridge Loans were negotiated by, and approved by, the Special Committee, with the assistance of the Company's advisors. The Special Committee ultimately decided that entry into the Prepetition Priority Bridge Loans was in the best interest of the Company because without it, the Company would have no opportunity to defend itself in the Florida Action and little to no chance at pursuing a process that could save the

Company and protect the more than 30 employees and contractors who have continued their tireless efforts to grow the Company to where it is today.  Moreover, the Prepetition Priority Bridge Loans were provided on extremely favorable terms.  Among other things, there were no fees (including no upfront, commitment or similar fees) incurred in connection with such loans, the interest rate was below market (at 8.5% per annum) and payable in kind, and the maturity date (at one year) was lengthy.

15.     After closing on the Prepetition Priority Bridge Loans and with the liquidity runway and breathing room provided by such facility, the Debtors, at the direction of the Special Committee, engaged in contingency planning for a chapter 11 filing to address the various issues facing the Company, and determined that any such filing would require DIP Financing. As a result, the Company, acting at the direction of the Special Committee, turned its attention to obtaining DIP Financing.  Accordingly, Cassel Salpeter & Co. ("**CS**"), the Debtors' proposed investment banker, began marketing the DIP financing opportunity to third parties. In parallel, the Special Committee, with the assistance of the Company's advisors, began negotiating the terms of the DIP Financing with FundNick and its independent advisors. As discussed below, those efforts, resulted in the Special Committee determining that the DIP Facility was not only the best financing available, but it was the only financing available.

16.     Accordingly, the Company, acting at the direction of the Special Committee, ultimately decided that entry into the DIP Facility was in the best interest of the Company. The terms of the DIP Facility were the product of good faith, arm's length negotiations between the Company, acting at the direction of the Special Committee, on the one hand, and FundNick, on the other hand, and provides the Company with the liquidity needed to stabilize the Company and

enter these chapter 11 cases in an orderly fashion in order to pursue a value maximizing sale or reorganization transaction for the benefit of all stakeholders.

**Alternative Sources of Financing Are Not Available Given the Circumstances**

17.     Leading up to the Petition Date, and at the direction and under the supervision of the Special Committee, CS solicited interest in DIP Financing from a large set of prospective third-party lenders. All such parties were offered the opportunity to refinance the Prepetition Priority Bridge Loans and provide post-petition financing on the same or better terms as the DIP Financing being offered by FundNick.  In total, CS contacted 13 potential lenders, of which none were willing to move forward with an actionable proposal.  During CS's discussions with potential financing partners, the following reasons were voiced as a basis for their inability to commit to providing the requested DIP Financing, including: (a) the extremely competitive interest rate and lack of any fees proposed by the incumbent prepetition lender, (b) a lack of opportunity to earn fees and interest due to the small size of the DIP Facility and extremely competitive economic proposal provided by the incumbent prepetition lender, (c) the lack of substantial hard assets that can serve as collateral given that the Company's most valuable assets are intangibles, such as intellectual property and customer relationships, and (d) the need to move quickly and devote significant resources to diligence the opportunity, particularly given the limited economic opportunity.  The Company, through counsel, also reached out to counsel to Mr. Nicklaus to solicit his interest in exploring the opportunity to provide DIP Financing — however, Mr. Nicklaus' counsel has not responded to such outreach as of the date hereof.

18.     Given the Debtors' prepetition capital structure and the challenges facing their business, as well as the proposed terms of the DIP Facility, the Debtors believe the proposed DIP Facility represents the best and only postpetition financing option currently available to the

Debtors.  As noted herein, the DIP Facility's low interest rate and exclusion of fees typically included in DIP Financings are terms that are easily better than market terms.  After extensive discussion with the Company's advisors, the Special Committee affirmed that entry into the DIP Facility with the DIP Lender represented the optimal path forward, particularly given the DIP Lender's willingness to provide the DIP Financing on favorable terms and the lack of any alternative.

19.     While it is unlikely that any other party will be willing to offer DIP financing on the same or better terms, CS, at the direction and under the supervision of the Special Committee, intends to continue marketing the DIP Financing after the first day hearing to third party financing sources to determine whether ahead of the final hearing on the DIP Facility, any third parties will be willing to refinance out the interim DIP Financing on better terms than the DIP Facility.

### Relief Requested Should Be Granted

I.    **The Debtors Should be Authorized to Obtain Postpetition Financing.**

A.    **Entering into the DIP Credit Agreement Reflects Debtors' Reasonable Business Judgment**

20.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Loan Documents and obtain access to the DIP Facility. Courts grant considerable deference to a debtors' business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del 1994) (noting that the interim loan, receivable facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment reasonable under the circumstances and in the best interests of TWA and its creditors"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under

section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

21.     Specifically, to determine whether a debtor has met this business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

22.     Here, the Debtors' determination, by and through the Special Committee, to move forward with the DIP Facility is a sound exercise of their business judgment following a thorough process and careful evaluation of the availability and viability of alternatives likely to result in a favorable outcome given their needs.  Specifically, the Debtors and their advisors determined that the Debtors would require postpetition financing to support the administration of their chapter 11 cases, pursue a marketing and sale process or reorganization transaction, and address the litigation claims asserted against the Debtors. *See* Cassel Decl. ¶ 7. The Debtors, acting at the direction of the Special Committee, negotiated the DIP Loan Documents with the DIP Lender in good faith, at arm's length, and with the assistance of their advisors, and the Debtors believe that they have obtained the best and only financing result given the circumstances. *See* Cassel Decl. ¶¶ 10, 11, 13.

**B.     The Debtors' Proposed Refinancing of the Prepetition Priority Bridge Loans Should Be Approved.**

23.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  It is well settled in

RLF1 34181772v.10

the Third Circuit that such transactions should be approved when they are supported by a sound

business purpose. *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986) (holding that in the

Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b)

of the Bankruptcy Code should be approved if the debtor can demonstrate a sound business

justification for the proposed transaction).   The business judgment rule shields a debtor's

management from judicial second-guessing. *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16

(Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business

by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

24.    Repayment or a roll-up exchange is a common feature in debtor-in-possession

financing arrangements. The importance of such features in DIP facilities has been repeatedly

recognized by courts in this district and others, and such courts have granted relief similar to the relief

requested herein. *See, e.g.*, *In re Vyaire Med., Inc.*, No. 24-11217 (BLS) (Bankr. D. Del. June 10,

2024) (authorizing a $180 million DIP facility, including a $135 million roll-up (3:1 roll-up)); *In re

Thrasio Holdings, Inc.*, No. 24-11840 (CMG) (Bankr. D.N.J. April 4, 2024) (authorizing a $270

million DIP facility, including a $90 million roll-up of the prepetition debt obligations (3:1 roll-up));

*In re Sientra, Inc.*, No. 24-10245 (JTD) (Bankr. D. Del. Mar. 11, 2024) (authorizing a $90 million

DIP facility, including a $67 million roll-up of the prepetition debt obligations (2.9:1 roll-up)); *In re

Yellow Corp.*, No. 23-11069 (CTG) (Bankr. D. Del. Sept. 15, 2023) (authorizing an approximately

$644 million DIP facility, including a $501 million roll-up of the prepetition debt obligations

(approximately 3.5:1 roll-up)); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (D.N.J. June 14,

2023) (authorizing an approximately $240 million DIP facility, including a $200 million roll-up of

prepetition debt obligations (5:1 roll-up)).

25.     As set forth above, the DIP Credit Agreement provides that upon entry of the Interim Order, the Debtors shall be authorized to refinance all prepetition amounts outstanding under the Prepetition Priority Bridge Loans (the "**Prepetition Priority Bridge Loan Refinancing**"). The Prepetition Priority Bridge Loan Refinancing is a material component of the structure of the DIP Facility and was a condition precedent to the DIP Lenders' commitment to provide the DIP Financing.  As noted herein, the Debtors were unable to secure an offer for debtor-in-possession financing on similar terms from the DIP Lender that did not provide for the refinancing of the Prepetition Priority Bridge Loans.

26.     The Debtors have determined that refinancing Prepetition Priority Bridge Loans as part of the DIP Facility is necessary to obtain access to the liquidity required to preserve the value of the Debtors' businesses for the benefit of these chapter 11 estates.  Refinancing the Prepetition Priority Bridge Loans benefits the estates by allowing the Debtors to access the liquidity necessary to successfully transition into chapter 11 and pursue a value-maximizing sale or restructuring strategy.  Indeed, the Prepetition Priority Bridge Loan Refinancing merely affects the timing, not the amount or certainty of the Prepetition Priority Bridge Loan Lender's recovery.  Additionally, the Prepetition Priority Bridge Loan Refinancing does not adversely affect junior creditors because the Prepetition Priority Bridge Loan Refinancing does not increase the amount of senior secured debt.  Further, the interest rate under Prepetition Priority Bridge Loans is greater than the DIP Loans. Moreover, the Prepetition Priority Bridge Loan Lender provided the Prepetition Priority Bridge Loans as an accommodation to provide the Debtors with sufficient liquidity to, among other things, (i) maintain critical business relationships with, among others, their vendors, suppliers and employees, (ii) satisfy other working capital and operational needs, and (iii) otherwise permit the Debtors to enter chapter 11 in as smooth and orderly a fashion as possible under the circumstances.

RLF1 34181772v.10

Importantly, that accommodation ultimately inured to the benefit of all of the Debtors' stakeholders because it allowed the Debtors to avoid entering chapter 11 in a stabilizing manner with financing (as opposed to a "free fall" with no access to cash). Accordingly, the Debtors submit that the Prepetition Priority Bridge Loan Refinancing is reasonable, appropriate, and a sound exercise of their business judgement, and that the Court should, therefore, approve the Debtors' decision to enter into the DIP Facility, including the Prepetition Priority Bridge Loan Refinancing.

**C.      The Debtors Should be Authorized to Grant Liens and Superpriority Claims to the DIP Lender.**

27.     The Debtors propose to obtain financing under the DIP Facility, in part, by providing superpriority claims and liens pursuant to section 364(c) of the Bankruptcy Code. The Debtors propose to provide, subject, in all respects, to the Carve-Out, (i) first priority liens on all DIP Collateral that, as of the Petition Date, is unencumbered and not subject to any liens, (ii) junior liens on all DIP Collateral that, as of the Petition Date, is encumbered on the Petition Date (other than the Primed Liens), and (iii) priming liens on DIP Collateral that is subject to the Primed Liens.

28.     In the event that a debtor demonstrates that it is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court:

> [M]ay authorize the obtaining of credit or the incurring of debt(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c); *see also In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test

to determine whether a debtor is entitled to financing pursuant to section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

(a)  the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

(b)  the credit transaction is necessary to preserve the assets of the estate; and

(c)  the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-DIP Borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Group*, 71 B.R. at 549.

29.      Based on the immediacy with which the Debtors require financing to avoid value destruction, the Debtors and their advisors believe that the DIP Facility represents the only alternative available to the Debtors under the circumstances. *See* Cassel Decl. ¶ 10.  The DIP Lender was not willing to provide the DIP Facility on any other terms and there are no alternative sources of financing available to the Debtors. *See id.*  The DIP Facility will provide the Debtors with postpetition financing on terms that the Debtors believe represent their best and only viable alternative. *See id.*  Accordingly, the superpriority claims and liens granted to the DIP Lender are appropriate and should be approved.

**D.      No Comparable Alternative to the DIP Facility is Reasonably Available.**

30.      A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *Sky Valley,*

*Inc.*, 100 B.R. at 113; *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that the refusal of two national banks to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

31.     Simply put, alternative sources of financing with better, or even as favorable, terms as those of the DIP Facility are not available to the Debtors. *See* Cassel Decl. ¶ 11.  Further, the DIP Facility is the product of good-faith, arm's-length negotiations and is necessary for the Debtors to pursue a value maximizing sale or reorganization for the benefit of all stakeholders. *See* Cassel Decl. ¶ 13. Accordingly, approval of the DIP Facility is in the best interests of the Debtors' estates and represents a sound exercise of the Debtors' reasoned business judgment. *See* Cassel Decl. ¶ 14.

**E.      The Debtors Should be Authorized to Pay the Interest Required by the DIP Lender under the DIP Loan Documents.**

32.     Under the DIP Loan Documents, the Debtors have agreed, subject to Court approval, to pay interest to the DIP Lender. In particular, the Debtors have agreed to pay interest at a rate per annum equal to 8.50%.  Notably, this interest is payable in kind and only due upon maturity of the DIP Facility.  The Debtors believe that the interest to be paid under the DIP Facility is consistent with the market, and arguably below market, given the financial and operating condition of the Debtors, the timing, cost, and risk of administering these chapter 11 cases, and the Debtors' liability profile.  The Special Committee considered the rate described above and the absence of any upfront, commitment or similar fees when determining in their sound business

40

judgment that the DIP Facility constituted the best and only actionable terms on which the Debtors could obtain the postpetition financing necessary to continue their operations, prosecute their cases, and benefit the Debtors' estates. Accordingly, the Court should authorize the Debtors to pay the interest provided under the DIP Documents in connection with the DIP Facility.

**F.     The DIP Lender Should be Afforded Good-Faith Protection Under Section 364(e) of the Bankruptcy Code.**

33.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal

34.     The DIP Facility is the result of (i) the Debtors' reasonable and informed determination that the DIP Lender offered the only terms on which to obtain critical postpetition financing given the circumstances and (ii) extensive good-faith, arm's-length negotiations between the Debtors, acting at the direction of the Special Committee, on the one hand, and the DIP Lender, on the other hand, with each party represented by separate counsel.  The terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Accordingly, the obligations arising under the DIP Facility and other financial accommodations made to the Debtors have been extended by the DIP Lender in "good faith" within the meaning of section 364(e)

of the Bankruptcy Code and, therefore, the DIP Lender is entitled to all of the protections afforded thereby.

## II.   Proposed Adequate Protection is Appropriate

35.    To the extent a secured creditor's interests in the collateral constitute valid and perfected security interests and liens as of the Petition Date, section 364(d)(1)(B) of the Bankruptcy Code requires that adequate protection be provided where the liens of such secured creditor are being primed to secure the obligations under a debtor in possession financing facility. Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief. What constitutes adequate protection must be decided on a case-by-case basis. *See In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985). The focus of the requirement is to protect a secured creditor from the diminution in the value of its interest in the particular collateral during the period of use. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).

36.    The proposed adequate protection provided to the Prepetition Secured Parties is comprised of, among other things, the Adequate Protection Liens, the 507(b) Claims, the Adequate Protection Fees and Expenses, the Adequate Protection Reporting Requirements, and interest at the default rate, payable in kind, with respect to the Prepetition Priority Bridge Loans (until repaid or refinanced under the DIP). The Debtors believe that the proposed adequate protection package is fair and reasonable. Further, in reliance upon, among other things, such adequate protection, the Prepetition Secured Parties have consented to the priming of the Primed Liens, which avoids potentially time consuming and unpredictable priming litigation. And importantly, the proposed

adequate protection shall only be provided to the extent there is any diminution in value to the Prepetition Secured Parties' interest in the Prepetition Collateral, and is subject in all respects to an investigation being conducted by the Special Committee into the liens and claims of the Prepetition Junior Term Loan Lender, and the rights of the Debtors to bring a Challenge. Accordingly, based upon the foregoing, the Debtors respectfully request that the Court authorize the Debtors to provide the adequate protection described above to such parties.

### III.    Approval of Use of Cash Collateral is Appropriate.

37.    Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell or lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."

38.    The Debtors have an urgent need for the immediate use of the Prepetition Collateral, including the Cash Collateral, and seek to use all Cash Collateral existing on or after the Petition Date pursuant to the terms of the DIP Loan Documents and the Interim Order. The Debtors need the Cash Collateral to pay operating expenses, including payroll and vendors, in order to ensure a continued supply of goods and services essential to the Debtors' business. Indeed, absent such relief, the Debtors' businesses will be brought to an immediate halt, with damaging consequences for the Debtors and their estates and creditors.

39.    The Debtors believe that the terms and conditions of their use of the Cash Collateral (including the provision of adequate protection described above) are appropriate and reasonable and that such adequate protection is sufficient to secure any adequate protection obligations under the circumstances. Furthermore, the Prepetition Secured Parties have consented to the Debtors' use of the Cash Collateral subject to the terms and conditions of the DIP Loan Documents and

the Interim Order. Therefore, the Debtors submit that they should be authorized to use the Cash Collateral on the terms set forth in the DIP Loan Documents.

## IV.    Carve-Out Is Appropriate

40.       Pursuant to the DIP Loan Documents and the Interim Order, each of the DIP Liens, the DIP Superpriority Claims, the Prepetition Secured Debt Liens, the 507(b) Claims, and any other liens, claims, or interests that any creditor, or any of their respective affiliates hold, own or control in relation to the Debtors or their affiliates, shall be subject and subordinate to payment of the Carve-Out (as defined herein).  Without the Carve-Out, the Debtors' estates or other parties in interest could be harmed because the services professionals might otherwise provide in these chapter 11 cases could be restricted. *See In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties in interest are sorely prejudiced"). Additionally, the Carve-Out protects against administrative insolvency during the pendency of these chapter 11 cases by ensuring that assets are available to pay U.S. Trustee fees and professional fees of the Debtors and any statutory committee. Accordingly, the Debtors submit that the Carve-Out is reasonable and appropriate under the circumstances.

## V.    The Automatic Stay Should be Modified on a Limited Basis.

41.       The relief requested herein contemplates a modification of the automatic stay (if applicable) to, among other things, (i) permit the Debtors to grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens, and (ii) permit the DIP Lender and Prepetition Secured Parties to exercise rights and remedies under certain circumstances. These provisions were part of the *quid pro quo* for the Debtors' ability to obtain the proposed DIP Facility

as provided in the DIP Loan Documents and in the Interim Order.  Importantly, the exercise of remedies will be subject to the Remedies Notice Period.  Under these circumstances, the Debtors believe that the extent of the modifications to the automatic stay under the Interim Order are reasonable and should be approved.

## VI.    Failure to Obtain Immediate Interim Access to the DIP Facility Would Cause Immediate and Irreparable Harm.

42.    Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the court is empowered to conduct an interim expedited hearing on the motion at which it may authorize a debtor to obtain credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. *See* Bankruptcy Rule 4001(c)(2).  Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3).

43.    The Debtors' available liquidity was extremely limited leading up to the filing of these chapter 11 cases and the Debtors determined that the best path forward was to obtain credit under the DIP Facility and pursue an orderly process in chapter 11. *See* Wu Decl. ¶ 5.  The Debtors have worked closely with their advisors to evaluate their cash requirements for the administration of these chapter 11 cases and have determined that the Debtors require immediate access to the financing under the DIP Facility.  As part of such evaluation, the Debtors and their advisors reviewed and analyzed the Debtors' anticipated sources and uses of cash for each calendar week and prepared the Initial DIP Budget, which reflects the cash needed to, among other things (a) administer and preserve the value of their estates; (b) permit the orderly continuation of the

operation of their business, (c) maintain business relationships with vendors, suppliers and customers, (d) make payroll, (e) satisfy other working capital and operational needs and (f) fund expenses of the chapter 11 cases, including professional fees associated with advancing a restructuring or sale process. The Debtors believe that the Initial DIP Budget provides an accurate reflection of the Debtors' funding requirements over the identified period and is reasonable and appropriate under the circumstances. *See* Wu Decl. ¶ 6. Thus, to preserve value and avoid irreparable harm pending the Final Hearing on the DIP Facility, it is essential that the Debtors have access to credit under the DIP Facility on an interim basis as requested and consistent with the Initial DIP Budget. *See* Wu Decl. ¶ 7.

44.     Accordingly, pursuant to section 363(c)(3) of the Bankruptcy Code and Bankruptcy Rule 4001(c), the Debtors request that the Court conduct an expedited hearing on this Motion, and enter the Interim Order authorizing the Debtors to enter into the DIP Facility.

### Request for Final Hearing

45.     Pursuant to Bankruptcy Rule 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

46.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004(h).

### Notice

47.     Notice of this Motion will be provided to the following parties (each as defined in the First Day Declaration): (a) the U.S. Trustee (Attn: Benjamin A. Hackman

(benjamin.a.hackman@usdoj.gov)); (b) the holders of the twenty (20) largest unsecured claims against the Debtors on a consolidated basis; (c) the Internal Revenue Service; (d) the United States Attorney's Office for the District of Delaware; (e) counsel to the Prepetition Priority Bridge Loan Lender, Prepetition Junior Term Loan Lender, and the DIP Lender: (i) Maynard Nexsen PC (Attn: David Kinman (dkinman@maynardnexsen.com) and Bethany Johnson (bethany.johnson@maynardnexsen.com)), and (ii) Young Conaway Stargatt & Taylor, LLP (Attn: Michael Nestor (mnestor@ycst.com) and Ryan Bartley (rbartley@ycst.com)); (f) the Debtors' depository banks; (g) all known parties with liens of record on assets of the Debtors' as of the Petition Date; and (h) any party that is entitled to notice pursuant to Local Bankruptcy Rule 9013-1(m) (collectively, the "**Notice Parties**").  Notice of this Motion and any order entered hereon will be served in accordance with Local Bankruptcy Rule 9013-1(m).

48.    The Debtors respectfully submit that no further notice is required.  No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE the Debtors respectfully request entry of the DIP Orders granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: November 23, 2025
      Wilmington, Delaware

*/s/ Clint M. Carlisle*
RICHARDS, LAYTON & FINGER, P.A.
Michael J. Merchant (No. 3854)
Zachary I. Shapiro (No. 5103)
Clint M. Carlisle (No. 7313)
920 North King Street
Wilmington, Delaware 19801
Telephone: 302-651-7700
Email: merchant@rlf.com
      shapiro@rlf.com
      carlisle@rlf.com

-and-

WEIL, GOTSHAL & MANGES LLP
David J. Cohen (*pro hac vice* pending)
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone: (305) 577-3100
Email: davidj.cohen@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ronit J. Berkovich (*pro hac vice* pending)
Daphne S. Papadatos (*pro hac vice* pending)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Emails: ronit.berkovich@weil.com
      daphne.papadatos@weil.com

*Proposed Attorneys for the Debtors*
*and the Debtors in Possession*

**Exhibit A**

**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------- x
                                                         :
In re                                                    :        Chapter 11
                                                         :
GBI SERVICES, LLC, et al.,                               :        Case No. 25–12089 (CTG)
                                                         :
          Debtors.¹                                      :        (Joint Administration Requested)
                                                         :
-------------------------------------------------------- x
```

**INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION
FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS
AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE
EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION TO THE
PREPETITION SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY,
(V) SCHEDULING A FINAL HEARING AND (VI) GRANTING RELATED RELIEF**

Upon the motion (the "**DIP Motion**") of Nicklaus Companies, LLC (the "**DIP Borrower**")

and its affiliated debtors and debtors-in-possession (each a "**DIP Guarantor**" and with the

Borrower, each, a "**Debtor**" and collectively, the "**Debtors**") in the above-captioned cases (the

"**Chapter 11 Cases**"), pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 363(m), 364(c)(1),

364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506(c) and 507 of title 11 of the United States Code,

11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of

the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1(b),

4001-2, 9006-1, and 9013 of the Local Rules of the United States Bankruptcy Court for the District

of Delaware (the "**Local Bankruptcy Rules**"), seeking entry of this interim order (this "**Interim**

**Order**") among other things:

- authorizing the DIP Borrower to obtain postpetition financing ("**DIP Financing**") pursuant
  to a superpriority, senior secured and priming debtor-in-possession term loan credit facility

---

¹ The last four digits of GBI Services, LLC's tax identification number are 0771. A complete list of the Debtors in
the chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at
https://dm.epiq11.com/GBIServices. The Debtors' mailing address is 3801 PGA Boulevard, Suite 565, Palm
Beach Gardens, FL 33410.

(the "**DIP Facility**") subject to the terms and conditions set forth in that certain credit agreement attached hereto as **Exhibit 1** (as amended, restated, supplemented, or otherwise modified from time to time, the "**DIP Credit Agreement**"), by and among the DIP Borrower, the DIP Guarantors (as defined below), FundNick, LLC (the "**DIP Lender**") in an aggregate principal amount not to exceed $17,000,000 (the commitments in respect thereof, the "**DIP Commitments**" and such loans, the "**DIP Loans**"), in the form of superpriority senior secured delayed draw term loans in the aggregate principal amount of $17,000,000, of which, $10,000,000 will be immediately available upon entry of this Interim Order, in accordance with the terms and conditions set forth in the DIP Credit Agreement and this Interim Order;

- authorizing the Guarantors to guarantee the DIP Loans and the other DIP Obligations (as defined below);

- authorizing the Debtors to execute, deliver and perform under the DIP Credit Agreement and all other loan documentation related to the DIP Facility, including, without limitation, as applicable, security agreements, pledge agreements, control agreements, mortgages, deeds, charges, guarantees, promissory notes, intercompany notes, certificates, instruments, intellectual property security agreements, notes, and such other documents that may be reasonably requested by the DIP Lender, in each case, as amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with the DIP Credit Agreement and any other Credit Documents (as defined in the DIP Credit Agreement), the "**DIP Loan Documents**");

- authorizing the Debtors to incur loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees, costs, expenses and other liabilities, and all other obligations (including indemnities and similar obligations, whether contingent or absolute) due or payable under the DIP Loan Documents (collectively, the "**DIP Obligations**"), and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

- authorizing the Debtors to refinance the Prepetition Priority Bridge Loan Obligations into DIP Obligations;

- subject to the Carve-Out (as defined herein), granting to the DIP Lender, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations of the Debtors;

- granting to the DIP Lender valid, enforceable, non-avoidable and automatically perfected liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on all prepetition and postpetition property of the Debtors' estates other than Avoidance Actions (as defined herein) and all proceeds thereof and, upon entry of the Final Order, any Avoidance Proceeds (as defined herein), in each case subject to the Carve-Out;

- upon entry of the Final Order, waiving with respect to the Prepetition Collateral (as defined herein) and the DIP Collateral (as defined herein) (together, the "**Collateral**") (a) the Debtors' right to surcharge the Collateral pursuant to section 506(c) of the Bankruptcy Code, and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code

- upon entry of the Final Order, waiving the equitable doctrine of "marshaling" and other similar doctrines (i) with respect to the DIP Collateral for the benefit of any party other than the DIP Lender and (ii) with respect to any of the Prepetition Collateral for the benefit of any party other than the Prepetition Secured Parties;

- authorizing the Debtors to use proceeds of the DIP Facility solely in accordance with this Interim Order and the DIP Loan Documents;

- authorizing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Loan Documents as such become earned, due and payable to the extent provided in, and in accordance with, the DIP Loan Documents;

- subject to the restrictions set forth in the DIP Loan Documents and this Interim Order, authorizing the Debtors to use the Prepetition Collateral, including Cash Collateral, of the Prepetition Secured Parties and to provide adequate protection to the Prepetition Secured Parties for any diminution in value of their interests in the Prepetition Collateral (including Cash Collateral), including, without limitation, any diminution in value resulting from the imposition of the automatic stay under section 362 of the Bankruptcy Code (the "**Automatic Stay**"), the Debtors' use, sale, or lease of the Prepetition Collateral (including Cash Collateral), and the priming of its interests in the Prepetition Collateral (including Cash Collateral);

- vacating and modifying the Automatic Stay to the extent set forth herein to the extent necessary to permit the Debtors, the DIP Lender and the Prepetition Secured Parties to implement and effectuate the terms and provisions of this Interim Order, the DIP Loan Documents and, upon entry, the Final Order and to deliver any notices of termination described below and as further set forth herein;

- authorizing the DIP Lender and the Prepetition Secured Parties (as defined herein), to take all commercially reasonable actions to implement and effectuate the terms of this Interim Order;

- waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order and, upon entry, the Final Order; and

- scheduling a final hearing (the "**Final Hearing**") to consider final approval of the DIP Facility and use of Cash Collateral pursuant to a proposed final order (the "**Final Order**"), as set forth in the DIP Motion and the DIP Loan Documents filed with this Court.

The Court having considered the interim relief requested in the DIP Motion, the exhibits attached thereto, and the *Declaration of Phil Cotton in Support of First Day Relief* (the "**First Day Declaration**"), and the *Declaration of Philip Cassel in Support of Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling A Final Hearing, and (VI) Granting Related Relief* (the "**DIP Declaration**"), the available DIP Loan Documents, and the evidence submitted and arguments made at the interim hearing held on the DIP Motion (the "**Interim Hearing**"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Bankruptcy Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court as set forth herein; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, otherwise is fair and reasonable and in the best interests of the Debtors and their estates, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Loan Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor.

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.      *Petition Date.*  On November 21, 2025 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "**Court**").  On November {{__}}, 2025, this Court entered an order approving the joint administration of the Chapter 11 Cases.

B.      *Debtors in Possession.*  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.      *Jurisdiction and Venue.*  This Court has core jurisdiction over the Chapter 11 Cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  Consideration of the DIP Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter a final order consistent with Article III of the United States Constitution.  Venue for the Chapter 11 Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.      *Committee Formation.*  As of the date hereof, the United States Trustee for the District of Delaware (the "**U.S. Trustee**") has not appointed an official committee of unsecured creditors in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "**Creditors' Committee**").

E.      *Notice.*  The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Notice of the Interim Hearing and the DIP Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, and no other or further notice of the Interim Hearing was required.

F.   *Cash Collateral*.  As used herein, the term "Cash Collateral" shall mean all of the Debtors' cash, wherever located and held, including cash in deposit accounts, that constitutes or will constitute "cash collateral" of the Prepetition Secured Parties and the DIP Lender within the meaning of section 363(a) of the Bankruptcy Code.

G.   *Stipulations*.  Subject only to the limitations contained in Paragraph 17 of this Interim Order, the Debtors admit, stipulate and agree that:

a.   *Prepetition Priority Bridge Loan Facility.*  Pursuant to that certain Credit Agreement, dated as of November 14, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "**Prepetition Priority Bridge Loan Credit Agreement**" and, together with all related Credit Documents (as defined therein), the "**Prepetition Priority Bridge Loan Credit Documents**" and the loans issued pursuant thereto, the "**Prepetition Priority Bridge Loans**"), by and among Nicklaus Companies, LLC, as borrower, and the Debtors acting as guarantors thereunder (collectively in such capacities, the "**Prepetition Priority Bridge Loan Obligors**") and FundNick, LLC (in such capacity, the "**Prepetition Priority Bridge Loan Lender**"), the Prepetition Priority Bridge Loan Lender has extended the Prepetition Priority Bridge Loans for the benefit of the Prepetition Priority Bridge Loan Obligors.

b.   *Prepetition Priority Bridge Loan Obligations*.  The Prepetition Priority Bridge Loan Obligors are lawfully indebted and liable to the Prepetition Priority Bridge Loan Lender without defense, challenge, objection, claim, counterclaim, or offset of any kind, in the aggregate principal amount as of the Petition Date of not less than $3,730,000 in principal amount of senior loans, including accrued and unpaid interest thereon (for the avoidance of doubt, excluding any make whole or similar premium), plus premiums, costs, fees, expenses, and any other amounts, liabilities, or obligations of whatever nature, whenever arising or accruing (whether before or after the Petition Date), that may be due, owing, or chargeable in connection therewith, in each case, as and to the extent provided in the Prepetition Priority Bridge Loan Credit Documents (collectively, the "**Prepetition Priority Bridge Loan Obligations**").

c.   *Prepetition Priority Bridge Loan Liens*.  Prior to the Petition Date, to secure the Prepetition Priority Bridge Loan Obligations, the Prepetition Priority Bridge Loan Obligors granted the Prepetition Priority Bridge Loan Lender valid, binding, non-avoidable, properly perfected and enforceable first priority continuing liens on and security interests in the "Collateral" as defined in the Prepetition Priority Bridge Loan Credit Agreement, including, for the avoidance of doubt, Cash Collateral (such liens and security interests collectively, the "**Prepetition Priority Bridge Loan Liens**", and such collateral the "**Prepetition Priority Bridge Loan Collateral**").

d.   *Validity, Perfection and Priority of Prepetition Priority Bridge Loan Liens and Prepetition Priority Bridge Loan Obligations*.  The Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition Priority Bridge Loan Liens on the Prepetition Priority Bridge Loan Collateral were valid, binding, enforceable, non-avoidable and properly perfected and were

granted to the Prepetition Priority Bridge Loan Lender for fair consideration and reasonably equivalent value; (b) the Prepetition Priority Bridge Loan Liens were senior in priority over any and all other liens on the Prepetition Priority Loan Collateral, subject only to certain senior liens permitted under the Prepetition Priority Bridge Loan Credit Documents (solely to the extent any such liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Priority Bridge Loan Liens as of the Petition Date, the "**Prepetition Priority Bridge Loan Permitted Prior Liens**"); (c) the Prepetition Priority Bridge Loans constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Priority Bridge Loan Obligors, enforceable in accordance with the terms of the applicable Prepetition Priority Bridge Loan Credit Documents; and (d) no offsets, recoupments, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Priority Bridge Loan Liens or Prepetition Priority Bridge Loans exist, and no portion of the Prepetition Priority Bridge Loan Liens or Prepetition Priority Bridge Loans is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (e) the Debtors waive, discharge, and release any right to challenge any of the Prepetition Priority Bridge Loans, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the Prepetition Priority Bridge Loan Liens securing the Prepetition Priority Bridge Loans.

e.    *Release of Prepetition Priority Lender Parties.*  Each of the Debtors and the Debtors' estates, on its and their own behalf and on behalf of its and their respective past, present and future predecessors, heirs, successors, subsidiaries, and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the Prepetition Priority Bridge Loan Lender (solely in its respective capacity as such) and each of its respective affiliates, subsidiaries, and Representatives (as defined herein) (each solely in their respective capacities as such) (collectively, the "**Prepetition Priority Bridge Loan Released Parties**"), from any and all (a) obligations and liabilities to the Debtors (and their successors and assigns) and (b) claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract or tort or under any state or federal law or otherwise, in each case arising out of or related to (as applicable) the Prepetition Priority Bridge Loan Credit Documents, the DIP Loan Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions and agreements reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter can or may have against any of the Prepetition Priority Bridge Loan Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order.

f.    *Prepetition Junior Term Loan Facility.*  Pursuant to that certain Credit Agreement, dated as of November 14, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "**Prepetition Junior Term Credit Agreement**" and, together with all related Credit Documents (as defined therein), the "**Prepetition Junior Term Loan Documents**" and the loans issued pursuant thereto, the "**Prepetition Junior Term Loans**") by and among ), by and among Nicklaus Companies, LLC, as borrower, and the Debtors acting as guarantors thereunder (collectively, in such capacities, the

"**Prepetition Junior Term Loan Obligors**") and PMP NICK, LLC (formerly known as Emigrant GB, LLC) (in such capacity, the "**Prepetition Junior Term Loan Lender**"), the Prepetition Junior Term Loan Lender has extended the Prepetition Junior Term Loans for the benefit of the Prepetition Junior Term Loan Obligors.   The "**Prepetition Loan Documents**" consist of the Prepetition Priority Bridge Loan Credit Documents and Prepetition Junior Term Loan Documents; the "**Prepetition Loans**" consist of the Prepetition Priority Bridge Loans and the Prepetition Junior Term Loan; the "**Prepetition Secured Parties**" consist of the Prepetition Priority Bridge Loan Lender and the Prepetition Junior Term Loan Lender.

g.      *Prepetition Junior Term Loan Obligations*.   The Prepetition Junior Term Loan Obligors are lawfully indebted and liable to the Prepetition Junior Term Loan Lender without defense, challenge, objection, claim, counterclaim, or offset of any kind, in the aggregate amount as of the Petition Date of not less than $462,248,071, for principal and accrued and unpaid interest thereon (for the avoidance of doubt, excluding any make whole or similar premium), plus premiums, costs, fees, expenses, and any other amounts, liabilities, or obligations of whatever nature, whenever arising or accruing (whether before or after the Petition Date), that may be due, owing, or chargeable in connection therewith, in each case, as and to the extent provided in the Prepetition Junior Term Loan Documents (collectively, the "**Prepetition Junior Term Loan Obligations**"). The "**Prepetition Secured Obligations**" consist of the Prepetition Priority Bridge Loan Obligations and (subject to any successful Challenge, as provided for in Paragraph 17 of this Interim Order) the Prepetition Junior Term Loan Obligations.

h.      *Prepetition Junior Term Loan Liens*.   Prior to the Petition Date, to secure the Prepetition Junior Term Loan Obligations, the Prepetition Junior Term Loan Obligors granted the Prepetition Junior Term Loan Lender valid, binding, non-avoidable, properly perfected and enforceable first priority continuing liens on and security interests in the "Collateral" as defined in the Prepetition Junior Term Loan Agreement, including, for the avoidance of doubt, Cash Collateral (such liens and security interests collectively, the "**Prepetition Junior Term Loan Liens**", and such collateral the "**Prepetition Junior Term Loan Collateral**").   The "**Prepetition Liens**" shall consist of the Prepetition Priority Bridge Loan Liens and (subject to any successful Challenge, as provided for in Paragraph 17 of this Interim Order) the Prepetition Junior Term Loan Liens; the "**Prepetition Collateral**" shall consist of the Prepetition Priority Bridge Loan Collateral and (subject to any successful Challenge, as provided for in Paragraph 17 of this Interim Order) the Prepetition Junior Term Loan Collateral.   For the avoidance of doubt, the Prepetition Junior Term Loan Liens and the Prepetition Junior Term Loan Collateral shall exclude (i) any lien and all rights in Collateral that has been voided after a Challenge, or has been agreed in writing by the Prepetition Junior Term Loan Lender to be void or voidable, and (ii) the Collateral against which such lien or security interest attaches.

i.      *Validity, Perfection and Priority of Prepetition Junior Term Loan Liens and Prepetition Junior Term Loan Obligations*.   The Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition Junior Term Loan Liens on the Prepetition Junior Term Loan Collateral were valid, binding, enforceable, non-avoidable and properly perfected and were granted to the Prepetition Junior Term Loan Lender for fair consideration and reasonably equivalent value; (b) the Prepetition Junior Term Loan Liens were senior in priority over any and all other liens on the Prepetition Junior Term Loan Collateral, subject only to (1) the Prepetition Junior Term Loan Liens and (2) certain senior liens permitted under the Prepetition Junior Term

Loan Documents (solely to the extent any such liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Junior Term Loan Liens as of the Petition Date, the "**Prepetition Junior Term Loan Permitted Prior Liens**" and with the Prepetition Priority Bridge Loan Permitted Prior Liens, the "**Prepetition Permitted Prior Liens**"); (c) the Prepetition Priority Bridge Loans constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Junior Term Loan Obligors, enforceable in accordance with the terms of the applicable Prepetition Junior Term Loan Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Junior Term Loan Liens or Prepetition Junior Term Loans exist, and no portion of the Prepetition Junior Term Loan Liens or Prepetition Junior Term Loans is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (e) the Debtors waive, discharge, and release any right to challenge any of the Prepetition Junior Term Loans, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the Prepetition Junior Term Loan Liens securing the Prepetition Junior Term Loans.

j.      *Release of Prepetition Junior Term Loan Lender Parties.*  Effective as of the expiration of the Challenge Period (as defined herein) and subject to any Challenge (as defined herein) brought in accordance with Paragraph 17 of this Interim Order, each of the Debtors and the Debtors' estates, on its and their own behalf and on behalf of its and their respective past, present and future predecessors, heirs, successors, subsidiaries, and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the Prepetition Junior Term Loan Lender (solely in its respective capacity as such) and each of its respective affiliates, subsidiaries, and Representatives (as defined herein) (each solely in their respective capacities as such) (collectively, the "**Prepetition Junior Term Loan Released Parties**"), from any and all (a) obligations and liabilities to the Debtors (and their successors and assigns) and (b) claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract or tort or under any state or federal law or otherwise, in each case arising out of or related to (as applicable) the Prepetition Priority Bridge Loan Documents, the DIP Loan Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions and agreements reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter can or may have against any of the Prepetition Junior Term Loan Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order.

H.      *Findings Regarding the DIP Financing and Use of Cash Collateral.*

a.      Good and sufficient cause has been shown for the entry of this Interim Order

and for authorization of the Debtors to obtain financing pursuant to the DIP Loan Documents.

b.      The Debtors have an immediate and critical need to obtain the DIP Financing and to use the Prepetition Collateral (including Cash Collateral) in order to, among other things (a) administer and preserve the value of their estates, (b) permit the orderly continuation of the operation of their business, (c) maintain business relationships with vendors, suppliers and customers, (d) make payroll, (e) satisfy other working capital and operational needs and (f) fund expenses of the Chapter 11 Cases.  In the absence of the DIP Facility and the use of Cash Collateral, the Debtors' business and estates would suffer immediate and irreparable harm.  The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral, the incurrence of new indebtedness under the DIP Loan Documents and other financial accommodations provided under the DIP Loan Documents and this Interim Order are necessary and vital to the preservation and maintenance of the value of the Debtors and to a successful reorganization of the Debtors.

c.      The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lender under the DIP Loan Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting to the DIP Lender the DIP Liens and the DIP Superpriority Claims (each as defined herein) and incurring the Adequate Protection Obligations (as defined herein), in each case subject to the Carve-Out to the extent set forth herein, under the terms and conditions set forth in this Interim Order and in the DIP Loan Documents.

d.      The Debtors may continue to collect cash, rents, income, offspring, products, proceeds, and profits generated from the Prepetition Collateral and acquire equipment,

inventory and other personal property, all of which constitute Prepetition Collateral under the Prepetition Loan Documents that are subject to the Prepetition Secured Parties' security interests as set forth in the Prepetition Loan Documents, as applicable, but subject to any Challenge brought in accordance with Paragraph 17 of this Interim Order.

   e. The Debtors desire to use a portion of the cash, rents, income, offspring, products, proceeds and profits described in the preceding paragraph in their business operations that constitute Cash Collateral of the Prepetition Secured Parties under section 363(a) of the Bankruptcy Code.

   f. Based on the DIP Motion, the First Day Declaration, the DIP Declaration and the record presented to the Court at the Interim Hearing, the extension of credit under the DIP Financing, the terms of the adequate protection granted to the Prepetition Secured Parties as provided in Paragraph 13 of this Interim Order (the "**Adequate Protection**"), and the terms on which the Debtors may continue to use the Prepetition Collateral (including Cash Collateral) pursuant to this Interim Order and the DIP Loan Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment and constitute reasonably equivalent value and fair consideration.

   g. Based on the DIP Motion, the First Day Declaration, the DIP Declaration and the record presented to the Court at the Interim Hearing, the DIP Financing, the Adequate Protection and the use of the Prepetition Collateral (including Cash Collateral) have been negotiated in good faith and at arm's length among the Debtors, the DIP Lender and the Prepetition Secured Parties, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Financing and the DIP Loan Documents, including, without limitation:  all loans made to and guarantees issued by the Debtors pursuant to the DIP Loan

Documents and any DIP Obligations shall be deemed to have been extended by the DIP Lender and its affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Lender (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is reversed or otherwise modified, on appeal or otherwise.

h.      Based on the DIP Motion, the First Day Declaration, the DIP Declaration and the record presented to the Court at the Interim Hearing, the Prepetition Secured Parties have acted in good faith regarding the DIP Financing and the Debtors' continued use of the Prepetition Collateral (including Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses (including the incurrence and payment of and performance under the Adequate Protection Obligations and the granting of the Adequate Protection Liens (as defined herein)), in accordance with the terms hereof, and the Prepetition Secured Parties (and the successors and assigns thereof) shall be entitled to the full protection of sections 363(m) and 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is, reversed or modified, on appeal or otherwise.

i.      The Prepetition Secured Parties are entitled to the Adequate Protection provided in this Interim Order as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code.  Based on the DIP Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of the Prepetition Collateral, including the Cash Collateral, and the

Prepetition Secured Parties have consented to the use of the Prepetition Collateral, including the Cash Collateral, the priming of the Prepetition Liens by the DIP Liens pursuant to the terms set forth in this Interim Order and the DIP Loan Documents; *provided* that nothing in this Interim Order or the DIP Loan Documents shall (x) be construed as the affirmative consent by the Prepetition Secured Parties for the use of Cash Collateral other than on the terms set forth in this Interim Order and in the context of the DIP Financing authorized by this Interim Order, (y) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior) other than as contemplated by the DIP Financing authorized by this Interim Order or (z) prejudice, limit or otherwise impair the rights of the Prepetition Secured Parties to seek new, different or additional adequate protection or assert any rights of the Prepetition Secured Parties, and the rights of any other party in interest, including the Debtors, to object to such relief are hereby preserved.

j.    For all Adequate Protection and stay relief purposes throughout these cases, the Prepetition Secured Parties shall be deemed to have requested relief from the automatic stay and Adequate Protection as of the Petition Date. For the avoidance of doubt, such request will survive termination of this Interim Order.

k.    The Debtors have prepared and delivered to the advisors to the DIP Lender an initial budget (the "**Initial DIP Budget**"), attached hereto as **Exhibit 2**. The Initial DIP Budget reflects, among other things, the DIP Borrower's and the DIP Guarantors' anticipated sources and uses of cash for each calendar week, in form and substance satisfactory to the DIP Lender. The Initial DIP Budget may be modified, amended, extended and updated from time to time in accordance with the DIP Credit Agreement, and once approved by the DIP Lender, shall supplement and replace the Initial DIP Budget (the Initial DIP Budget and each subsequent

Approved DIP Budget, shall constitute without duplication, the then in effect "**Approved DIP Budget**"). The Debtors believe that the Initial DIP Budget is reasonable under the facts and circumstances. The DIP Lender is relying, in part, upon the Debtors' agreement to comply with the Approved DIP Budget (subject only to variances permitted under the DIP Loan Documents), the other DIP Loan Documents and this Interim Order in determining to enter into the postpetition financing arrangements provided for in this Interim Order.

I.      *Immediate Entry*. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2), (c)(2) and 6003. Absent granting the relief set forth in this Interim Order, the Debtors' estates will be immediately and irreparably harmed. Consummation of the DIP Financing and the use of Prepetition Collateral (including Cash Collateral), in accordance with this Interim Order and the DIP Loan Documents are therefore in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.

J.      *Prepetition Permitted Prior Liens; Continuation of Prepetition Liens*. Nothing herein shall constitute a finding or ruling by this Court that any alleged Prepetition Permitted Prior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including, but not limited to, the Debtors, the DIP Lender or the Prepetition Secured Parties to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Prepetition Permitted Prior Lien and/or security interests. Subject to entry of the Final Order granting such relief, the right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Prepetition Permitted Prior Lien and is expressly subject to the DIP Liens.

K.     Based upon the foregoing findings and conclusions, the DIP Motion and the record before the Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefor, **IT IS HEREBY ORDERED THAT:**

1.     *Motion Granted.*  The relief sought in the DIP Motion is granted as set forth herein, on an INTERIM basis.  The interim financing described herein is authorized, and the use of Cash Collateral on an interim basis is authorized, in each case subject to the terms and conditions set forth in the DIP Loan Documents and this Interim Order.  All objections to entry of this Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled on the merits.  The rights of all parties in interest to object to the entry of the Final Order on the DIP Motion are fully reserved.

2.     *Authorization of the DIP Financing and the DIP Loan Documents.*

a.     The Debtors are hereby authorized to execute, deliver, enter into and, as applicable, perform all of their obligations under the DIP Loan Documents and such other and further acts as may be necessary, appropriate or desirable in connection therewith.  The DIP Borrower is hereby authorized to borrow money pursuant to the DIP Credit Agreement and the DIP Guarantors are hereby authorized to provide a guaranty of payment in respect of the DIP Borrower's obligations with respect to such borrowings, subject to any limitations on borrowing under the DIP Loan Documents, which shall be used for all purposes permitted under the DIP Loan Documents (and subject to and in accordance with the Approved DIP Budget (subject to any variances permitted thereunder)).

b.     In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized to perform all acts, to make, execute and deliver all instruments, certificates, agreements, charges, deeds and documents (including, without limitation, the

- 15 -

execution or recordation of pledge and security agreements, mortgages, financing statements and other similar documents), and to pay all fees, expenses and indemnities in connection with or that may be reasonably required, necessary, or desirable for the Debtors' performance of their obligations under or related to the DIP Financing, including, without limitation:

    i.    the execution and delivery of, and performance under, the DIP Credit Agreement each of the other DIP Loan Documents;

    ii.    the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Loan Documents, in each case, in such form as the Debtors and the DIP Lender may agree, it being understood that no further approval of this Court shall be required for any authorizations, amendments, waivers, consents or other modifications to and under the DIP Loan Documents (and any fees and other expenses (including attorneys', accountants', appraisers' and financial advisors' fees), amounts, charges, costs, indemnities and other like obligations paid in connection therewith) that do not shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments, the fees or the rate of interest payable thereunder; *provided* that, for the avoidance of doubt, updates and supplements to the Approved DIP Budget required to be delivered by the Debtors under the DIP Loan Documents shall not, for purposes of this Interim Order or any Final Order, be considered amendments or modifications to the Approved DIP Budget or the DIP Loan Documents that require further approval of this Court;

    iii.    the non-refundable payment to the DIP Lender of all fees, premiums and rights received as consideration under, or in connection with the DIP Facility, including, amendment fees, servicing fees, audit fees, liquidator fees, collateral agent's or security trustee's fees, (subject to Paragraph 12 of this Interim Order) the fees and expenses of the Lender Professionals (as defined below) advising the DIP Lender (the "**DIP Fees and Expenses**"), and indemnities (the payment of which fees, expenses and other amounts shall be irrevocable, and shall be, and shall be deemed to have been, authorized upon entry of this Interim Order, whether any such fees arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance, disallowance, impairment, or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, applicable non-bankruptcy law or otherwise by any person or entity) and any amounts due (or that may become due) in respect of any indemnification and expense reimbursement obligations, and the costs and expenses as may be due from time to time, in

each case referred to in the DIP Credit Agreement or DIP Loan Documents (or in any separate letter agreements); and

    iv.    the performance of all other acts required under or in connection with the DIP Loan Documents, including the granting of the DIP Liens and the DIP Superpriority Claims and perfection of the DIP Liens and DIP Superpriority Claims as permitted herein and therein, and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith, in each case in accordance with the terms of the DIP Loan Documents.

    c.    Upon entry of this Interim Order, but subject to the occurrence of the Closing Date, the Debtors are authorized to indefeasibly pay in full all Prepetition Priority Bridge Loan Obligations and, upon the Closing Date, the Debtors shall be deemed to have indefeasibly refinanced all Prepetition Priority Bridge Loan Obligations by converting all such amounts into DIP Obligations.

    3.    *DIP Obligations*.  Upon execution and delivery of the DIP Loan Documents, the DIP Loan Documents shall constitute legal, valid, binding and non-avoidable obligations of the Loan Parties, enforceable against each Debtor and its estate in accordance with the terms of the DIP Loan Documents and this Interim Order, and any successors thereto, including any trustee appointed in the Chapter 11 Cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**").  Upon execution and delivery of the DIP Loan Documents, the DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Lender, in each case, under, or secured by, the DIP Loan Documents or this Interim Order, including all principal, interest, costs, fees, expenses, premiums, indemnities and other amounts under the DIP Loan Documents (including this Interim Order).  The Debtors shall be jointly and severally liable for the DIP Obligations.  Except as permitted hereby, no obligation,

- 17 -

payment, transfer, or grant of security hereunder or under the DIP Loan Documents to the DIP Lender (including its Representatives) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

4.     *Carve-Out*.

a.     <u>Priority of Carve-Out</u>. Each of the DIP Liens, the DIP Superpriority Claims, the Prepetition Secured Debt Liens, the 507(b) Claims, and any other liens, claims, or interests that any creditor, or any of their respective affiliates hold, own or control in relation to the Debtors or their affiliates, shall be subject and subordinate to payment of the Carve-Out (as defined herein). The Carve-Out shall be senior to all claims and liens over all assets of the Debtors, including any DIP Collateral and Prepetition Collateral, as set forth in this Interim Order.  For the avoidance of doubt, after delivery of a Carve-Out Notice or the date upon which the DIP Obligations are paid in full, the Carve-Out shall remain in effect as to all claims and obligations, including the Prepetition Secured Obligations, and the Debtors shall be permitted and required to continue to fund amounts in relation to the Carve-Out in accordance with the terms of this Interim Order.

b.     <u>Carve-Out</u>.  As used in this Interim Order, the "<u>Carve-Out</u>" means the sum of (i) all unpaid fees required to be paid to the Clerk of the Court and to the Office of the United

States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all unpaid reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, final order, procedural order, or otherwise, all accrued and unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Creditors' Committee  pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Lender of a Carve-Out Notice (as defined below), and any monthly, restructuring, sale, success, or other transaction fees (but excluding any tail fees) that is earned or payable to a Debtor Professional prior to the date of delivery of a Carve-Out Notice, whether allowed by the Court prior to or after delivery of a Carve-Out Notice (the "Pre-Carve-Out Notice Amount"), and for each Committee Professional, up to the amounts set forth in the Approved DIP Budget (less amounts already paid); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $200,000, in each case incurred after the first business day following delivery by the DIP Lender of the Carve-Out Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve-Out Notice Amount").  For purposes of the foregoing, "Carve-Out Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Lender to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee, which notice may be delivered following the

occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve-Out Notice Cap has been invoked.

      c.    <u>Professional Fees Escrow Account</u>. The Debtors are authorized to open, or cause to be opened, a new bank account or designate an existing bank account that shall function as a segregated account held in trust for and exclusively available for the payment of fees and expenses of Professional Persons pursuant to this Interim Order (the "<u>Professional Fees Escrow Account</u>"). Any such new account shall be at a bank that is party to a Uniform Depository Agreement with the U.S. Trustee. The Professional Fees Escrow Account shall not be subject to the control of the DIP Lender, any of the Prepetition Secured Parties, or any other creditors, shall not be deemed property of the estates under section 541 of the Bankruptcy Code or otherwise, and shall be deemed to be held in trust for the Professional Persons until all Allowed Professional Fees are indefeasibly paid in full in cash. Until all Allowed Professional Fees are indefeasibly paid in full in cash, any and all amounts in the Professional Fees Escrow Account shall not be subject to any cash sweep and/or foreclosure provisions in the Prepetition Loan Documents, DIP Loan Documents, or applicable law, and neither the Prepetition Secured Parties nor the DIP Lender shall be entitled to sweep or foreclose on such amounts notwithstanding any provision to the contrary in the Prepetition Loan Documents, DIP Financing Agreements or applicable law. If, after indefeasibly paying all Allowed Professional Fees in full in cash (subject to the limitations on Committee Professionals), the Professional Fees Escrow Account has not been reduced to zero, all remaining funds in the Professional Fees Escrow Account shall be distributed in accordance with Paragraph 7(f) of this Interim DIP Order. The funds transferred to the Professional Fees Escrow Account for the benefit of the Professional Persons shall not be subject to the liens, claim or interests of any other party; provided, however, that, notwithstanding the foregoing, any residual

amounts remaining in the Professional Fees Escrow Account after all Allowed Professional Fees are indefeasibly paid in full in cash shall be subject to springing DIP Liens and Adequate Protection Liens that spring into effect after payment of all Allowed Professional Fees.

      d.    <u>Pre-Carve-Out Notice</u>. Prior to the delivery of a Carve-Out Notice, not later than 7:00 p.m. Eastern Time on the third Business Day of each week starting with the first full calendar week following the date of this Interim Order, each Professional Person shall deliver to the Debtors, the DIP Lender, and their respective advisors a weekly statement (each, a "<u>Weekly Statement</u>") setting forth a good-faith estimate of the amount of accrued but unpaid fees and expenses incurred by such Professional Person during the preceding week (the "<u>Weekly Estimated Fees and Expenses</u>"), and the Debtors shall, on a weekly basis, transfer cash proceeds from amounts previously drawn under the DIP Facility or cash on hand into the Professional Fees Escrow Account in an amount equal to the aggregate amount of Weekly Estimated Fees and Expenses based on the Weekly Statements submitted by each Professional Person (and if no such estimate is provided in a given week, then the amount forecasted for such Professional Person in the Approved DIP Budget) that remain unpaid (and that were not previously funded to the Professional Fees Escrow Account); *provided* that the amounts actually paid and funded into the Professional Fees Escrow Account for Committee Professionals shall not exceed, in the aggregate, the amounts set forth in the Approved DIP Budget for each Committee Professional (less amounts already paid). The Committee Professionals shall be capped in recovering from the Carve-Out and the Professional Fees Escrow Account to the amounts funded for such Committee Professionals and shall not be entitled to payment of amounts escrowed for Debtor Professionals. The Debtors shall use funds held in the Professional Fees Escrow Account exclusively to pay Allowed Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code,

the Bankruptcy Rules, the Local Bankruptcy Rules, in accordance with any interim or final orders of the Court; provided that the Debtors' obligations to pay Allowed Professional Fees shall not be limited or be deemed limited to funds held in the Professional Fees Escrow Account.

      e.      <u>Post-Carve-Out Notice</u>. On the date on which a Carve-Out Notice is delivered in accordance with this paragraph of this Interim Order, (the "<u>Carve-Out Trigger Date</u>"), the Carve-Out Notice shall constitute a demand to the Debtors to utilize all cash (including cash on hand, cash available to be drawn under the DIP Facility, and any available cash thereafter held by any Debtor) to fund the Professional Fees Escrow Account in an amount equal to (i) the Pre-Carve-Out Notice Amount and (ii) the Post-Carve-Out Notice Amount (i) and (ii), each to the extent not previously funded to the Professional Fees Escrow Account). Not later than three (3) Business Days after the delivery of a Carve-Out Notice, each Professional Person shall deliver one (1) additional statement to the Debtors, the DIP Lender, and their respective advisors setting forth a good-faith estimate of the amount of accrued but unpaid fees and expenses incurred by such Professional Person during the period following the period covered by the most recent Weekly Statement previously delivered by such Professional Person through and including the Carve-Out Trigger Date, and the Debtors shall transfer such amounts to the Professional Fees Escrow Account. Notwithstanding anything to the contrary in this Interim Order, the Post-Carve-Out Notice Amount shall promptly be funded into the Professional Fees Escrow Account on the Carve-Out Trigger Date. Notwithstanding anything to the contrary in this Interim Order, the DIP Documents, or the Prepetition Secured Debt Facilities, after delivery of a Cave-Out Notice, if the Professional Fees Escrow has not been funded with the full Carve-Out Amount within two (2) business days of delivery of such Carve-Out Notice, the DIP Lender shall be required to fund any

shortfall, up to the amount of any unfunded DIP Commitment that is authorized by the Court to be borrowed pursuant to this Interim Order.

f.      Notwithstanding anything to the contrary in this Interim Order, the DIP Documents, or the Prepetition Secured Debt Facilities, following delivery of a Carve-Out Notice, the DIP Lender and the Prepetition Secured Parties shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Professional Fees Escrow Account has been fully funded in an amount equal to all respective obligations benefitting from the Carve-Out as set forth herein.

g.      Notwithstanding anything to the contrary in this Interim Order, the DIP Documents, or the Prepetition Secured Debt Facilities, (i) disbursements by the Debtors from the Professional Fees Escrow Account shall not constitute loans or indebtedness under the DIP Documents or the Prepetition Secured Debt Facilities or otherwise increase or reduce the DIP Obligations or the Prepetition Secured Obligations, (ii) the failure of the Professional Fees Escrow Account to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve-Out, (iii) nothing contained herein shall constitute a cap or limitation on the amount that the Professional Persons may assert as administrative expense claims against the Debtors on account of Allowed Professional Fees incurred by such Professional Persons, and (iv) the Carve-Out and the entitlement of the Professional Persons to the Carve-Out and the Professional Fees Escrow Account proceeds shall be senior to all liens and claims securing the DIP Facility and the 507(b)

Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Obligations.

h.     <u>Payment of Allowed Professional Fees Prior to the Carve-Out Trigger Date</u>.  Any payment or reimbursement made prior to the occurrence of the Carve-Out Trigger Date in respect of any Allowed Professional Fees shall not reduce the Carve-Out.

i.     <u>No Direct Obligation To Pay Allowed Professional Fees</u>.  None of the DIP Lender, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Lender, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement; *provided* that nothing herein shall limit the DIP Lender's obligations to honor its obligations under the DIP Credit Agreement and this Interim Order to provide funding to the Debtors and to fund any shortfall as contemplated above.

j.     <u>Payment of Carve-Out On or After the Carve-Out Trigger Date</u>.  Any payment or reimbursement made on or after the occurrence of the Carve-Out Trigger Date in respect of any Allowed Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis.  Any funding of the Carve-Out from funds drawn on the DIP Facility shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise

entitled to the protections granted under this Interim Order, the DIP Loan Documents, the Bankruptcy Code, and applicable law.

5.      *DIP Superpriority Claims*.  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Debtors on a joint and several basis (without the need to file any proof of claim) with, to the fullest extent permitted under the Bankruptcy Code or other applicable law, priority over any and all claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, including any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a) (other than section 507(a)(1)), 507(b), 1113 or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "**DIP Superpriority Claims**") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "**Avoidance Actions**") but, subject to the entry of the Final Order, including any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement or otherwise ("**Avoidance Proceeds**")) in accordance with the DIP Loan Documents, this Interim Order or the Final Order, subject only to the Carve-Out.  The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the

Bankruptcy Code in the event that this Interim Order or any provision hereof is reversed or otherwise modified, on appeal or otherwise. The DIP Superpriority Claims shall be *pari passu* in right of payment with one another and senior to the 507(b) Claims (as defined herein), and subordinated to the Carve-Out.

6. *DIP Liens*. As security for the DIP Obligations, effective and automatically and properly perfected upon the date of this Interim Order and without the necessity of the execution, recordation or filing by the Debtors or the DIP Lender of mortgages, security agreements, control agreements, pledge agreements, financing statements, intellectual property filings or other similar documents, notation of certificates of title for titled goods or other similar documents, instruments, deeds, charges or certificates, or the possession or control by the DIP Lender of, or over, any DIP Collateral, without any further action by the DIP Lender, the following valid, binding, continuing, enforceable and non-avoidable security interests and liens (all security interests and liens granted to the DIP Lender, pursuant to this Interim Order and the DIP Loan Documents, the "**DIP Liens**") on all DIP Collateral are hereby granted to the DIP Lender; *provided* that notwithstanding anything herein to the contrary, the DIP Liens shall be (i) subject and junior to the Carve-Out in all respects, (ii) senior in all respects to the Prepetition Liens and (iii) senior in all respects to the Adequate Protection Liens:

a. *Liens on Unencumbered Property*. Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, automatically fully-perfected first priority senior security interest in and lien upon all tangible and intangible prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, is not subject to (i) a valid, perfected and non-avoidable lien or (ii) a valid and non-avoidable lien in

- 26 -

existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, including, without limitation, any and all unencumbered cash of the Debtors and any investment of cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, goodwill, causes of action, insurance policies and rights, claims and proceeds from insurance, commercial tort claims and claims that may constitute commercial tort claims (known and unknown), chattel paper (including electronic chattel paper and tangible chattel paper), interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, equity interests of subsidiaries, joint ventures and other entities, wherever located, and the proceeds, products, rents and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise (the "**Unencumbered Property**"), in each case other than the Avoidance Actions (but, for the avoidance of doubt, subject to entry of the Final Order, "Unencumbered Property" shall include Avoidance Proceeds).

b.      *Liens Junior to Certain Prepetition Liens.*  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, automatically fully perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of each of the Debtors, which shall be immediately junior and subordinate to (i) valid, perfected and non-avoidable senior liens (other than the Primed Liens (as defined herein)) in existence immediately prior to the Petition Date and permitted by the terms of the **Prepetition Priority Bridge Loan Credit Documents**, and (ii) valid and non-avoidable senior liens (other than the Primed Liens) in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date, as permitted by section 546(b) of the Bankruptcy Code and the terms of the

**Prepetition Priority Bridge Loan Credit Documents**; _provided_ that nothing in the foregoing clauses (i) and (ii) shall limit the rights of the DIP Lender under the DIP Loan Documents to the extent such liens are not permitted thereunder; and

       c.    _Liens Priming Prepetition Liens_.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, automatically fully-perfected first priority senior priming security interest in and lien upon all tangible and intangible prepetition and postpetition property of the Debtors subject to the Prepetition Liens, regardless of where located, regardless whether or not any liens on such assets are voided, avoided, invalidated, lapsed or unperfected (the "**Priming Liens**"), which Priming Liens shall prime in all respects the interests of the Prepetition Secured Parties arising from the current and future liens of the Prepetition Secured Parties (including, without limitation, the Adequate Protection Liens granted to the Prepetition Secured Parties) (the "**Primed Liens**").

       d.    _DIP Collateral_.  "**DIP Collateral**" means, collectively, all assets of the Debtors (and their bankruptcy estates) of any nature whatsoever and wherever located, whether first arising prior to or following the Petition Date, now owned or hereafter acquired, including (i) all accounts; (ii) all chattel paper; (iii) all deposit accounts; (iv) all documents; (v) all equipment; (vi) all general intangibles; (vii) all goods; (viii) all instruments; (ix) all inventory; (x) all investment property; (xi) all intellectual property; (xii) reserved; (xiii) all commercial tort claims; (xiv) all letter-of-credit rights; (xv) all money; (xvi) all books and records pertaining to the foregoing; (xvii) to the extent not otherwise included, all proceeds, products, accessions, rents and profits of any and all of the foregoing and all supporting obligations, collateral security and guarantees given by any person with respect to any of the foregoing; (xviii) all other Collateral (including Pledged Collateral and Registered Intellectual Property Collateral) in each case as

defined in the Prepetition Priority Bridge Loan Credit Documents; (xix) all aircrafts, airframes, engines, propellers, spare parts, and other aircraft components; (xx) subject to entry of the Final DIP Order, all Avoidance Proceeds (but not Avoidance Actions themselves); (xxi) all proceeds, whether by settlement, judgment or otherwise, arising from or relating to any litigation, arbitration, administrative proceeding or other legal action (other than avoidance actions) in which the DIP Borrower or any of the DIP Guarantors is or may become a party, including, but not limited to, all monetary awards, settlements, compensation, damages, penalties or any other form of payment or relief that the DIP Borrower or any DIP Guarantor receives or is entitled to receive as a result of such legal actions, including, but not limited to, any proceeds or other payments related to claims asserted against any legal professionals; and (xxii) all products, offspring, profits and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, including any and all proceeds of any insurance (including any business interruption and property insurance), indemnity, warranty or guaranty payable to such Debtor from time to time with respect to any of the foregoing.

e.      *Liens Senior to Certain Other Liens.*  The DIP Liens shall not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors or their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in the DIP Loan Documents or in this Interim Order, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, or (C) any intercompany or affiliate liens of the Debtors or security interests of the Debtors; or (ii)

subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code granted after the date hereof.

       7.    *Protection of DIP Lender's and Prepetition Secured Parties' Rights.*

       a.    *Limitation on Enforcement and Control by Prepetition Secured Parties.*  So long as there are any DIP Obligations outstanding or the DIP Lender has any outstanding DIP Commitments under the DIP Loan Documents, the Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Loan Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against the DIP Collateral, including in connection with the Adequate Protection Liens; (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens on, the DIP Collateral (but not any proceeds of such transfer, disposition or sale to the extent remaining after payment in cash in full of the DIP Obligations and termination of the DIP Commitments), to the extent such transfer, disposition, sale or release is authorized under the DIP Loan Documents; (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect its security interests in the DIP Collateral other than as necessary to give effect to this Interim Order other than, (x) solely as to this clause (iii), the Prepetition Secured Parties filing financing statements or other documents to perfect the liens granted pursuant to this Interim Order, or (y) as may be required by applicable state law or foreign law to complete a previously commenced process of perfection or to continue the perfection of valid and non-avoidable liens or security interests existing as of the Petition Date; and (iv) deliver or cause to be delivered, at the Debtors' cost and expense, any termination statements, releases and/or assignments in favor of the DIP Lender or other documents necessary to effectuate and/or evidence the release, termination

and/or assignment of liens on any portion of the DIP Collateral subject to any sale or disposition permitted by this Interim Order and the other DIP Loan Documents.

b.      *Possession and Control in Favor of DIP Lender.*  To the extent any of the Prepetition Secured Parties has possession of any Prepetition Collateral or DIP Collateral or has control with respect to any Prepetition Collateral or DIP Collateral, or has been noted as a secured party on any certificate of title for a titled good constituting Prepetition Collateral or DIP Collateral, then such Prepetition Secured Party shall be deemed to maintain such possession or notation or exercise such control as a gratuitous bailee and/or gratuitous agent for perfection for the benefit of the DIP Lender, and such Prepetition Secured Party shall comply with the instructions of the DIP Lender with respect to the exercise of such control or possession.

c.      *Turnover of Proceeds.*  Any proceeds of Prepetition Collateral received by any Prepetition Secured Party, whether in connection with the exercise of any right or remedy (including setoff) relating to the Prepetition Collateral or otherwise received by a Prepetition Secured Party, shall be segregated and held in trust for the benefit of and forthwith paid over to the DIP Lender in the same form as received by such Prepetition Secured Party, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct.  The DIP Lender is hereby authorized to make any such endorsements as agent for the Prepetition Secured Parties. This authorization is coupled with an interest and is irrevocable.

d.      *Termination Date*.  On the Termination Date (as defined below), consistent with Section 9.2 of the DIP Credit Agreement, (i) all DIP Obligations shall be immediately due and payable and all DIP Commitments will terminate; (ii) the Prepetition Secured Parties may terminate, reduce or restrict the ability of the Debtors to use Cash Collateral; *provided*, *however*, that during the Remedies Notice Period (as defined below), the Debtors may use Cash Collateral

solely to (a) fund the Carve-Out and Professional Fees Escrow Account in accordance with Paragraph 4 of this Interim Order, and (b) pay payroll and other expenses critical to the administration of the Debtors' estates strictly in accordance with the Approved DIP Budget incurred prior to and through the expiration of the Remedies Notice Period; and (iii) the DIP Lender shall be otherwise entitled to exercise rights and remedies under the DIP Loan Documents in accordance with this Interim Order.

   e. *Rights and Remedies Upon Event of Default*. Immediately upon the occurrence and during the continuation of an Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of the DIP Loan Documents and this Interim Order, including the Remedies Notice Period for the exercise of remedies other than the following (i) the DIP Lender may declare, which declaration shall be in writing and delivered by email and overnight mail to the Debtors, any Creditors' Committee, and the U.S. Trustee (any such declaration shall be referred to herein as a "**Termination Declaration**" and the date on which a Termination Declaration is delivered, the "**Termination Date**") (A) all DIP Obligations owing under the DIP Loan Documents to be immediately due and payable, (B) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the DIP Facility, (C) termination of the DIP Facility and the DIP Loan Documents as to any future liability or obligation of the DIP Lender, but without affecting any of the DIP Liens or the DIP Obligations, and (D) the Termination Declaration shall be deemed a Carve-Out Trigger Notice to the DIP Borrower; and (ii) the DIP Lender or, subject to Paragraph 7(a) of this Interim Order, the Prepetition Secured Parties may declare a termination, reduction or restriction on the ability of the Debtors to use Cash Collateral by delivering a Termination

Declaration, and the right of the Prepetition Secured Parties to terminate, reduce, or restrict the use of Cash Collateral shall continue following termination of the DIP Credit Agreement, with each reference to "Event of Default" deemed a reference to the Events of Default under the DIP Credit Agreement as of the date of this Interim Order.  The Automatic Stay in the Chapter 11 Cases otherwise applicable to the DIP Lender is hereby modified so that five (5) calendar days after a Termination Date (the "**Remedies Notice Period**"):  (a) the DIP Lender shall be entitled to exercise all of its rights and remedies in accordance with the DIP Loan Documents and this Interim Order to satisfy the DIP Obligations, DIP Superpriority Claims, and DIP Liens, including (subject to (i) funding the Carve-Out and Professional Fees Escrow Account in accordance with Paragraph 4 of this Interim Order, and (ii) payment of all accrued but unpaid wages and benefits to the Debtors' employees incurred prior to and through the expiration of the Remedies Notice Period) (w) freeze or sweep monies or balances in the Debtors' accounts; (x) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Lender against the DIP Obligations; (y) enforce any and all rights against DIP Collateral, including, without limitation, foreclosure on all or any portion of the DIP collateral, occupying the Debtors' premises, sale or disposition of the DIP Collateral; and (z) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Loan Documents or applicable law and (b) subject to the foregoing clause (a), the entry of the Final DIP Order, and to any Challenge, the Prepetition Secured Parties shall be entitled to exercise their rights and remedies to the extent available in accordance with the applicable Prepetition Loan Documents and this Interim Order with respect to the Debtors' use of Cash Collateral.  During the Remedies Notice Period, the Debtors and other parties in interest shall be entitled to seek (and the DIP Lender and Prepetition Secured Parties shall consent to) an emergency hearing within the Remedies Notice Period with the Court.  Unless

the Court orders otherwise prior to the expiration of the Remedies Notice Period, the Automatic

Stay as to the DIP Lender and the Prepetition Secured Parties shall automatically be terminated at

the end of the Remedies Notice Period without further notice or order.  Upon expiration of the

Remedies Notice Period, absent order of the Court to the contrary, the DIP Lender and the

Prepetition Secured Parties shall be permitted to exercise all remedies set forth herein, and in the

DIP Loan Documents and Prepetition Documents, and as otherwise available at law without further

order of or application or motion to this Court consistent with this Interim Order.

   f. *Application of Proceeds of DIP Collateral*.  In the event of a sale of all or

substantially all of the DIP Collateral, the proceeds of the DIP Collateral received by the DIP

Borrower or any DIP Guarantor will be applied in the following order of priority (subject to the

Carve-Out and Wind Down Amount):

> i. <u>first</u>, to pay all reasonable, documented out-of-pocket costs and expenses of the DIP Lender (including, without limitation, all reasonable and documented fees and expenses of the Lender Professionals incurred on behalf of the DIP Lender in accordance with the procedures set forth in this Interim DIP Order);

> ii. <u>second</u>, to pay an amount equal to all accrued and unpaid interest owing to the DIP Lender in respect of the DIP Loans other than interest that has been paid in kind;

> iii. <u>third</u>, to repay any principal amounts outstanding in respect of the DIP Loans (including interest paid in kind);

> iv. <u>fourth</u>, to pay all other amounts owing to the DIP Lender;

> v. <u>fifth</u>, the balance, if any, after all the DIP Obligations have been paid in full, to the Prepetition Priority Bridge Loan Lender to satisfy any remaining Prepetition Priority Bridge Loan Obligations, if any; and

> vi. <u>last</u>, if all DIP Obligations and Prepetition Priority Bridge Loan Obligations have been paid in full, to the extent there remain any proceeds of Prepetition Junior Term Loan Collateral that the Debtors' Investigation has concluded is subject to the valid, perfected and unavoidable liens of the Prepetition Junior Term Loan Lender, then such proceeds shall be paid to the Prepetition Junior Term Loan Lender in satisfaction of the Prepetition Junior Term Loan

Obligations up to the value of such Prepetition Junior Term Loan Collateral as determined by an order of the Court.

g.     No rights, protections or remedies of the DIP Lender or the Prepetition Secured Parties granted by the provisions of this Interim Order or the other DIP Loan Documents shall be limited, modified or impaired in any way by: (i) any actual or purported withdrawal of the consent of any party to the Debtors' authority to continue to use Cash Collateral; (ii) any actual or purported termination of the Debtors' authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the Debtors' continued use of Cash Collateral or the provision of adequate protection to any party.

8.     *Limitation on Charging Expenses Against Collateral*.  Subject to entry of the Final Order granting such relief, except to the extent of the Carve-Out, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from (i) the DIP Collateral (including Cash Collateral) with respect to the DIP Lender or (ii) the Prepetition Collateral (including Cash Collateral) with respect to the Prepetition Secured Parties, pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender or the Prepetition Secured Parties, as applicable, and no consent shall be implied from any other action, inaction or acquiescence by the DIP Lender or the Prepetition Secured Parties, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Lender or the Prepetition Secured Parties to any charge, lien, assessment or claims against the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise.

9.     *No Marshaling / Section 552(b) Waiver*.  Subject to entry of the Final Order granting such relief, in no event shall the DIP Lender or the Prepetition Secured Parties be subject to the

equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, the Prepetition Loans, or the Prepetition Collateral. Further, subject to entry of the Final Order, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Secured Parties with respect to proceeds, products, offspring or profits of any Prepetition Collateral.

10. *Payments Free and Clear*. Any and all payments or proceeds remitted to the DIP Lender or Prepetition Priority Bridge Loan Lender pursuant to the provisions of this Interim Order or the DIP Loan Documents shall be received free and clear of any claim, charge, assessment or other liability, whether asserted or assessed by through or on behalf of the Debtors, subject to the Carve-Out in all respects and any Challenge brought in accordance with Paragraph 17 of this Order, with respect to the Prepetition Junior Term Loan Lender.

11. *Use of Cash Collateral*. The Debtors are hereby authorized, subject to the terms and conditions of this Interim Order, to use all Cash Collateral in accordance with the DIP Loan Documents and the Approved DIP Budget (subject to variances permitted under the DIP Loan Documents); *provided* that (a) the Prepetition Secured Parties are granted the Adequate Protection as hereinafter set forth and (b) except on the terms and conditions of this Interim Order, the Debtors shall be enjoined and prohibited from at any times using the Cash Collateral absent further order of the Court.

12. *Payment and Review of Lender Professional Fees*. The Debtors are authorized and directed to pay the DIP Fees and Expenses and the Adequate Protection Fees and Expenses (as defined below). Subject to the review procedures set forth in this paragraph 12, the Lender Professionals shall not be required to file applications with the Court or and their fees and expenses shall not be subject to allowance or review by the Court. The Lender Professionals shall not be

required to comply with the U.S. Trustee's fee guidelines with respect to their fees and expenses; *however*, any time that any such professional seeks payment of fees and expenses from the Debtors from the period from the Interim Closing Date to confirmation of a chapter 11 plan, each such professional shall provide summary copies of its invoices (including aggregate amounts of fees and expenses and total amount of time on a per-professional basis), which are not required to contain time detail and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, to counsel to the Debtors, counsel to the Creditors' Committee, and the U.S. Trustee (together, the "**Review Parties**"); *provided*, *however*, that the provision of such invoices shall not constitute a waiver of the attorney client privilege or of any benefits of the attorney work product doctrine or any other evidentiary privilege or protection recognized under applicable law; and *provided*, *further* that, the Review Parties shall have the right to request additional details regarding the services rendered and expenses incurred by such professionals (each, an "**Information Request**").  Any objections raised by any Review Party with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the applicable Lender Professional within ten (10) calendar days after receipt (the "**Review Period**"), which shall not be extended by the delivery of an Information Request.  If no written objection is received by 12:00 p.m., prevailing Eastern Time, on the last date of the Review Period, the Debtors shall pay such invoices within five (5) business days.  If an objection to a Lender Professional's invoice is received within the Review Period, the Debtors shall promptly pay the undisputed portion of the invoice without the necessity of filing any pleading with the Court, and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually.  Notwithstanding the foregoing, the

Debtors are authorized and directed to pay, on or prior to the Closing Date (as defined in the DIP Credit Agreement), any and all costs, fees, expenses of the Lender Professionals required to be paid under the DIP Credit Agreement as a condition to the Closing Date occurring and without subjecting such amount to a Review Period.

13.     *Adequate Protection of Prepetition Secured Parties*.   Subject in all respects to the rights set forth in Paragraph 17 of this Interim Order for parties (including, for the avoidance of doubt, the Debtors) to assert a Challenge with respect to the Prepetition Junior Term Loan Collateral and Prepetition Junior Term Loan Liens, the Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral (including Cash Collateral) in an amount equal to the aggregate diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, for any reason provided for under the Bankruptcy Code, including, without limitation, any diminution resulting from the sale, lease or use by the Debtors of the Prepetition Collateral, the priming of the Prepetition Liens by the DIP Liens pursuant to the DIP Loan Documents and this Interim Order, the grant of any other lien under section 364 of the Bankruptcy Code or the stay of the Prepetition Secured Parties' exercise of their rights in the Prepetition Collateral, the payment of any amounts pursuant to the Carve-Out or pursuant to this Interim Order, the Final Order or any other order of the Court or provision of the Bankruptcy Code or otherwise, and the imposition of the Automatic Stay (the "**Adequate Protection Claims**").   In consideration of the foregoing, the Prepetition Secured Parties are hereby granted the following as Adequate Protection for, and to secure repayment of an amount equal to such Adequate Protection Claims, and as an inducement to the Prepetition Secured Parties to consent to the priming of the Prepetition Liens and use of the

Prepetition Collateral (including Cash Collateral) (collectively, the "**Adequate Protection Obligations**"):

      a.    *Prepetition Adequate Protection Liens*.  The Prepetition Secured Parties are hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements) in the amount of the Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all of the DIP Collateral (the "**Adequate Protection Liens**"), in each case senior to all other liens but subject and subordinate only to (A) the DIP Liens, (B) the Carve-Out, and (C) the respective Prepetition Permitted Prior Liens.

      b.    *Section 507(b) Claims*.  The Prepetition Secured Parties are hereby granted, subject to the Carve-Out, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases as provided for in section 507(b) of the Bankruptcy Code in the amount of the Adequate Protection Claims, with, to the fullest extent permitted under the Bankruptcy Code, and subject to the next sentence, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**507(b) Claims**"), which 507(b) Claims shall be payable from all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding Avoidance Actions, but including, subject to entry of the Final Order, Avoidance Proceeds).  The 507(b) Claims shall be subject and subordinate only to the Carve-Out and the DIP Superpriority Claims.  Except to the extent expressly set forth in this Interim Order, the Final Order or the DIP Loan Documents, the Prepetition Secured Parties shall not receive or retain any payments, property or other amounts in respect of the 507(b) Claims unless and until the DIP Obligations (other than contingent indemnification obligations as to which

no claim has been asserted) have indefeasibly been paid in cash in full and all DIP Commitments have been terminated.

c.      *Fees and Expenses of Professionals.*  Subject to Paragraph 12 of this Interim Order, the Debtors shall pay as adequate protection on a current basis all reasonable and documented fees, costs and expenses of professionals retained by the Prepetition Priority Bridge Loan Lender and Prepetition Junior Term Loan Lender, whether incurred prior to or after the Petition Date, which professionals shall be limited to (i) Maynard Nexsen PC, (ii) Young Conaway Stargatt & Taylor, LLP, and (iii) any required local counsel, subject to the consent of the Debtors (not to be unreasonably withheld) (such professionals, collectively, the "**Lender Professionals**"; the items payable pursuant to this subparagraph (c) are referred to as the  "**Adequate Protection Fees and Expenses**").

d.      *Interest on Prepetition Priority Bridge Loan Obligations.*  Interest shall continue to accrue on the Prepetition Priority Bridge Loan Obligations at the Default Rate under the Prepetition Priority Bridge Loan Credit Documents, paid in kind by capitalizing such interest and adding it to the outstanding principal balance of the Prepetition Priority Bridge Loan Obligations in accordance with the Prepetition Priority Bridge Loan Credit Documents until the Prepetition Priority Bridge Loan Obligations are paid in full.

e.      *Repayment of the Prepetition Obligations.*  As additional adequate protection, the Prepetition Secured Obligations shall be repayable to the extent set forth in Paragraphs 3(c) and 7(f) of this Interim Order.

f.      *Budget Covenants.*  Upon indefeasible payment in full of all DIP Obligations and all other obligations under the DIP Facility, the Approved DIP Budget (including

any variances permitted thereunder) shall continue to be updated and adhered to in accordance with the terms and conditions of the DIP Loan Documents.

g.      *Prepetition Secured Parties' Adequate Protection Information Rights*. Unless otherwise agreed by the Prepetition Secured Parties, the Debtors shall promptly provide the Prepetition Secured Parties and, to the extent applicable, counsel to such party (and subject to applicable confidentiality restrictions contained in any of the Prepetition Loan Documents), with all required written financial reporting and other periodic reporting that is required to be provided to the DIP Lender under the DIP Loan Documents, including without limitation the reporting required under Section 7.1 of the DIP Credit Agreement (the "**Adequate Protection Reporting Requirements**").  Upon indefeasible payment in full of all DIP Obligations and termination of all DIP Commitments, the Prepetition Secured Parties shall continue to be entitled hereby to satisfaction of the Adequate Protection Reporting Requirement.

h.      *Maintenance of Collateral*.  The Debtors shall continue to maintain and insure the Prepetition Collateral and DIP Collateral in amounts and for the risks, and by the entities, as required under the Prepetition Loan Documents and the DIP Loan Documents.

14.     *Reservation of Rights of Prepetition Secured Parties*.  Under the circumstances and given that the above-described Adequate Protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the Adequate Protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties and any other parties holding interests that are secured by liens primed by the DIP Financing; *provided* that the Prepetition Secured Parties may request further or different adequate protection and the Debtors or any other party in interest may contest any such request.

15.     *Perfection of DIP Liens and Adequate Protection Liens*.

a.    Without in any way limiting the automatic validity and effective perfection of the DIP Liens granted pursuant to Paragraph 6 of this Interim Order and the Adequate Protection Liens granted pursuant to Paragraph 13 of this Interim Order, the DIP Lender and the Prepetition Secured Parties are hereby authorized, but not required, to file or record (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, including as may be reasonably required or deemed appropriate by the DIP Lender or (subject to Paragraph 7(a) of this Interim Order) the Prepetition Secured Parties, or take possession of or control over cash or securities, or to amend or modify security documents, or enter into, amend or modify intercreditor agreements, or to subordinate existing liens and any other similar action or action in connection therewith or take any other action in order to document, validate and perfect the liens and security interests granted to them hereunder (the "**Perfection Actions**").  Whether or not the DIP Lender or the Prepetition Secured Parties take such Perfection Actions, the liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Interim Order.  Upon the request of the DIP Lender, the Prepetition Secured Parties and the Debtors, without any further consent of any party, and at the sole cost of the Debtors as set forth herein, are authorized, and such direction is hereby deemed to constitute required direction under the applicable DIP Loan Documents or Prepetition Loan Documents, to take, execute, deliver and file such actions, instruments and agreements (in each case, without representation or warranty of any kind) to enable the DIP Lender to further validate, perfect, preserve and enforce the DIP Liens in all jurisdictions required under the DIP Credit Agreement, including all local law documentation

therefor determined to be reasonably necessary by the DIP Lender; *provided*, *however*, that no action need be taken in a foreign jurisdiction that would jeopardize the validity and enforceability of the Prepetition Liens.  All such documents will be deemed to have been recorded and filed as of the Petition Date.  To the extent necessary to effectuate the terms of this Interim Order and the DIP Loan Documents, the DIP Lender and the Prepetition Secured Parties hereby are deemed to appoint the other (and deemed to have accepted such appointment) to act as its agent with respect to the Collateral (as defined in the DIP Loan Documents) to which they are a party in such capacity, with such powers as are expressly delegated thereto under the DIP Loan Documents and Prepetition Loan Documents, (and even if it involves self-contracting and multiple representation to the extent legally possible,) together with such other powers as are reasonably incidental thereto.

b.       A certified copy of this Interim Order may, in the discretion of the DIP Lender or the Prepetition Secured Parties, as applicable, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept a certified copy of this Interim Order for filing and/or recording, as applicable.  The Automatic Stay shall be modified to the extent necessary to permit the DIP Lender and the Prepetition Secured Parties to take all actions, as applicable, referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

16.    *Preservation of Rights Granted Under this Interim Order.*

a.       Other than the Carve-Out and other claims and liens expressly granted by this Interim Order, no claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to the DIP Lender or the Prepetition Secured Parties shall be permitted while any of the DIP Obligations or the Adequate Protection Obligations remain outstanding, and, except

as otherwise expressly provided in or permitted under this Interim Order, the DIP Liens and the Adequate Protection Liens shall not be: (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (iii) subordinated to or made *pari passu* with any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors; or (iv) subject or junior to any intercompany or affiliate liens or security interests of the Debtors.

b.      Unless the DIP Lender shall have provided its prior written consent (which includes, for the avoidance of doubt, consent to the imposition of the Prepetition Permitted Prior Liens and the Carve-Out), or all DIP Obligations have been indefeasibly paid in full and the DIP Commitments have terminated, it shall be an Event of Default (under and as defined in the DIP Credit Agreement) if there is entered in these Chapter 11 Cases or any potential successor case any order (including any order confirming any plan of reorganization or liquidation) that authorizes any of the following: (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the DIP Collateral and/or that is entitled to administrative priority status, in each case that is superior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and/or the Adequate Protection Claims; (ii) the use of Cash Collateral for any purpose other than as permitted in the DIP Loan Documents and this Interim Order; (iii) upon entry of the Final Order granting such relief, the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of the Debtors or any

creditor's taking any setoff or recoupment against any of its prepetition indebtedness based upon any such return of goods pursuant to section 553 of the Bankruptcy Code or otherwise; or (iv) any modification of the DIP Lender's or the Prepetition Secured Parties' rights under this Interim Order, the DIP Loan Documents or the Prepetition Loan Documents, as applicable, with respect any DIP Obligations or Prepetition Secured Obligations.

c.      Upon the occurrence of any Event of Default, interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Credit Agreement. Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code:  (i) the DIP Superpriority Claims, the 507(b) Claims, the DIP Liens, and the Adequate Protection Liens, and any claims related to the foregoing, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Obligations shall have been paid in full (and such DIP Superpriority Claims, 507(b) Claims, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (ii) the other rights granted by this Interim Order, including with respect to the Carve-Out, shall not be affected and (iii) this Court shall, to the fullest extent permitted under applicable law, retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim Order.

d.      If any or all of the provisions of this Interim Order are hereafter reversed or otherwise modified, such reversal or other modification, shall not affect: (i) the validity, priority or enforceability of any DIP Obligations or Adequate Protection Obligations incurred prior to the DIP Lender's or the Prepetition Secured Parties', as applicable, receipt of written notice of the effective date of such reversal or modification; or (ii) the validity, priority or enforceability of the

DIP Liens or the Adequate Protection Liens (with such protections applying as and to the extent afforded in accordance with and consistent with sections 364(e) and 363(m) of the Bankruptcy Code (as applicable)). Notwithstanding any such reversal or other modification of any use of Cash Collateral, any DIP Obligations, DIP Liens, Adequate Protection Claims, Adequate Protection Liens or other Adequate Protection Obligations incurred by the Debtors and granted to the DIP Lender or the Prepetition Secured Parties, as the case may be, prior to the DIP Lender's or the Prepetition Secured Parties', as applicable, receipt of written notice of the effective date of such reversal or other modification shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender and the Prepetition Secured Parties shall be entitled to, and are hereby granted, all the rights, remedies, privileges and benefits arising under sections 364(e) and 363(m) of the Bankruptcy Code, this Interim Order and the other DIP Loan Documents with respect to all uses of Cash Collateral, DIP Obligations and Adequate Protection Obligations.

e. Except as expressly provided in this Interim Order or in the DIP Loan Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Obligations, the 507(b) Claims and all other rights and remedies of the DIP Lender and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Loan Documents and the Carve-Out shall survive, and shall not be modified, impaired or discharged by: (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Chapter 11 Cases or terminating the joint administration of the Chapter 11 Cases or by any other act or omission; (ii) the entry of an order approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Loan Documents); or (iii) the entry of an order confirming a chapter 11 plan in any of the Chapter 11 Cases. The terms and provisions of this Interim Order

and the DIP Loan Documents shall continue in the Chapter 11 Cases, in any Successor Cases if these Chapter 11 Cases cease to be jointly administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and the Adequate Protection Obligations and all other rights and remedies of the DIP Lender and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Loan Documents shall continue in full force and effect until the DIP Obligations or Prepetition Secured Obligations, as applicable, are indefeasibly paid in full in cash, as set forth herein and in the DIP Loan Documents or Prepetition Loan Documents, as applicable, and the DIP Commitments have been terminated, and the Carve-Out shall continue in full force and effect.

17.     *Effect of Stipulations.*

a.     *No Challenge to Stipulations Regarding Prepetition Priority Bridge Loan Facility.*  The Debtors' stipulations, admissions, agreements and releases contained in Paragraphs G(a) through (e) of this Interim Order shall be binding upon the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases and any other person or entity acting or seeking to act on behalf of the Debtors' estates in all circumstances and for all purposes upon the entry of this Interim Order.

b.     *Third Party Challenges to Remaining Stipulations.*   The stipulations, admissions, agreements and releases contained in Paragraphs G(f) through (j) of this Interim Order shall be binding upon the Debtors and all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases and any other person or entity acting or seeking to act on behalf of the Debtors' estates in all circumstances

and for all purposes unless (a) the Debtors, such committee, or any other party in interest with requisite standing (in each case, to the extent requisite standing is obtained pursuant to an order of this Court entered prior to the expiration of the Challenge Period (as defined herein) and subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so) has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, inter alia, in this paragraph) by no later than 75 calendar days after entry of this Interim Order (such time period, the "**Challenge Period**"),[2] (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Junior Term Loan Obligations or the Prepetition Junior Term Loan Liens, or (B) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "**Challenges**") against the Prepetition Junior Term Loan Lender or its subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (each, a "**Representative**" and, collectively, the "**Representatives**") in connection with matters related to the Prepetition Junior Term Loan Documents, the Prepetition Junior Term Loan Obligations, the Prepetition Junior Term Loan Liens and the Prepetition Junior Term Loan Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter.

---

[2]    For the avoidance of doubt, the Court may expand the Challenge Period for cause shown so long as a motion to extend the Challenge Period is timely filed and served before the expiration of the then extant Challenge Period, which motion shall be heard on an expedited basis if opposed by the effected Prepetition Secured Party. Any party subject to a Challenge (as defined below) may voluntarily agree, in writing, to an extension of the Challenge Period solely with respect to itself.

In the event that a chapter 7 or chapter 11 trustee is appointed prior to the end of the Challenge Period, the Challenge Period solely for such chapter 7 or chapter 11 trustee shall be extended to the longer of (A) the remaining Challenge Period or (B) the date that is twenty-one (21) calendar days following the appointment of such trustee.

c.      *Debtors' Challenge Rights for Remaining Stipulations*.  For the avoidance of doubt, the Debtors' stipulations, admissions, agreements and releases contained in Paragraphs G(f) through (j) of this Interim Order shall be binding upon the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors), unless: (a) the Debtors institute a Challenge before the expiration of the Challenge Period and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter. Notwithstanding the foregoing, the Debtors may also revoke, limit or modify any Stipulation set forth in Paragraphs G(f) through (j) of this Interim Order with the express written consent of the Prepetition Junior Term Loan Lender.  For the avoidance of doubt, the special committee of the Board of Managers of Nicklaus Companies, LLC (the "**Special Committee**") is empowered and authorized to investigate the matters contemplated in the stipulations, agreements, and releases contemplated in paragraphs G(f) through (j), and has waived no rights, claims, causes of action, or otherwise on account of the filing of the DIP Motion, entry of this Interim Order, or entry into any DIP Document.

d.      *Effect of No Challenge*.  If no Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such timely and properly-filed proceeding then: (1) the stipulations, admissions, agreements and releases contained in this Interim Order shall be binding on all parties in interest; (2) the obligations of the Debtors

under the Prepetition Junior Term Loan Documents, including the Prepetition Junior Term Loan Obligations, shall constitute allowed claims not subject to defense, claim, counterclaim, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, recoupment, offset or avoidance, for all purposes in the Chapter 11 Cases, and any subsequent chapter 7 case(s); (3) the Prepetition Junior Term Loan Liens on the Prepetition Junior Term Loan Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected, security interests and liens, not subject to recharacterization, subordination (whether equitable, contractual or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, avoidance or other defense; and (4) the Prepetition Junior Term Loan Loan Obligations and the Prepetition Junior Term Loan Liens on the Prepetition Junior Term Loan Collateral shall not be subject to any other or further claim or challenge by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and any defenses, claims, causes of action, counterclaims and offsets by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other party acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors), whether arising under the Bankruptcy Code or otherwise, against the Prepetition Junior Term Loan Lender and its Representatives arising out of or relating to any of the Prepetition Junior Term Loan Documents, the Prepetition Junior Term Loan Obligations, the Prepetition Junior Term Loan Liens and the Prepetition Junior Term Loan Collateral shall be deemed forever waived, released and barred.  Further, any pleadings filed in

connection with any Challenge shall set forth with specificity the basis for such challenge or claim, and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred, including any amended or additional claims that may or could have been asserted thereafter through an amended complaint under Fed. R. Civ. P. 15 or otherwise, and subject to the findings in the prior sentence.  If any Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in this Interim Order shall nonetheless remain binding and preclusive (as provided in the first sentence of this subparagraph (d)) on the Debtors, any statutory or non-statutory committee appointed or formed in the Chapter 11 Cases and on any other person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction.  For the avoidance of doubt, any chapter 11 or chapter 7 trustee appointed or elected in these cases, upon the expiration of the Challenge Period (and subject to any tolling of the Challenge Period with respect to any claims that are the subject of an adversary proceeding or contested matter commenced pursuant to this paragraph (whether commenced by such trustee or commenced by any other party in interest on behalf of the Debtors' estates)), shall be bound by the acknowledgements, admissions, confirmations and stipulations of the Debtors in Paragraph G of this Interim Order.

      e.     Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the Prepetition Junior Term Loan Documents, the Prepetition Junior Term Loan Obligations or the

Prepetition Junior Term Loan Liens, and any ruling on standing, if appealed, shall not stay or otherwise delay the Chapter 11 Cases, confirmation of any plan of reorganization or consummation of any sale of all or substantially all assets of the Debtors.

18.    *Release of DIP Lender*.  Effective immediately upon the entry of this Interim Order, each of the Debtors and the Debtors' estates, on its and their own behalf and on behalf of its and their respective past, present and future predecessors, heirs, successors, subsidiaries, and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the DIP Lender (solely in its capacity as such) and each of its respective affiliates, subsidiaries, and Representatives (each solely in their respective capacities as such) (collectively, the "**DIP Released Parties**"), from any and all (a) obligations and liabilities to the Debtors (and their successors and assigns) and (b) claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract or tort or under any state or federal law or otherwise, in each case arising out of or related to (as applicable) the Prepetition Priority Bridge Loan Documents and the DIP Loan Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions and agreements reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter can or may have against any of the DIP Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order.  For the

avoidance of doubt, nothing in this release shall relieve the DIP Lender or the Debtors of their Obligations under the DIP Loan Documents from and after the date of this Interim Order.

19.     *Limitation on Use of DIP Financing Proceeds and Collateral.*  Notwithstanding any other provision of this Interim Order or any other order entered by the Court but expressly subject to the last sentence of this Paragraph, no DIP Loans, DIP Collateral, Prepetition Collateral (including Cash Collateral) or any portion of the Carve-Out, may be used directly or indirectly, including without limitation through reimbursement of professional fees of any non-Debtor party: (a) in connection with the investigation, threatened initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against the DIP Lender, the Prepetition Secured Parties, their respective predecessors-in-interest, affiliates, or Representatives, or any action purporting to do the foregoing, including in respect of the DIP Obligations, DIP Liens, DIP Superpriority Claims, Prepetition Secured Obligations, and/or the Adequate Protection Obligations and Adequate Protection Liens granted to the Prepetition Secured Parties, as applicable, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to the DIP Obligations, the Prepetition Secured Obligations and/or the liens, claims, rights, or security interests securing or supporting the DIP Obligations granted under this Interim Order, the Final Order, the DIP Loan Documents or Prepetition Loan Documents in respect of the Prepetition Secured Obligations, including, in the case of each (i) and (ii), without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; *provided* that, notwithstanding anything to the contrary herein, the proceeds of the DIP Loans and/or DIP Collateral (including Cash Collateral) may be used by the Creditors' Committee to investigate (but not to prosecute or initiate the prosecution of, including the preparation of any complaint or motion

on account of) (A) the claims and liens (including the validity and priority thereof whether by legal, equitable or other means) of the Prepetition Junior Term Loan Lender and (B) potential claims, counterclaims, causes of action or defenses against the Prepetition Junior Term Loan Lender, up to an aggregate cap of no more than $25,000; (b) to prevent, hinder, or otherwise delay or otherwise delay or interfere with the Prepetition Secured Parties' or the DIP Lender's, as applicable, enforcement or realization on the Prepetition Secured Obligations, Prepetition Collateral, DIP Obligations, DIP Collateral, and the liens, claims and rights granted to such parties under the Interim Order or Final Order, as applicable, each in accordance with the DIP Loan Documents, the Prepetition Loan Documents or this Interim Order; (c) to seek to modify any of the rights and remedies granted to the Prepetition Secured Parties or the DIP Lender under this Interim Order, the Prepetition Loan Documents or the DIP Loan Documents, as applicable; (d) to apply to the Court for authority to approve superpriority claims or grant liens (other than the liens permitted pursuant to the DIP Loan Documents) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens and 507(b) Claims granted to the Prepetition Secured Parties; or (e) to pay or to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are approved or authorized by the Court, agreed to in writing by the DIP Lender, expressly permitted under this Interim Order or permitted under the DIP Loan Documents (including the Approved DIP Budget, subject to permitted variances), in each case unless all DIP Obligations, Prepetition Secured Obligations, Adequate Protection Obligations, and claims granted to the DIP Lender and Prepetition Secured Parties under this Interim Order have been refinanced or paid in full in cash (including the cash collateralization of any letters of credit). For the avoidance of doubt, this Paragraph 19 shall not limit in any respect the Debtors' right to use any

cash, including DIP Collateral (including the proceeds thereof), Prepetition Collateral (including the proceeds thereof), Cash Collateral, the proceeds of the DIP Loans and the Carve-Out (i) in connection with (A) an investigation being conducted by the Special Committee of the Debtors' board of directors, including with respect to the Stipulations in Paragraphs G(f) through (j) of this Interim Order, and (B) any action, cause of action, adversary proceeding, litigation, contested matter or lawsuit relating thereto or arising therefrom, including any Challenge to the Stipulations in Paragraphs G(f) through (j) of this Interim Order, (ii) to contest whether an Event of Default has occurred hereunder pursuant to and consistent with Paragraph 7 of this Interim Order and (iii) to make any argument or other request in connection with an Emergency Hearing following a Termination Declaration or other exercise of remedies.

20.    *Indemnification*.  The Prepetition Secured Parties and the DIP Lender have acted in good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens, any challenges or objections to the DIP Facility or the use of Cash Collateral, the DIP Loan Documents, and all other documents related to and all transactions contemplated by the foregoing. Accordingly, without limitation to any other right to indemnification, the Prepetition Secured Parties and the DIP Lender shall be and hereby are indemnified (as applicable) as provided in the Prepetition Loan Documents and DIP Loan Documents, as applicable, including, without limitation, Section 10.2 of the DIP Credit Agreement.  The Debtors agree that no exception or defense in contract, law, or equity exists as of the date of this Interim Order to any obligation set forth, as the case may be, in this Paragraph 20 or otherwise in the DIP Loan Documents or in the

Prepetition Loan Documents to indemnify and/or hold harmless the DIP Lender or the Prepetition Secured Parties, as the case may be, and any such defenses that may be in existence as of the date of this Interim Order are hereby waived.

21.     *Interim Order Governs*.  In the event of any inconsistency between the provisions of this Interim Order and the DIP Loan Documents (including, but not limited to, with respect to the Adequate Protection Obligations) the provisions of this Interim Order shall govern. Notwithstanding the relief granted in any other order by this Court, (a) all payments and actions by any of the Debtors pursuant to the authority granted therein shall be subject to this Interim Order, including compliance with the Approved DIP Budget (subject to permitted variances) and all other terms and conditions hereof, and (b) to the extent there is any inconsistency between the terms of such other order and this Interim Order, this Interim Order shall control, in each case, except to the extent expressly provided otherwise in such other order.

22.     *Binding Effect; Successors and Assigns*.  The DIP Loan Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in the Chapter 11 Cases, including, without limitation, the DIP Lender, the Prepetition Secured Parties, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Lender, the Prepetition Secured Parties and the Debtors and their respective successors and assigns; *provided* that the DIP Lender and the Prepetition Secured Parties shall have no obligation to permit the use of the DIP Collateral and

Prepetition Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

23.    *Limitation on Liability*.  Nothing in this Interim Order, the DIP Loan Documents, the Prepetition Loan Documents or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender or the Prepetition Secured Parties any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts.  The DIP Lender and the Prepetition Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral or Prepetition Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person and all risk of loss, damage or destruction of the DIP Collateral or Prepetition Collateral shall be borne by the Debtors.  By virtue of making any loan or other extension of credit under the DIP Loan Documents, to permit the use of the DIP Collateral or Prepetition Collateral (including Cash Collateral), or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents or Prepetition Loan Documents, neither the DIP Lender nor the Prepetition Secured Parties shall (a) have any liability to any third party or be deemed to be in "control" of the operations of the Debtors, (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates, or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" or "managing agent" with respect to the operation or management of any of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, et seq., as amended, or any other

federal or state statute, including the Internal Revenue Code). Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

24.     *Master Proof of Claim.*  The Prepetition Secured Parties shall not be required to file proofs of claim in the Chapter 11 Cases or any Successor Case in order to assert claims for payment of the Prepetition Secured Obligations arising under the Prepetition Loan Documents, including, without limitation, any principal, unpaid interest, fees, expenses and other amounts under the Prepetition Loan Documents.  The statements of claim in respect of such indebtedness set forth in this Interim Order is deemed sufficient to and shall hereby constitute proofs of claim in respect of such debt and such secured status.  Any order entered by this Court in relation to the establishment of a bar date for any claim (including, without limitation, administrative claims) in any of the Chapter 11 Cases or any Successor Cases shall not apply to the Prepetition Secured Parties with respect to the Prepetition Secured Obligations (or with respect to the Adequate Protection Obligations).  However, in order to facilitate the processing of claims, each of the Prepetition Priority Bridge Loan Lender and the Prepetition Junior Term Loan Lender are authorized, but not directed or required, to file in the Debtors' lead chapter 11 case, Case No. 25-12089 (CTG), a single master proof of claim on behalf of each of them on account of any and all of their respective claims against any of the Debtors arising under the applicable Prepetition Loan Documents and hereunder (each, a "**Master Proof of Claim**").  Upon the filing of a Master Proof of Claim by either of the Prepetition Secured Parties, the filing lender shall be deemed to have filed a proof of claim in the amount set forth therein in respect of its claims against each of the Debtors of any

type or nature whatsoever with respect to the applicable Prepetition Loan Documents, and the claim of each applicable Prepetition Secured Lender (and each of its respective successors and assigns) specified in a Master Proof of Claim shall be treated as if it had filed a separate proof of claim in each of these Chapter 11 Cases. The Master Proofs of Claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition Secured Party, which instruments, agreements or other documents will be provided upon written request to counsel to the applicable Prepetition Secured Party. The DIP Lender shall similarly not be required to file proofs of claim with respect to its DIP Obligations under the DIP Loan Documents, and the evidence presented with the DIP Motion and the record established at the Interim Hearing are deemed sufficient to, and do, constitute proofs of claim with respect to its obligations, secured status, and priority.

25. *Insurance*. To the extent that either Prepetition Secured Party is listed as loss payee under the DIP Borrower's or DIP Guarantor's insurance policies, the DIP Lender is also deemed to be the loss payee under the insurance policies (in any such case with the same priority of liens and claims thereunder relative to the priority of the Prepetition Liens and Adequate Protection Liens as set forth herein), and shall act in that capacity and distribute any proceeds recovered or received in respect of the insurance policies, to the indefeasible payment in full of the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and termination of the DIP Commitments, and to the payment of the applicable Prepetition Secured Obligations.

26. *Credit Bidding*. (a) The DIP Lender shall have the immediate right to credit bid in accordance with the DIP Loan Documents, up to the full amount of the DIP Obligations in any sale of the DIP Collateral (or any portion thereof); (b) the Prepetition Priority Bridge Loan Lender

shall have the immediate right to credit bid in accordance with Prepetition Priority Bridge Loan Credit Documents, up to the full amount of the Prepetition Priority Bridge Loan Obligations (including any Adequate Protection Obligations), in any sale of the Prepetition Collateral (or any portion thereof); and (c) subject to any Challenge, section 363(k) of the Bankruptcy Code, and to the entry of the Final Order granting such relief, the Prepetition Junior Term Loan Lender shall have the right to credit bid in accordance with Prepetition Junior Term Loan Documents, up to the full amount of the Prepetition Junior Term Loan Obligations (including any Adequate Protection Obligations), in any sale of the Prepetition Collateral (or any portion thereof), in each case (i) without the need for further Court order authorizing the same, and (ii) whether any such sale is effectuated through section 363(k), 1123 or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.  Subject to the entry of the Final Order, the Special Committee's investigation, and any Challenge, in each instance solely with respect to the Prepetition Junior Term Loan Obligations, Prepetition Junior Term Loan Liens, and Prepetition Junior Term Loan Collateral, no Debtor shall object to the DIP Lender or the Prepetition Secured Parties credit bidding up to the full amount of the applicable outstanding DIP Obligations or Prepetition Secured Obligations (including any DIP Superpriority Claims and Adequate Protection Obligations), in each case including any accrued interest, fees, and expenses, in any sale of any DIP Collateral or Prepetition Collateral, as applicable, whether such sale is effectuated through sections 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

27.    *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 and shall take effect and be fully enforceable nunc pro tunc to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy

Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any Local Bankruptcy Rules, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

28. *Headings*.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

29. *Payments Held in Trust*.  Except as expressly permitted in this Interim Order or the DIP Loan Documents and except with respect to the Debtors, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral or receives any other payment with respect thereto from any other source prior to indefeasible payment in full in cash of all DIP Obligations and termination of all DIP Commitments, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Lender and shall immediately turn over the proceeds to the DIP Lender, or as otherwise instructed by this Court, for application in accordance with the DIP Loan Documents and this Interim Order.

30. *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001(b)(3), 4001(c)(3) 6003(b) and 6004(a), in each case to the extent applicable, are satisfied by the contents of the DIP Motion.

31. *No Third-Party Rights*.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect or incidental beneficiary.

32.     *Necessary Action*.  The Debtors, the DIP Lender and the Prepetition Secured Parties are authorized to take all actions as are necessary or appropriate to implement the terms of this Interim Order.

33.     *Retention of Jurisdiction*.  The Court shall retain jurisdiction to enforce the provisions of this Interim Order.

34.     *Final Hearing and Objections*.  The final hearing (the "**Final Hearing**") on the DIP Motion shall be held on January {{__}}, 2025, at {{___}}, prevailing Eastern Time.  On or before 4:00 p.m., prevailing Eastern Time, on December {{__}}, 2025, any objections or responses to entry of the Final Order shall be filed with this Court, and served on: (i) the Debtors, GBI Services, LLC, 3801 PGA Boulevard, Suite 565 Palm Beach Gardens, Florida 33410 (Attn: Jim Schnare (jim.schnare@nicklaus.com)); (ii)   proposed co-counsel to the Debtors: (a) Weil, Gotshal & Manges LLP, 1395 Brickell Avenue, Suite 1200 Miami, Florida 33131 (Attn: David J. Cohen (DavidJ.Cohen@weil.com)), and 767 Fifth Avenue New York, New York 10153 (Attn: Ronit Berkovich        (ronit.berkovich@weil.com)        and        Daphne        S.        Papadatos (Daphne.Papadatos@weil.com)) and (b) Richards, Layton & Finger, P.A. 920 North King Street Wilmington, Delaware 19801 (Attn: Zachary I. Shapiro (shapiro@rlf.com) and Clint M. Carlisle (carlisle@rlf.com); (iii) counsel for the DIP Lender: ((a) Maynard Nexsen PC, 1901 Sixth Avenue North,     Suite     1700,     Birmingham,     AL     35203     (Attn:     David     Kinman (dkinman@maynardnexsen.com) and Bethany Johnson (bethany.johnson@maynardnexsen.com)) and (b) Young Conaway Stargatt & Taylor, LLP, 1000 North King St., Wilmington, Delaware 19801 (Attn: Michael Nestor (mnestor@ycst.com) and Ryan Bartley (rbartley@ycst.com); (iv) counsel to any statutory committee appointed in these cases; and (v) the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, DE 19801 (Attn: Benjamin A.

Hackman, Esq. (benjamin.a.hackman@usdoj.gov)).  In the event no objections to entry of the Final

Order on the DIP Motion are timely received, this Court may enter such Final Order without need

for the Final Hearing.

# <u>Exhibit 1</u>

**DIP Credit Agreement**

**EXECUTION VERSION**

SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT
AGREEMENT

dated as of November [  ], 2025

among

NICKLAUS COMPANIES, LLC
as Borrower and Debtor,

and

FUNDNICK LLC
as DIP Lender

# SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

**THIS SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**, dated as of November [__], 2025 (as amended, restated, supplemented, increased, extended, supplemented or otherwise modified from time to time, this "**Agreement**"), is entered into by and between **NICKLAUS COMPANIES, LLC,** a Delaware limited liability company, in its capacity as a debtor and debtor in possession under chapter 11 of the Bankruptcy Code (the "**Borrower**"), certain Persons from time to time party hereto as Guarantors (collectively, the "**Guarantors**") and **FUNDNICK LLC,** a Delaware limited liability company (the "**DIP Lender**").

## RECITALS:

WHEREAS, on November 21, 2025 (the "Petition Date"), Borrower, and certain of its direct and indirect subsidiaries commenced Chapter 11 cases, which cases are being jointly administered under Chapter 11 Case No. 25-12088 (each a "Chapter 11 Case" and collectively, the "Chapter 11 Cases"), by filing separate voluntary petitions for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors (as defined herein) continue to operate their respective businesses and manage their respective properties as debtors and debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

WHEREAS, Borrower has requested, and DIP Lender has agreed, upon the terms and conditions set forth in this Agreement, to make available to Borrower a senior secured super-priority debtor-in-possession credit facility in a principal amount of up to $17,000,000.00. Borrower intends to utilize such credit facility, subject to the Financing Orders, to fund general corporate needs, including without limitation working capital and other needs in accordance with the Approved Budget, subject to any Permitted Variances, or as otherwise provided by the Financing Orders.

WHEREAS, certain subsidiaries of Borrower who comprise the other Debtors in the Chapter 11 Cases wish to guaranty the Guaranteed Obligations under this Agreement.

WHEREAS, each Debtor has agreed to secure all of the Obligations and the Guaranteed Obligations under the Credit Documents by granting to DIP Lender a security interest in and lien upon substantially all of their existing and after-acquired personal and real property (including as a debtor and debtor-in-possession) subject to the limitations and priorities contained in the Credit Documents and the Financing Orders.

WHEREAS, each Debtor acknowledges that it will receive substantial direct and indirect benefits by reason of the making of loans and other financial accommodations to Borrower as provided in this Agreement.

WHEREAS, DIP Lender desires to extend such credit facility to Borrower, on and subject to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises and the agreements contained herein, in reliance upon the representations, warranties, and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, and intending to be legally bound, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS AND INTERPRETATION

**Section 1.1**    Definitions. The following terms used herein, including in the introductory paragraph, recitals, exhibits and schedules hereto, shall have the following meanings:

"Acquisition" means, with respect to any Person, the acquisition by such Person, in a single transaction or in a series of related transactions, of (a) all or any substantial portion of the property of another Person, or any division, line of business or other business unit of another Person or (b) at least a majority of the Voting Stock of another Person, in each case whether or not involving a merger or consolidation with such other Person and whether for cash, property, services, assumption of Indebtedness, securities or otherwise.

"Actual Cash Receipts" means, with respect to any period, the actual amount that corresponds to the line item "Total Operating Receipts" as determined by reference to the Approved Budget as then in effect.

"Actual Net Operating Cash Flow" means, with respect to any period, the actual amount that corresponds to the line item "Net Cash Flow" in the Approved Budget as then in effect.

"Actual Operating Disbursement Amounts" means, with respect to any period, the actual amount that corresponds to the line item "Total Operating Disbursements" in the Approved Budget as then in effect.

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agreement" means as defined in the introductory paragraph hereto.

"Anti-Corruption Laws" means the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1, *et seq,* the UK Bribery Act of 2010 and all other laws, rules, and regulations of any jurisdiction applicable to any Obligor or any of its Affiliates from time to time concerning or relating to bribery or corruption.

"Applicable Laws" means all applicable laws, including all applicable provisions of constitutions, statutes, rules, ordinances, regulations and orders of all Governmental Authorities and all orders, rulings, writs and decrees of all courts, tribunals and arbitrators.

"Approved Budget" means a rolling thirteen (13) week forecast of projected receipts, disbursements, net cash flow, liquidity and loans for the immediately following consecutive thirteen (13) weeks after the date of delivery, which shall be in substantially the form of the Initial

3

Approved Budget or otherwise in form and substance acceptable to and approved by DIP Lender, in its sole discretion. The initial Approved Budget (the "Initial Approved Budget") is attached hereto as **Error! Reference source not found.**.  Any Proposed Budget submitted by the Debtor that is in form and substance acceptable to DIP Lender and approved in writing by the DIP Lender, in its sole discretion, shall become the "Approved Budget".

"Asset Sale" means a sale, lease, Sale and Leaseback Transaction, assignment, conveyance, exclusive license (as licensor), securitization transaction, transfer or other disposition to, or any exchange of property with, any Person, in one transaction or a series of transactions, of all or any part of any Debtor or any of its Subsidiaries' businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, created, leased or licensed, including the Equity Interests of any Subsidiary of Borrower, other than (a) dispositions of surplus, obsolete or worn out property or property no longer used or useful in the business of Borrower and its Subsidiaries, whether now owned or hereafter acquired, in the ordinary course of business; (b) dispositions of inventory sold in the ordinary course of business; (c) dispositions of accounts or payment intangibles (each as defined in the UCC) resulting from the compromise or settlement thereof in the ordinary course of business for less than the full amount thereof; and (d) dispositions of Cash Equivalents in the ordinary course of business.

"Authorized Officer" means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, president or one of its vice presidents (or the equivalent thereof), chief financial officer or treasurer.

"Bankruptcy Code" has the meaning given to such term in the introductory statements to this Agreement.

"Bankruptcy Court" has the meaning given to such term in the introductory statements to this Agreement.

"Bi-Weekly Budget Variance Report" means a report provided by Borrower to DIP Lender (a) showing, in each case, on a line item by line item and a cumulative basis, the Actual Cash Receipts, the Actual Operating Disbursement Amounts and the Actual Net Operating Cash Flow, in each case as of the last day of the Variance Testing Period then most recently ended, noting therein (i) all variances, on a cumulative basis, from the Budgeted Cash Receipts, the Budgeted Operating Disbursement Amounts and the Budgeted Net Operating Cash Flow for such period as set forth in the Approved Budget as in effect for such period; (ii) containing an indication as to whether each variance is temporary or permanent and analysis and explanations for all material variances; (iii) certifying compliance or non-compliance in such Variance Testing Period with the Permitted Variances; and (iv) including explanations for all material variances and violations, if any, of such covenant and if any such violation exists, setting forth the actions which Borrower has taken or intends to take with respect thereto and (b) which such reports shall contain supporting information, satisfactory to DIP Lender in its sole discretion.

"Bi-Weekly Proposed Budget" means the updated budget, which shall be delivered by Borrower in accordance with Section Section 7.1(c) on a bi-weekly basis to DIP Lender and its advisors which shall provide for an updated and supplemented cash flow forecast (the "Proposed

4

Budget") for the thirteen-week period commencing with the calendar week in which such Proposed Budget is delivered and reports of the information contained in the previous Approved Budget. Until any Proposed Budget, amendment, supplement or modification has been approved by DIP Lender, Borrower shall be subject to and be governed by the terms of the Approved Budget then in effect.

"Bi-Weekly Report" means (a) the Bi-Weekly Proposed Budget, (b) a cash balance report as of the immediately preceding Friday, (c) accounts payable and accounts receivable balance reports as of the immediately preceding Friday, (d) accounts payable and accounts receivable aging reports as of the immediately preceding Friday, (e) a revenue forecast, and (f) a schedule by Professional Person (as defined in the Financing Orders) of amounts paid to the Professional Person, amounts on deposit in the Professional Fee Reserve Account (as defined in the Financing Orders) on account of such Professional Person, and the amount set forth in the Approved DIP Budget for such Professional Person through the end of the reporting period.

"Bidding Procedures Motion" shall have the meaning given such term in Section 7.11 of this Agreement.

"Blocked Account" means any Deposit Account, Securities Account, or Commodity Account, each as defined in accordance with the UCC in effect from time to time, subject to a Blocked Account Agreement.

"Blocked Account Agreement" means an agreement with respect to any Blocked Account entered into by and among the applicable Debtor in whose name such Blocked Account is maintained, the applicable Blocked Account Bank, and the DIP Lender, which agreement shall be in form and form and substance reasonably satisfactory to DIP Lender and effective to establish "control" (within the meaning set forth in Sections 9-104 and 9-106 of the Uniform Commercial Code) of such Blocked Account in favor of the DIP Lender to the extent required to perfect the DIP Lender's Lien on such Blocked Account.

"Blocked Account Bank" means Northern Trust or any other institution(s) maintaining such Blocked Account in connection with a Blocked Account Agreement.

"Borrowing Request" has the meaning given to such term in Section Section 2.7.

"Budgeted Cash Receipts" means with respect to any period, the amount that corresponds to the line item "Total Cash Receipts" in the Approved Budget, as then in effect.

"Budgeted Net Operating Cash Flow" means with respect to any period, the actual amount that corresponds to the line item "Net Cash Flow" in the Approved Budget as then in effect.

"Budgeted Operating Disbursement Amounts" means with respect to any period, the amount that corresponds to the line item "Total Operating Disbursements" in the Approved Budget as then in effect.

"Business Day" means a day, other than Saturday or Sunday and legal holidays, when DIP Lender is open for business.

5

"Carve-Out" has the meaning given such term in the Financing Orders.

"Cash Collateral" has the meaning given to such term in the Financing Orders.

"Cash Equivalents" means, as of any date of determination, any of the following: (a) marketable securities (i) issued or directly and unconditionally guaranteed as to interest and principal by the United States government, or (ii) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one (1) year after such date; (b) marketable direct obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one (1) year after such date and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (c) commercial paper maturing no more than one (1) year from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (d) certificates of deposit or bankers' acceptances maturing within one (1) year after such date and issued or accepted by DIP Lender or any commercial bank that is organized under the laws of the United States or any state thereof or the District of Columbia that (i) is at least "adequately capitalized" (as defined in the regulations of its primary federal banking regulator), and (ii) has Tier 1 capital (as defined in such regulations) of not less than $100,000,000; and (e) shares of any money market mutual fund that (i) has substantially all of its assets invested continuously in the types of investments referred to in clauses (a) and (b) above, (ii) has net assets of not less than $500,000,000, and (iii) has the highest rating obtainable from either S&P or Moody's.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith, (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III and (iii) all requests, rules, guidelines or directives issued by a Governmental Authority in connection with DIP Lender's submission or re-submission of a capital plan under 12 C.F.R. § 225.8 or a Governmental Authority's assessment thereof shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Chapter 11 Case" and "Chapter 11 Cases" have the respective meanings given such terms in the recitals to this Agreement.

"Closing Date" means November [_], 2025.

"Closing Date Guarantors" means all Subsidiaries of Borrower executing this Agreement on the Closing Date and denoted as a "Guarantor".

"Collateral" means the collateral identified in, and at any time covered by, the Collateral Documents, including, without limitation, the DIP Collateral as defined in the Financing Orders.

"Collateral Documents" means the Financing Orders and all other instruments, documents and agreements delivered by any Obligor pursuant to this Agreement or any of the other Credit Documents in order to grant to DIP Lender, for the benefit of the holders of the Obligations, a Lien on any real, personal or mixed property of that Obligor as security for the Obligations.

"Commitments" means Interim DIP Loan Commitments and Final DIP Loan Commitments.

"Consolidated Basis" means, with respect to Borrower and its Subsidiaries, on a consolidated basis in accordance with GAAP.

"Contractual Obligation" means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Credit Document" means this Agreement, the Note, each Collateral Document, each Subordination Agreement, any assumption agreement or joinder pursuant to which a Subsidiary becomes a Guarantor, and, to the extent evidencing or securing the Obligations, all other documents, instruments or agreements executed and delivered by any Obligor for the benefit of DIP Lender in connection herewith or therewith.

"Debt Transaction" means, with respect to Borrower or any of its Subsidiaries, any sale, issuance, placement, assumption or guaranty of Funded Debt, whether or not evidenced by a promissory note or other written evidence of Indebtedness.

"Debtor" and "Debtors" means, individually and collectively, as applicable, Borrower and each Guarantor.

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"Debtors' Investigation" means an investigation by the Debtors' Special Committee into, among other things, the subject matter of the stipulations set forth in the Financing Orders concerning the Prepetition Junior Term Loan Facility.

"Default" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

7

"Default Rate" means the interest rate that is the lesser of (i) three percent (3 %) per annum above the then applicable DIP Rate, and (ii) the Highest Lawful Rate.

"DIP Liens" means the valid, binding, continuing, enforceable and fully and automatically perfected liens on the Collateral having the priorities described in the Financing Orders.

"DIP Loan" means the Interim DIP Loan and Final DIP Loan.

"DIP Rate" means interest on the principal balance of the Loan, payable at a per annum rate which shall be 850 basis points (8.50%).

"DIP Superpriority Claims" means liabilities and obligations pursuant to Section 364(c)(1) of the Bankruptcy Code, entitled to superpriority administrative expense claim status against each of the Debtors, with the priority described in the Financing Orders.

"Dollars" and the sign "$" mean the lawful money of the United States.

"Domestic Subsidiary" means any Subsidiary that is organized in the United States, any state thereof or the District of Columbia.

"Environmental Claim" means any known investigation, written notice, notice of violation, written claim, action, suit, proceeding, written demand, abatement order or other written order or directive (conditional or otherwise), by any Person arising (a) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (b) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (c) in connection with any actual or alleged damage, injury, threat or harm to human health, safety, natural resources or the environment.

"Environmental Laws" means any and all current or future federal or state (or any subdivision of either of them), statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations, or any other written requirements of Governmental Authorities relating to (a) any Hazardous Materials Activity; (b) the generation, use, storage, transportation or disposal of Hazardous Materials; or (c) protection of human health and the environment from pollution, in any manner applicable to any Debtor or any of its Subsidiaries or their respective Facilities.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Borrower, any other Debtor or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which Borrower or any Subsidiary of Borrower assumed liability with respect to any of the foregoing.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights

8

for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"Equity Transaction" means, with respect to Borrower or any of its Subsidiaries, any issuance or sale by such Borrower or such Subsidiary of shares of its Equity Interests, to include, without limitation, any capital contribution by such Person's existing members, partners or shareholders, as applicable, other than an issuance (a) to any Borrower or any Subsidiary of Borrower, (b) in connection with a conversion of debt securities to equity, (c) in connection with the exercise by a present or former employee, officer or director under a stock incentive plan, stock option plan or other equity-based compensation plan or arrangement, or (d) which occurred prior to the Closing Date.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended to the date hereof and from time to time hereafter, any successor statute, and the regulations thereunder.

"ERISA Affiliate" means, as applied to any Person, (a) any corporation that is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member; (b) any trade or business (whether or not incorporated) that is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member; and (c) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (a) above or any trade or business described in clause (b) above is a member.

"ERISA Event" means (a) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which notice to the PBGC has been waived by regulation); (b) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(c) of the Internal Revenue Code), the failure to make by its due date any minimum required contribution or any required installment under Section 430(j) of the Internal Revenue Code with respect to any Pension Plan or the failure to make by its due date any required contribution to a Multiemployer Plan; (c) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (d) the withdrawal from any Pension Plan with two (2) or more contributing sponsors or the termination of any such Pension Plan, in either case resulting in material liability pursuant to Section 4063 or 4064 of ERISA; (e) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition reasonably likely to constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (f) the imposition of liability pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA, each case reasonably likely to result in material liability;

9

(g) the withdrawal of any Debtor, any of its Subsidiaries or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if such withdrawal is reasonably likely to result in material liability, or the receipt by any Debtor, any of its Subsidiaries or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4245 of ERISA, or that it is in "critical" or "endangered" status within the meaning of Section 103(f)(2)(G) of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA, if such reorganization, insolvency or termination is reasonably likely to result in material liability; (h) the imposition of fines, penalties, taxes or related charges under Chapter 43 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Pension Plan if such fines, penalties, taxes or related charges are reasonably likely to result in material liability; (i) the assertion of a claim (other than routine claims for benefits and funding obligations in the ordinary course) against any Pension Plan other than a Multiemployer Plan or the assets thereof, or against any Person in connection with any Pension Plan such Person sponsors or maintains which is reasonably likely to result in material liability; (j) receipt from the Internal Revenue Service of a final written determination of the failure of any Pension Plan intended to be qualified under Section 401(a) of the Internal Revenue Code to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any such plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; or (k) the imposition of a lien pursuant to Section 430(k) of the Internal Revenue Code or pursuant to Section 303(k) or 4068 of ERISA.

"Event of Default" means each of the conditions or events set forth in Section 9.1.

"Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"Facility" means any real property including all buildings, fixtures or other improvements located on such real property now, hereafter or heretofore owned, leased, operated or used by Borrower or any of its Subsidiaries or any of their respective predecessors.

"Final DIP Order" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing pursuant to Sections 105, 326, 363, 364, 503 and 507 of the Bankruptcy Code and Bankruptcy Rule 4001, that shall be in the form of the Interim DIP Order with any changes thereto that are satisfactory to DIP Lender, together with all extensions, modifications and amendments thereto in form and substance satisfactory to DIP Lender, authorizing Borrower to obtain credit, incur Indebtedness, and grant Liens under this Agreement and/or certain financing documentation, all as set forth in such order.

"Financing Orders" means, collectively, the Interim DIP Order and the Final DIP Order, as applicable.

"Final DIP Loan" means as defined in Section 2.1.

"Final DIP Loan Commitment" means the commitment of DIP Lender to make the Final DIP Loan hereunder. The Final DIP Loan Commitment as of the Closing Date is set forth on **APPENDIX A**.

"<u>Fiscal Quarter</u>" means a fiscal quarter of any Fiscal Year.

"<u>Fiscal Year</u>" means the fiscal year of Borrower and its Subsidiaries ending on December 31 of each calendar year.

"<u>Foreign Subsidiary</u>" means any Subsidiary that is not a Domestic Subsidiary.

"<u>Funded Debt</u>" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)      all obligations for borrowed money, whether current or long-term (including the Obligations hereunder), all obligations evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)      all obligations in respect of the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and, in each case, not past due for more than sixty (60) days after the date on which such trade account payable was created), recognized as a liability on the balance sheet of Borrower and its Subsidiaries in accordance with GAAP;

(c)      all obligations under letters of credit (including standby and commercial), bankers' acceptances and similar instruments (including bank guaranties);

(d)      [Intentionally omitted];

(e)      all preferred stock and comparable equity interests providing for mandatory redemption, sinking fund or other like payments;

(f)      all Funded Debt of others secured by (or for which the holder of such Funded Debt has an existing right, contingent or otherwise, to be secured by) any Lien on, or payable out of the proceeds of production from, property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed;

(g)      all Guarantees in respect of Funded Debt of another Person; and

(h)      Funded Debt of any partnership or joint venture or other similar entity in which such Person is a general partner or joint venturer, and, as such, has personal liability for such obligations, but only to the extent there is recourse to such Person for payment thereof.

For purposes hereof, the amount of Funded Debt shall be determined (x) based on the outstanding principal amount in the case of borrowed money indebtedness under <u>clause (a)</u> and purchase money indebtedness and the deferred purchase obligations under <u>clause (b)</u>, (y) based on the maximum amount available to be drawn in the case of letter of credit obligations and the other obligations under <u>clause (c)</u>, and (z) based on the amount of Funded Debt that is the subject of the Guarantees in the case of Guarantees under <u>clause (g)</u>.

"GAAP" means, subject to the limitations on the application thereof set forth in Section 1.2, accounting principles generally accepted in the United States in effect as of the date of determination thereof.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank and any group or body charged with setting financial accounting or regulatory capital rules or standards).

"Governmental Authorization" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner (including as a result of joint and several liability with such primary obligor), whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guaranteed Obligations" means as defined in Section 4.1.

"Guarantors" means the Closing Date Guarantors and their successors and permitted assigns.

"Guaranty" means the Guarantee made by the Guarantors in favor of DIP Lender and the other holders of the Obligations pursuant to Article 4.

"Hazardous Materials" means any hazardous substances defined by the Comprehensive Environmental Response Compensation and Liability Act, 42 USCA 9601, et. seq., as amended,

12

including any hazardous waste as defined under 40 C.F.R. Parts 260-270, gasoline or petroleum (including crude oil or any fraction thereof), asbestos or polychlorinated biphenyls.

"Hazardous Materials Activity" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"Highest Lawful Rate" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under Applicable Laws relating to DIP Lender which are currently in effect or, to the extent allowed under such Applicable Laws, which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than Applicable Laws now allow.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

        (a)      all Funded Debt;

        (b)      all Guarantees in respect of Indebtedness of another Person; and

        (c)      all Indebtedness of the types referred to in clauses (a) through (c) above of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which Borrower or a Subsidiary is a general partner or joint venturer, unless such Indebtedness is expressly made non-recourse to such Borrower or such Subsidiary.

"Indemnitee" means as defined in Section 10.2(b).

"Intellectual Property" means all trademarks, service marks, trade names, copyrights, patents, patent rights, franchises related to intellectual property, licenses related to intellectual property and other intellectual property rights.

"Intercreditor Agreement" means that certain Intercreditor Agreement dated as of November 14, 2025, by and among Prepetition Priority Bridge Lender and Prepetition Junior Term Lender and consented to by Borrower, as amended, supplemented, modified, replaced, substituted for or restated from time to time and all exhibits and schedules attached thereto.

"Interest Payment Date" means December [___], 2025, and the same day of each calendar month thereafter.

"Interim DIP Loan" means as defined in Section 2.1.

"Interim DIP Loan Commitment" means the commitment of DIP Lender to make the Interim DIP Loan hereunder. The Interim DIP Loan Commitment as of the Closing Date is set forth on **APPENDIX A**.

"Interim DIP Order" means the interim order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed in Sections 105, 326, 363, 364, 503 and 507 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), that shall be in the form attached hereto as Exhibit B, together with all extensions, modifications and amendments thereto that are reasonably satisfactory in form and substance to DIP Lender, authorizing, on an interim basis, Borrower to execute and perform under the terms of this Agreement and the other Credit Documents.

"Internal Revenue Code" means the Internal Revenue Code of 1986.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor Guarantees any Indebtedness of such other Person, or (c) an Acquisition. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"Involuntary Disposition" means the receipt by Borrower or any of its Subsidiaries of any cash insurance proceeds or condemnation awards payable by reason of theft, loss, physical destruction or damage, taking or similar event with respect to any of its Property.

"IRS" means the United States Internal Revenue Service.

"Lender Professionals" means professionals retained by the DIP Lender and Prepetition Secured Parties, which professionals shall be limited to (a) Maynard Nexsen PC, (b) Young Conaway Stargatt & Taylor, LLP, and (c) any required local counsel, subject to the consent of the Debtors (not to be unreasonably withheld).

"Lien" means (a) any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease or license in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing, and (b) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"Loan" means the DIP Loan, together with all amendments, supplements, restatements, modifications, consolidations or refinancings thereto.

"Margin Stock" means as defined in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"Material Adverse Effect" means, since the Petition Date, any event, circumstance or condition that, individually or in the aggregate, has had or would reasonably be expected to have a materially adverse effect on (i) the business, assets, properties, liabilities (contingent or otherwise), financial condition or results of operations of the Debtors, other than any material

14

adverse changes leading up to, or customarily resulting from, the filing of the Chapter 11 Cases or the existence of the Chapter 11 Cases, (ii) the ability of the Debtors to perform their obligations under the DIP Loan, (iii) the validity or enforceability against the Debtor of the DIP Loan or (iv) the material rights and remedies of DIP Lender under the DIP Loan.

"Maturity Date" means the earliest to occur of (i) the date that is 150 days after the Petition Date; (ii) the date of consummation of any sale or disposition of all or substantially all of the Debtors' assets; (iii) the date of substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court; and (iv) the date of acceleration of all the DIP Loan and the termination of the DIP Commitments upon the occurrence and during the continuance of an Event of Default (as defined below); *provided* that the dates in clauses (i) and (ii) may be extended with the prior written consent of DIP Lender, in its sole discretion.

"Moody's" means Moody's Investor Services, Inc., together with its successors.

"Multiemployer Plan" means any "multiemployer plan" as defined in Section 3(37) of ERISA that is sponsored, maintained or contributed to by, or required to be contributed to by, any Debtor or any of its ERISA Affiliates or with respect to which any Debtor or any of its ERISA Affiliates previously sponsored, maintained or contributed to or was required to contributed to, and still has liability.

"Net Cash Proceeds" means the aggregate proceeds paid in cash or Cash Equivalents received by Borrower or any of its Subsidiaries in connection with any Involuntary Disposition, Debt Transaction or Equity Transaction, net of (a) direct costs incurred or estimated costs for which reserves are maintained, in connection therewith (including legal, accounting and investment banking fees and expenses, sales commissions and underwriting discounts) and (b) estimated taxes paid or payable (including sales, use or other transactional taxes and any net marginal increase in income taxes) as a result thereof. For purposes hereof, "Net Cash Proceeds" includes any cash or Cash Equivalents received upon the disposition of any non-cash consideration received by Borrower or any of its Subsidiaries in any Involuntary Disposition, Debt Transaction or Equity Transaction.

"Note" means that certain Promissory Note dated as of even date herewith payable by Borrower to DIP Lender and evidencing the Loan, together with all amendments, supplements, restatements, modifications, consolidations or refinancings thereto.

"Obligations" means all obligations, indebtedness and other liabilities of every nature of each Obligor from time to time owed to DIP Lender under any Credit Document, together with all renewals, extensions, modifications or refinancings of any of the foregoing, whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy with respect to such Obligor, would have accrued on any Obligation, whether or not a claim is allowed against such Obligor for such interest in the related bankruptcy proceeding).

"Obligor" means each Debtor.

"OFAC" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"Organizational Documents" means (a) with respect to any corporation, its certificate or articles of incorporation or organization, as amended, and its by-laws, as amended, (b) with respect to any limited partnership, its certificate of limited partnership, as amended, and its partnership agreement, as amended, (c) with respect to any general partnership, its partnership agreement, as amended, and (d) with respect to any limited liability company, its articles of organization, certificate of formation or comparable documents, as amended, and its operating agreement, as amended. In the event any term or condition of this Agreement or any other Credit Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"Patriot Act" means as defined in Section 5.1(j).

"PBGC" means the Pension Benefit Guaranty Corporation or any successor thereto.

"Pension Plan" means any "employee pension benefit plan" as defined in Section 3(2) of ERISA other than a Multiemployer Plan, which is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA and which is sponsored, maintained or contributed to by, or required to be contributed to by, any Debtor or any of its ERISA Affiliates or with respect to which any Debtor or any of its ERISA Affiliates previously sponsored, maintained or contributed to, or was required to contribute to, and still has liability.

"Permitted Liens" means those certain Liens described in Section Section 8.2

"Permitted Lines of Business" means any business engaged in any Debtor or its Subsidiaries as of the Closing Date and businesses that are substantially similar, related or incidental thereto, and, the offering of products and services that are complementary or ancillary thereto, as may be adjusted from time to time subject to the sole discretion of DIP Lender.

"Permitted Variances" means (i) Actual Disbursements that are not more than one hundred fifteen percent (115%) of Budgeted Operating Disbursement Amounts for any Variance Testing Period, in each instance, excluding disbursements to Lender Professionals, and (ii) Actual Receipts that are at least eighty percent (80%) of Budgeted Cash Receipts for any Variance Testing Period.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning given such term in the recitals to this Agreement.

"Prepetition Junior Term Lender" means PMP Nick LLC, f/k/a Emigrant GB LLC.

"Prepetition Junior Term Loan Documents" means the Prepetition Junior Term Loan Facility, that certain Security and Pledge Agreement executed pursuant thereto, and the other instruments or agreements (including notes) executed and delivered in connection therewith.

16

"<u>Prepetition Junior Term Loan Facility</u>" means that certain Term Loan and Guaranty Agreement, dated as of May 25, 2007, by and among Nicklaus Companies, LLC, as borrower thereunder, and Prepetition Junior Term Lender, as lender thereunder. The Prepetition Junior Term Loan Facility shall at all times be subordinate to the DIP Loan and the Prepetition Priority Bridge Loan Facility pursuant to the Intercreditor Agreement.

"<u>Prepetition Junior Term Loan Obligations</u>" means the obligations due and owing under the Prepetition Junior Term Loan Facility, including premiums, costs, fees, and expenses.

"<u>Prepetition Liens</u>" has the meaning given such term in the Financing Orders.

"<u>Prepetition Obligations</u>" means the Prepetition Priority Bridge Loan Obligations and the Prepetition Junior Term Loan Obligations.

"<u>Prepetition Permitted Liens</u>" means certain liens senior by operation of law (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Liens as of the Petition Date, or valid, non-avoidable, senior priority liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by Section 546(b) of the Bankruptcy Code).

"<u>Prepetition Priority Bridge Lender</u>" means FundNick LLC.

"<u>Prepetition Priority Bridge Loan Documents</u>" means the Prepetition Priority Loan Facility, that certain Pledge and Security Agreement executed pursuant thereto, and the other instruments or agreements (including notes) executed and delivered in connection therewith.

"<u>Prepetition Priority Bridge Loan Facility</u>" means that certain Credit Agreement, dated as of November 14, 2025, by and between Nicklaus Companies, LLC, as borrower thereunder, and Prepetition Priority Lender, as lender thereunder.

"<u>Prepetition Priority Bridge Loan Obligations</u>" means the obligations due and owing under the Prepetition Priority Loan Facility, including premiums, costs, fees, and expenses.

"<u>Prepetition Secured Parties</u>" means the Prepetition Priority Bridge Lender and Prepetition Junior Term Lender.

"<u>Professional Fee Reserve</u>" has the meaning given to such term in the Financing Orders.

"<u>Property</u>" means an interest of any kind in any property or asset, whether real, personal or mixed, and whether tangible or intangible.

"<u>Proposed Budget</u>" has the meaning given to such term in the definition of "Bi-Weekly Proposed Budget".

"<u>Real Estate Asset</u>" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by Borrower or any of its Subsidiaries in any real property.

17

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Release" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"Representatives" means with respect to a Person, such Person's subsidiaries, Affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests of Borrower or any Subsidiary of Borrower, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests or on account of any return of capital to any such Person's stockholders, partners or members (or the equivalent Person thereof), or any setting apart of funds or property for any of the foregoing.

"S&P" means Standard & Poor's Financial Services LLC, a subsidiary of The McGraw-Hill Companies, Inc., together with its successors.

"Sale and Leaseback Transaction" means, with respect to Borrower or any Subsidiary of Borrower, any arrangement, directly or indirectly, with any Person (other than a Debtor) whereby such Borrower or such Subsidiary shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

"Sanctioned Country" means (a) a country, region, territory or a government of a country or territory, (b) an agency of the government of a country, region or territory, or (c) an organization directly or indirectly owned or controlled by a country, region, territory or its government, that is subject to Sanctions.

"Sanctioned Person" means (a) a Person named on the list of "Specially Designated Nationals" or any other Sanctions related list of designated Persons maintained by OFAC, the U.S. Department of State, the United Nations Security Council, the European Union or any European Union member state, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b).

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those

18

administered by OFAC or the U.S. Department of State, (b) the United Nations Security Council, (c) the European Union, (d) any European Union member state, (e) His Majesty's Treasury of the United Kingdom or (f) any other relevant sanctions authority.

"Securities" means any stock, shares, partnership interests, limited liability company interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement (e.g., stock appreciation rights), options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"Subordinated Debt" means any Indebtedness of Borrower to any shareholder, officer, director or Affiliate of Borrower, which Indebtedness shall be properly subordinated to the Loan. In order for said Indebtedness to properly be Subordinated Debt, Borrower must cause each shareholder, officer, director or Affiliate to execute any and all documents reasonably required by DIP Lender to subordinate such Indebtedness.

"Subordination Agreement" means, collectively, those certain subordination agreements with respect to Subordinated Debt, which shall be executed and delivered in connection therewith and as a condition thereto, each of which must be acceptable to DIP Lender in its sole and absolute discretion. For the avoidance of doubt, the Intercreditor Agreement shall be a Subordination Agreement.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than fifty percent (50%) of the Voting Stock is at the time owned or controlled, directly or indirectly, by that Person, or the accounts of which would be consolidated with those of such Person in its consolidated financial statements in accordance with GAAP, if such statements were prepared as of such date, or one or more of the other Subsidiaries of that Person or a combination thereof; provided, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding. Unless otherwise provided, "Subsidiary" shall refer to a Subsidiary of Borrower.

"Successor Case" has the meaning given such term in the Financing Orders.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"UCC" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in the State of New York (or any other applicable jurisdiction, as the context may require).

"United States" or "U.S." means the United States of America.

19

"Variance Testing Period" means, starting the fourth full week following the Petition Date the four-week period ending on the fourth Sunday following the Petition Date and each week thereafter the rolling four-week period ending on each Sunday.

"Voting Stock" means, with respect to any Person, Equity Interests issued by such Person the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even though the right so to vote has been suspended by the happening of such a contingency.

**Section 1.2**    Accounting Terms. All accounting terms not specifically defined herein shall be construed in accordance with GAAP consistent with those applied in the preparation of the financial statements referred to in Section 6.7 and Section 7.1, and all financial data submitted pursuant to this Agreement shall be prepared in accordance with such principles. Furthermore, in the calculation of income, expenses and other accounting items, all calculations shall be done on a Consolidated Basis and without duplication among each Borrower and all other Persons properly included thereunder in accordance with GAAP.

**Section 1.3**    Terms Not Defined. Terms contained in this Agreement shall, unless otherwise defined herein or unless the context otherwise indicates, have the meanings, if any, assigned to them by the UCC.

**Section 1.4**    Patent Errors. DIP Lender may, without further authorization from Borrower, correct any and all patent errors in this Agreement or any other Credit Document; provided DIP Lender shall provide Borrower with written notice of such correction.

**Section 1.5**    Singular v. Plural; Amendments. References to the plural shall include the singular, and references to the singular shall include the plural. All references to other documents or instruments shall be deemed to refer to such documents or instruments as they may hereafter be extended, renewed, modified, or amended and all replacements and substitutions therefor.

**Section 1.6**    [Intentionally omitted].

**Section 1.7**    Payment to DIP Lender. All sums payable to DIP Lender hereunder shall be paid directly to DIP Lender in United States Dollars and immediately available funds at the place payment is due. If DIP Lender shall send to Borrower statements of amounts due hereunder, such statements shall be considered correct and conclusively binding on Borrower unless Borrower notifies DIP Lender to the contrary within thirty (30) days of Borrower's receipt of any statement which it deems to be incorrect. Alternatively, at its sole discretion, DIP Lender may charge against any deposit account of Borrower all or any part of any amount due hereunder, and by its execution of this Agreement Borrower expressly authorizes DIP Lender to debit any deposit account or other funds maintained with DIP Lender to satisfy any amount due and owing for interest, principal, fees or expenses under this Agreement or any other Credit Document.

**Section 1.8**    Default Rate. Upon the occurrence and continuation of an Event of Default, all Obligations shall accrue interest from the date of such Event of Default until such Event of Default is cured (which determination shall be made in DIP Lender's sole and absolute discretion) at the Default Rate.

20

**Section 1.9**    <u>Savings Clause</u>. If, at any time, the DIP Rate or the Default Rate shall be deemed by any competent court of law, governmental agency or tribunal to exceed the maximum rate of interest permitted by any Applicable Laws, then, for such time as the DIP Rate or the Default Rate, as applicable, would be deemed excessive, its application shall be suspended and there shall be charged instead the maximum rate of interest permissible under such laws, and any excess interest or charges actually collected by DIP Lender shall be credited as a partial prepayment of principal.

**Section 1.10**    <u>360 Day Year</u>. Interest hereunder shall be calculated on the basis of a 360-day year, by multiplying the product of the principal amount outstanding for the Loan and the applicable rate by the actual number of days elapsed, and dividing by 360.

**Section 1.11**    <u>Conditions of Loan</u>. Borrower will not, directly or indirectly, use any part of such proceeds for the purpose of purchasing or carrying any Margin Stock or to extend credit to any Person for the purpose of purchasing or carrying any such Margin stock, or for any purpose which violates, or is inconsistent with, Regulation X of such Board of Governors.

**Section 1.12**    <u>Reimbursement for Increased Costs</u>. If any law or guideline or interpretation or application thereof by any Governmental Authority charged with the interpretation or administration thereof or compliance with any request or directive of any Governmental Authority (whether or not having the force of law) now existing or hereafter adopted (a) subjects DIP Lender to any Tax or changes the basis of taxation with respect to this Agreement, the Loan, any other Credit Document or payments by Borrower of principal, interest or other amounts due from Borrower hereunder or thereunder (except for Taxes on the overall net income or overall gross receipts of DIP Lender imposed as a result of a present or former connection between the jurisdiction of the Governmental Authority imposing such Tax on DIP Lender, provided that this exclusion shall not apply to a connection arising solely from DIP Lender having executed, delivered, performed its obligations under, or received a payment under, or enforced, any of the Credit Documents), or (b) imposes upon DIP Lender any other condition or expense with respect to this Agreement, any Credit Document, the Loan, or their making, maintenance or funding of any part of the Loan, or any security therefor, and the result of any of the foregoing is to increase the cost to, reduce the income receivable by, or impose any expense (including, without limitation, loss of margin) upon, DIP Lender with respect to the Loan, or the making, maintenance or funding of any part of the Loan, by an amount which DIP Lender deems to be material, DIP Lender may from time to time notify Borrower of the amount determined in good faith (using any averaging and attribution methods) by DIP Lender (which determination shall be conclusive) to be necessary to compensate DIP Lender for such increase, reduction or imposition and, if Borrower is by law prohibited from paying any such amount, DIP Lender may elect to declare the unpaid principal balance hereof and all interest accrued thereon immediately due and payable. Such amount shall be due and payable by Borrower to DIP Lender seven (7) days after such notice is given.

## ARTICLE 2
## <u>THE LOAN</u>

**Section 2.1**    <u>Loan.</u>

21

(a)     Subject to the terms and conditions set forth herein, including the satisfaction of the conditions precedent in Section Section 5.1, DIP Lender will advance a term loan (the "Interim DIP Loan") in an amount not to exceed the Interim DIP Loan Commitment, which Interim DIP Loan will be disbursed to Borrower in Dollars in an initial advance on the Interim DIP Loan in an amount not to exceed the Interim DIP Loan Commitment. For the avoidance of doubt, (i) upon disbursement on the Interim DIP Loan, the Interim DIP Loan Commitment (but not the Final DIP Loan Commitment) shall terminate, and (ii) amounts repaid on the Interim DIP Loan may not be reborrowed.

(b)     Subject to the terms and conditions set forth herein, including the satisfaction of the conditions precedent in Section Section 5.2, DIP Lender will advance an additional term loan (the "Final DIP Loan") in an amount not to exceed the Final DIP Loan Commitment, which Final DIP Loan will be funded in Dollars on the date specified in the applicable Borrowing Request submitted following a request pursuant to Section Section 2.7. For the avoidance of doubt, (i) upon Borrowing Request disbursement on the applicable date of borrowing, the Final DIP Loan Commitment shall be reduced in an amount equal to the Final DIP Loan funded on such date, and (ii) amounts repaid on the Final DIP Loan may not be reborrowed.

(c)     Once funded, both the Final DIP Loan and the Interim DIP Loan shall constitute a portion of the "DIP Loan" for all purposes herein and shall have the same terms and be treated as a single class of the DIP Loan.

### Section 2.2    Priority of Obligations and DIP Lender's Liens

(a)     To secure all of the Obligations now existing or hereafter arising, each Debtor hereby grants to DIP Lender (i) a super-priority administrative claim against each of the Debtors pursuant to Section 364(c)(1) of the Bankruptcy Code, and except as set forth in the Financing Orders (including with respect to the Carve-Out), having a priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 363, 364, 503, 506, 507, 546, 726, 1113 or 1114 or any other provision of the Bankruptcy Code or otherwise (whether incurred in these Chapter 11 Cases and any Successor Case), and, except as set forth in the Financing Orders (including with respect to the Carve-Out), shall at all times be senior to the rights of the Debtors or any domestic or foreign Subsidiary of the Debtors, any successor trustee or estate representative, or any other creditor or party in interest in the Chapter 11 Cases or any Successor Case, and (ii) pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code and subject to clause (b) below, Liens on, and security interests in, the Collateral.

(b)     The priority of DIP Lender's Liens on the Collateral shall be as set forth in the Financing Orders.

(c)     Notwithstanding anything herein to the contrary (i) all proceeds received by DIP Lender from the Collateral subject to the Liens granted in this Section Section 2.2 and in each other Credit Document and by the Financing Orders shall be subject to the priorities set forth in the Financing Orders, and (ii) no Person entitled to the Carve-Out shall be entitled to sell, or otherwise dispose, or seek or object to the sale or other disposition of, such Collateral, subject to any such Person's fiduciary obligations.

22

(d)     Each of the Debtors agrees for itself that the Obligations of such Person shall constitute allowed administrative expenses in the Chapter 11 Cases, having priority over all administrative expenses of and unsecured claims against such Person now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, except as set forth in the Financing Orders (including with respect to the Carve-Out).

(e)     Upon the maturity (whether by acceleration or otherwise) of any of the Obligations, DIP Lender shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

Section 2.3     Note. Borrower shall execute and deliver to DIP Lender on the Closing Date, the Note to evidence the DIP Loan.

Section 2.4     Payments to DIP Lender.

(a)     Accrued interest on the funded DIP Loan shall be payable in kind on each Interest Payment Date by adding such accrued interest to the principal amount of the DIP Loan. Interest on past due amounts, including fees and expenses, shall be added to the principal on a monthly basis; and

(b)     The principal sum of the DIP Loan, together with all accrued, unpaid, interest and fees, shall be payable on the Maturity Date and, for the avoidance of doubt, there shall be no scheduled principal payment due prior to the Maturity Date.

Section 2.5     Interest Rate. Interest on the principal balance of the DIP Loan, from time to time funded and outstanding, shall be payable at the DIP Rate.

Section 2.6     Default Rate of Interest. During the continuance of an Event of Default, interest shall accrue on the principal amount of all outstanding Obligations hereunder at the Default Rate, to the fullest extent permitted by Applicable Laws.

Section 2.7     Borrowing Requests. Borrower may request a Final DIP Loan by submitting to DIP Lender a written request (including via email) for advance by an authorized officer or other representative of Borrower (a "Borrowing Request"), subject to the following: (a) each such Borrowing Request shall include the proposed amount of such Final DIP Loan and the proposed date of borrowing, which date must be a Business Day; (b) each such Borrowing Request shall be communicated to DIP Lender by 2:00 p.m. (Eastern Time) on the Business Day immediately preceding the proposed date of borrowing; and (c) the amount of the Final DIP Loan requested by such request shall not exceed the Final DIP Loan Commitments remaining at such time.

Section 2.8     Prepayments.

(a)     Voluntary Prepayments. Borrower may prepay the DIP Loan on any Business Day in whole or in part without premium or penalty. Any such voluntary prepayment shall be applied as specified in Section Section 2.9.

(b)    Mandatory Prepayments. Prepayments will be made on the Obligations in an amount equal to:

(i)    <u>Asset Sales and Involuntary Dispositions</u>. 100% of the Net Cash Proceeds of any sale or disposition of all or substantially all of the Debtors' assets either (a) pursuant to Section 363 of the Bankruptcy Code or (b) pursuant to a plan of reorganization, in each case, simultaneously with the consummation thereof, after funding the Carve-Out; *provided,* that $200,000 to allow the Debtors to wind down their estates plus sufficient funds to pay all accrued and unpaid administrative claims incurred in accordance with the Approved Budget up to the amounts set forth therein (along with any Permitted Variances) shall be permitted to be retained by the Debtors and used for such purpose;

(ii)    <u>Debt Transactions</u>. 100% of the Net Cash Proceeds received from the incurrence or issuance of indebtedness by Borrower or Guarantors or their subsidiaries not permitted to be incurred or issued pursuant to clause (iii) of the section entitled "Negative Covenants" below; and

(iii)    <u>Equity Transactions</u>. 100% of the Net Cash Proceeds received from the sale or issuance of equity securities by Borrower or Guarantors.

(c)    Subject to the Financing Orders, upon the occurrence and during the continuance of any Event of Default, all insurance proceeds received in respect of Collateral or otherwise shall be applied by DIP Lender in accordance with <u>Section Section 2.9</u>.

**Section 2.9**    <u>Application of Prepayments</u>. Voluntary and mandatory prepayments shall be applied in the following order of priority (subject to other intercreditor arrangements that may be ordered or agreed to with holders of Prepetition Permitted Liens and any other payments required pursuant to the Financing Orders, including the Carve-Out):

(a)    <u>first</u>, to pay all reasonable, documented out-of-pocket costs and expenses of DIP Lender (including, without limitation, all reasonable and documented fees and expenses of the Lender Professionals incurred on behalf of DIP Lender in accordance with the procedures set forth in the Financing Orders);

(b)    <u>second</u>, to pay an amount equal to all accrued and unpaid interest owing to DIP Lender in respect of the DIP Loan other than interest that has been paid in kind;

(c)    <u>third</u>, to repay any principal amounts outstanding in respect of the DIP Loan (including interest paid in kind);

(d)    <u>fourth</u>, to pay all other amounts owing to DIP Lender;

(e)    <u>fifth</u>, the balance, if any, after all the Obligations have been paid in full, to the Prepetition Priority Bridge Lender to satisfy any remaining Prepetition Priority Loan Obligations, if any; and

(f)     last, if all DIP Obligations and Prepetition Priority Bridge Loan Obligations have been paid in full, to the extent there remain any proceeds of "Collateral" (as defined in the Prepetition Junior Term Loan Documents) that the Debtors' Investigation has concluded is subject to the valid, perfected and unavoidable liens of the Prepetition Junior Term Lender, then such proceeds shall be paid to the Prepetition Junior Lender in satisfaction of the Prepetition Junior Term Loan Obligations up to the value of such "Collateral" as determined by an order of the Bankruptcy Court.

**Section 2.10**   General Provisions Regarding Payments.

(a)     All payments by Borrower of principal, interest, fees and other Obligations hereunder or under any other Credit Document shall be made in Dollars in immediately available funds, without defense, recoupment, setoff or counterclaim, free of any restriction or condition.

(b)     Payments hereunder and under any other Credit Document shall be delivered to DIP Lender not later than 2:00 p.m. (New York City time) on the date due at the principal office of DIP Lender or via wire transfer of immediately available funds to an account designated by DIP Lender (or at such other location as may be designated in writing by DIP Lender from time to time); for purposes of computing interest and fees, funds received by DIP Lender after that time on such due date shall be deemed to have been paid by Borrower on the next Business Day.

(c)     [Intentionally omitted].

(d)     Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day, but such payment shall be deemed to have been made on the date therefor for all other purposes hereunder.

**ARTICLE 3**
**INTENTIONALLY OMITTED**

**ARTICLE 4**
**GUARANTY**

**Section 4.1**   The Guaranty.

(a)     Each of the Guarantors hereby jointly and severally guarantees to DIP Lender, as primary obligor and not as surety, the prompt payment of the Obligations (the "Guaranteed Obligations") in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise) strictly in accordance with the terms thereof. The Guarantors hereby further agree that if any of the Obligations are not paid in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise), the Guarantors will, jointly and severally, promptly pay the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Obligations, the same will be promptly paid in full when due (whether at extended maturity, as a mandatory prepayment, by

25

acceleration, as a mandatory cash collateralization or otherwise) in accordance with the terms of such extension or renewal.

(b)     Notwithstanding any provision to the contrary contained herein, in any other of the Credit Documents or other documents relating to the Obligations, the obligations of each Guarantor under this Agreement and the other Credit Documents shall be limited to an aggregate amount equal to the largest amount that would not render such obligations subject to avoidance under the Debtor Relief Laws or any comparable provisions of any Applicable Law,.

**Section 4.2**     <u>Obligations Unconditional</u>. The obligations of the Guarantors under Section 4.1 are joint and several, absolute and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of any of the Credit Documents or any other agreement or instrument referred to therein, or any substitution, release, impairment or exchange of any other guarantee of or security for any of the Obligations, and, to the fullest extent permitted by Applicable Law, irrespective of any law or regulation or other circumstance whatsoever which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this Section 4.2 that the obligations of the Guarantors hereunder shall be absolute and unconditional under any and all circumstances. Each Guarantor agrees that such Guarantor shall have no right of subrogation, indemnity, reimbursement or contribution against Borrower or any other Guarantor for amounts paid under this Article Article 4 until such time as the Obligations have been paid in full and the Commitments have expired or terminated. Without limiting the generality of the foregoing, it is agreed that, to the fullest extent permitted by law, the occurrence of any one or more of the following shall not alter or impair the liability of any Guarantor hereunder, which shall remain absolute and unconditional as described above:

(a)     at any time or from time to time, without notice to any Guarantor, the time for any performance of or compliance with any of the Obligations shall be extended, or such performance or compliance shall be waived;

(b)     any of the acts mentioned in any of the provisions of any of the Credit Documents between any Debtor and DIP Lender or any Affiliate of DIP Lender, or any other agreement or instrument referred to in the Credit Documents shall be done or omitted;

(c)     the maturity of any of the Obligations shall be accelerated, or any of the Obligations shall be modified, supplemented or amended in any respect, or any right under any of the Credit Documents or any other agreement or instrument referred to in the Credit Documents, or any security therefor shall be released, impaired or exchanged in whole or in part or otherwise dealt with;

(d)     any Lien granted to, or in favor of, DIP Lender as security for any of the Obligations shall fail to attach or be perfected; or

(e)     any of the Obligations shall be determined to be void or voidable (including, without limitation, for the benefit of any creditor of any Guarantor) or shall be subordinated to the claims of any Person (including, without limitation, any creditor of any Guarantor).

With respect to its obligations hereunder, each Guarantor hereby expressly waives diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that DIP Lender exhaust any right, power or remedy or proceed against any Person under any of the Credit Documents, or any other agreement or instrument referred to in the Credit Documents, or against any other Person under any other guarantee of, or security for, any of the Obligations.

Section 4.3    Reinstatement. The obligations of the Guarantors under this Article Article 4 shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of any Person in respect of the Obligations is rescinded or must be otherwise restored by any holder of any of the Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, and each Guarantor agrees that it will indemnify DIP Lender on demand for all reasonable costs and expenses (including, without limitation, the reasonable fees, charges and disbursements of counsel) incurred by DIP Lender in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law.

Section 4.4    Certain Additional Waivers. Each Guarantor agrees that such Guarantor shall have no right of recourse to security for the Obligations, except through the exercise of rights of subrogation pursuant to Section 4.2 and through the exercise of rights of contribution pursuant to Section 4.6.

Section 4.5    Remedies. The Guarantors agree that, to the fullest extent permitted by law, as between the Guarantors, on the one hand, and DIP Lender, on the other hand, the Obligations may be declared to be forthwith due and payable as provided in the Financing Orders.  The Guarantors acknowledge and agree that their obligations hereunder are secured in accordance with the terms of the Collateral Documents and the Financing Orders and that DIP Lender may exercise its remedies thereunder in accordance with the terms thereof.

Section 4.6    Rights of Contribution. The Guarantors agree among themselves that, in connection with payments made hereunder, each Guarantor shall have contribution rights against the other Guarantors as permitted under Applicable Law.  Such contribution rights shall be subordinate and subject in right of payment to the obligations of such Guarantors under the Credit Documents and no Guarantor shall exercise such rights of contribution until all Obligations have been paid in full and any Commitments have terminated.

Section 4.7    Guarantee of Payment; Continuing Guarantee. The guarantee in this Article Article 4 is a guaranty of payment and not of collection, is a continuing guarantee, and shall apply to all Obligations whenever arising.

Section 4.8    Intentionally Omitted.

## ARTICLE 5
## CONDITIONS PRECEDENT

Section 5.1    Conditions Precedent to the Interim DIP Loan. The obligation of DIP Lender to make available the initial disbursements of the DIP Loan on the Closing Date is subject

to the satisfaction of the following conditions on or before the Closing Date (the date all such conditions are satisfied, the "**Interim Closing Date**"):

(a) <u>Executed Credit Documents</u>. Receipt by DIP Lender of executed counterparts of this Agreement and the other Credit Documents, in each case, in form and substance reasonably satisfactory to DIP Lender and duly executed by the appropriate parties thereto.

(b) <u>Initial Approved Budget</u>. The Debtors shall have timely delivered to DIP Lender and its advisors the Initial Approved Budget or any update thereto that are acceptable to DIP Lender in its sole discretion.

(c) <u>Borrowing Request</u>. The Debtors shall have delivered to DIP Lender a Borrowing Request in connection with such draw request no later than 10:00 A.M. (Eastern Time) on the date of entry of the Interim DIP Order (or such later time as DIP Lender may agree to in its sole discretion).

(d) <u>Closing Certificate</u>. Borrower shall have delivered to DIP Lender a closing certificate duly executed by an Authorized Officer of Borrower, certifying to DIP Lender that the conditions precedent set forth in Sections 5.1(g), 5.1(k) and 5.1(l) have been satisfied.

(e) <u>Incumbency Certificate</u>. Receipt by DIP Lender of an incumbency certificate in form and substance reasonably satisfactory to DIP Lender.

(f) <u>Insurance</u>. The Debtors shall have insurance (including, without limitation, commercial general liability and property insurance) with respect to the Collateral (which shall be deemed satisfied if such insurance as required by the Prepetition Priority Bridge Loan Facility remains in place).

(g) <u>Bankruptcy Court orders</u>.

(i) (A) The Bankruptcy Court shall have entered the Interim DIP Order, (B) the Interim DIP Order shall not have been stayed, vacated, or reversed, nor modified or amended without DIP Lender and Borrower's consent, and (C) the Debtors shall be in compliance in all respects with the Interim DIP Order.

(ii) The Bankruptcy Court shall have approved the repayment of the Prepetition Priority Bridge Loan Obligations as set forth in the Interim DIP Order.

(h) <u>Funds Disbursement Instructions</u>. DIP Lender shall have received duly executed disbursement instructions (with wiring instructions and account information) for all disbursements to be made on the Closing Date.

(i) <u>Fees and Expenses</u>. All reasonable and documented fees and out-of-pocket expenses (whether incurred prepetition or post-petition) of the Lender Professionals that have been invoiced relating to the Chapter 11 Cases, the DIP Loan, the Prepetition Priority Bridge Loan Facility and the Prepetition Junior Term Loan Facility and such invoice has been delivered to the Debtors at least one (1) Business Day before the Interim Closing Date, shall have been paid in full

28

(or will be paid in connection with such Interim DIP Loan draw) in accordance with the terms of the Interim DIP Order.

(j)     Patriot Act. DIP Lender shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the USA PATRIOT Act (Title III of Pub. L. 107-57) (the "Patriot Act").

(k)     No Default. No event shall have occurred and be continuing that would constitute an Event of Default or a Default, and no Termination Event under, and as defined in, the Interim DIP Order shall have occurred and be continuing on the Closing Date or shall exist immediately after giving effect to the Interim DIP Loan to be made on the Closing Date.

(l)     Representations and Warranties. The representations and warranties of the Debtors shall be true and correct in all material respects on the Interim Closing Date and except to the extent that such representations and warranties expressly relate to any earlier date, in which case such representations and warranties shall have been true and correct in all material respects, as applicable, as of such earlier date, in each case, subject to the terms of the Financing Orders and other orders of the Bankruptcy Court; and

(m)     Due Authorization. Subject to Bankruptcy Court approval, (a) each Debtor shall have the organizational power and authority to make, deliver and perform its obligations under the Interim DIP Order, and (b) no consent or authorization of, or filing with, any Governmental Authority is required in connection with the execution, delivery or performance by any Debtor, or for the validity or enforceability in accordance with its terms against any Debtor, of the Interim DIP Order except for those consents, authorizations and filings which have been heretofore obtained or made and are in full force and effect and except for such consents, authorizations and filings, the failure to obtain or perform could not reasonably be expected to cause a Material Adverse Effect.

**Section 5.2**     Conditions Precedent to the Final DIP Loan. The obligation of DIP Lender to make each Final DIP Loan shall be subject to satisfaction, or written waiver, by DIP Lender, of each of the conditions precedent in connection with the related Borrowing Request (the date all such conditions are satisfied, the "**Final Closing Date**"):

(a)     The Debtors shall have timely delivered to DIP Lender the Approved Budget.

(b)     The Debtors shall have delivered to DIP Lender a Borrowing Request in connection with such draw request no later than 11:00 A.M. (Eastern Time) three (3) Business Days prior to the requested funding date for such Final DIP Loan (or such later time as DIP Lender may agree to).

(c)     The Final DIP Order shall have been entered on or prior to January 9, 2026 by the Bankruptcy Court (after notice to all parties having or asserting a lien on all or any portion of the Collateral) and shall not have been reversed, modified, amended, stayed or vacated, or in the case of any modification or amendment, modified or amended in any manner adverse to DIP

29

Lender without the consent of DIP Lender, and the Debtors shall be in compliance in all material respects with the Final DIP Order.

(d)     No Default or Event of Default under this Agreement or a Termination Event under, and as defined in, the Final DIP Order shall have occurred and be continuing on the Final Closing Date or shall exist immediately after giving effect to the Final DIP Loan to be made on the Final Closing Date.

(e)     The representations and warranties of the Debtors shall be true and correct in all material respects and except to the extent that such representations and warranties expressly relate to any earlier date, in which case such representations and warranties shall have been true and correct in all material respects, as applicable, as of such earlier date, in each case, subject to the terms of the Financing Orders and other orders of the Bankruptcy Court.

(f)     Subject to Bankruptcy Court approval, (a) the Debtors shall have the organizational power and authority to make, deliver and perform their obligations under this Agreement and the Final DIP Order, and (b) no consent or authorization of, or filing with, any Governmental Authority shall be required in connection with the execution, delivery or performance by any Debtor, or for the validity or enforceability in accordance with its terms against any Debtor, of this Agreement and the Final DIP Order except for consents, authorizations and filings which shall have been obtained or made and be in full force and effect and except for such consents, authorizations and filings, the failure to obtain or perform, could not reasonably be expected to have a Material Adverse Effect.

(g)     All reasonable and documented fees and out-of-pocket expenses (whether incurred prepetition or post-petition) of the Lender Professionals that have been invoiced relating to the DIP Loan and such invoice has been delivered at least one (1) Business Day before the Final Closing Date and are payable as of such date in accordance with the Interim DIP Order shall have been paid in full (or will be paid in connection with such Final DIP Loan draw) in accordance with the terms of the Final DIP Order.

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES

In order to induce DIP Lender to enter into this Agreement and to make the Loan to be made thereby, each Debtor represents and warrants to each DIP Lender as follows:

**Section 6.1**     Organization; Requisite Power and Authority; Qualification. Each Debtor and its Subsidiaries (a) is duly organized, validly existing and (except for Nicklaus Real Estate Investors, LLC and NC Asia Partner, LLC) in good standing under the laws of its jurisdiction of organization as identified in Schedule 6.1, (b) has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Credit Documents to which it is a party and to carry out the transactions contemplated thereby, and (c) is qualified to do business and in good standing in every jurisdiction where necessary to carry out its business and operations, except in jurisdictions where the failure to be so qualified or in good standing has not had, and could not be reasonably expected to have, a Material Adverse Effect.

30

**Section 6.2**     Equity Interests and Ownership. Schedule 6.2 correctly sets forth the ownership interest of each Debtor in its Subsidiaries as of the Closing Date. The Equity Interests of each Debtor and its Subsidiaries have been duly authorized and validly issued and is fully paid and non-assessable. Except as set forth on Schedule 6.2 as of the Closing Date, there is no existing option, warrant, call, right, commitment, buy-sell, voting trust, contribution agreement or other shareholder agreement or other agreement with respect to any Debtor or any Subsidiary to which any Debtor or Subsidiary is a party requiring, and there is no membership interest or other Equity Interests of any Debtor or any Subsidiary outstanding which upon conversion or exchange would require, the issuance by any Debtor or any Subsidiary of any additional membership interests or other Equity Interests of any Debtor or any Subsidiary or other Securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase, a membership interest or other Equity Interests of any Debtor or any Subsidiary.

**Section 6.3**     Due Authorization. The execution, delivery and performance of the Credit Documents have been duly authorized by all necessary action on the part of each Debtor that is a party hereto or thereto.

**Section 6.4**     No Conflict. The execution, delivery and performance by Debtors of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not (a) violate in any material respect any provision of any Applicable Laws relating to any Debtor, any of the Organizational Documents of any Debtor, or any order, judgment or decree of any court or other agency of government binding on any Debtor; (b) except as could not reasonably be expected to have a Material Adverse Effect, conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any other Contractual Obligations of any Debtor; (c) result in or require the creation or imposition of any Lien upon any of the properties or assets of any Debtor (other than any Liens created under any of the Credit Documents in favor of the DIP Lender for the benefit of the holders of the Obligations) whether now owned or hereafter acquired; or (d) require any approval of stockholders, members or partners or, except as could not reasonably be expected to have a Material Adverse Effect, any approval or consent of any Person under any Contractual Obligation of any Debtor, in each case except for any such approval or consent that has been duly obtained.

**Section 6.5**     Governmental Consents. The execution, delivery and performance by the Debtors of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not require, as a condition to the effectiveness thereof, any registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority except for filings and recordings with respect to the Collateral to be made, or otherwise delivered to the DIP Lender for filing and/or recordation, as of the Closing Date and other filings, recordings or consents which have been obtained or made, as applicable.Binding Obligation. Each Credit Document has been duly executed and delivered by each Debtor that is a party thereto and is the legally valid and binding obligation of such Debtor, enforceable against such Debtor in accordance with its respective terms, except as may be limited by Debtor Relief Laws or by equitable principles relating to enforceability.

**Section 6.7**     Financial Statements; Approved Budgets.

31

(a)　　The balance sheet of Borrower and its Subsidiaries prepared on a Consolidated Basis for the most recent Fiscal Year ended, and the related statements of income, equity and cash flows prepared on a Consolidated Basis for such Fiscal Year, including the notes thereto (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present the financial condition of Borrower and its Subsidiaries in all material respects as of the date thereof and their results of operations for the period covered thereby, in each case, on a Consolidated Basis, in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) show all material indebtedness and other liabilities, direct or contingent, of Borrower and its Subsidiaries as of the date thereof, including liabilities for Taxes, material commitments and Indebtedness.

(b)　　The unaudited balance sheet of Borrower and its Subsidiaries prepared on a Consolidated Basis for the most recent Fiscal Quarter ended, and the related statements of income and cash flows prepared on a Consolidated Basis for such Fiscal Quarter (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, (ii) fairly present the financial condition of Borrower and its Subsidiaries in all material respects as of the date thereof and their results of operations for the period covered thereby, in each case, on a Consolidated Basis, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments, and (iii) show all material indebtedness and other liabilities, direct or contingent, of Borrower and its Subsidiaries as of the date of such financial statements, including liabilities for Taxes, material commitments and Indebtedness.

(c)　　The Initial Approved Budget, each Proposed Budget and all projected consolidated balance sheets, income statements and cash flow statements of the Borrower delivered to the DIP Lender were prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed in good faith by the Borrower to be reasonable at the time of preparation and delivery of such report or projection

**Section 6.8**　　Litigation, Labor Controversies, etc. Except for the Chapter 11 Cases and as previously provided to DIP Lender, there is no pending or, to the knowledge of any Debtor, threatened in writing, litigation, action, proceeding, or labor controversy (including without limitation, strikes, lockouts, or slowdowns) against or involving any of the Debtors or any of their respective Subsidiaries which (i) purports to affect the legality, validity, or enforceability of any Credit Document or any of the transactions contemplated herein or (ii) could reasonably be expected to have a Material Adverse Effect.

**Section 6.9**　　Tax Matters. Each Debtor and its Subsidiaries have filed all federal, state and other material tax returns and reports required to be filed or have obtained a valid extension of the deadline for any such returns or reports such that there are no delinquencies for filing, and have paid all federal, state and other material Taxes, assessments, fees and other governmental charges levied or imposed upon them or their respective properties, assets, income, businesses and franchises otherwise due and payable, except those being actively contested in good faith and by appropriate proceedings and for which adequate reserves have been provided in accordance with GAAP. There is no proposed tax assessment against any Debtor or any of its Subsidiaries that would, if made, have a Material Adverse Effect.

32

**Section 6.10**    Properties.

(a)    Title. Each of the Debtors and its Subsidiaries has (i) good, sufficient and legal title to (in the case of fee interests in real property), (ii) valid leasehold interests in (in the case of leasehold interests in real or personal property), and (iii) good title to (in the case of all other personal property), all of their respective properties and assets reflected in their financial statements and other information referred to in Section 6.6 and in the most recent financial statements delivered pursuant to Section 7.1, in each case except for assets disposed of since the date of such financial statements as permitted under Section Section 8.9.  All such properties and assets are free and clear of Liens other than Liens permitted by Section Section 8.2.

(b)    Real Estate. As of the Closing Date, Schedule 6.10(b) contains a true, accurate and complete list of all Real Estate Assets of the Debtors.

(c)    Intellectual Property. Each Debtor and its Subsidiaries owns or is validly licensed to use all Intellectual Property that is necessary for the present conduct of its business, free and clear of Liens, without conflict with the rights of any other Person unless the failure to own or benefit from such valid license could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. To the knowledge of each Debtor, no Debtor nor any of its Subsidiaries is infringing, misappropriating, diluting, or otherwise violating the Intellectual Property rights of any other Person unless such infringement, misappropriation, dilution or violation could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**Section 6.11**    Environmental Matters. (a) No Debtor nor any of its Subsidiaries nor any of their respective current Facilities (solely during and with respect to such Person's ownership thereof) or operations, and to their knowledge, no former Facilities (solely during and with respect to any Debtor's or its Subsidiary's ownership thereof), are subject to any outstanding order, consent decree or settlement agreement with any Person relating to any Environmental Law, any Environmental Claim, or any Hazardous Materials Activity that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect; (b) no Debtor nor any of its Subsidiaries has received any letter or request for information under Section 104 of the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9604) or any comparable state law; (c) there are and, to each Debtor's and its Subsidiaries' knowledge, have been, no Hazardous Materials Activities which could reasonably be expected to form the basis of an Environmental Claim against such Debtor or any of its Subsidiaries that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect; (d) no Debtor nor any of its Subsidiaries has filed any notice under any Environmental Law indicating past or present treatment of Hazardous Materials at any Facility (solely during and with respect to such Debtor's or its Subsidiary's ownership thereof), and (e) no Debtor's nor any of its Subsidiaries' operations involves the generation, transportation, treatment, storage or disposal of hazardous waste, as defined under 40 C.F.R. Parts 260-270 or any equivalent state rule defining hazardous waste, except in material compliance with Environmental Law.  Compliance with all current requirements pursuant to or under Environmental Laws could not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

33

**Section 6.12**    Chapter 11 Cases. The Chapter 11 Cases have been duly authorized by all necessary legal and corporate action by or on behalf of each Debtor and have been duly and properly commenced.

**Section 6.13**    Collateral Documents; Perfection.

(a)    Upon entry of the Financing Orders, each of Article Article 2 of this Agreement, the Financing Orders, and the Pledge and Security Agreement, after giving effect to the Confirmation Agreement, is effective to create in favor of DIP Lender a legal, valid and enforceable first priority (subject only to Permitted Liens) security interest in the Collateral described therein and proceeds thereof.

(b)    Upon entry of the Financing Orders, the Lien granted under each of Article Article 2 of this Agreement, the Financing Orders, and the Pledge and Security Agreement, as applicable, shall constitute a fully perfected Lien on, and first priority (subject only to Permitted Liens) security interest in, all right, title, and interest of the Debtors in such Collateral and the proceeds thereof (to the extent such proceeds can be perfected by a filing), as security for the Obligations.

(c)    Upon entry of the Financing Orders, the Liens granted to DIP Lender pursuant to the Collateral Documents and the Financing Orders will at all times be fully perfected Liens in and to the Collateral described therein, subject, as to priority only to Permitted Liens or other Liens permitted to have such priority under the Financing Orders (including, to the extent constituting a Lien, the Carve-Out).

**Section 6.14**    Information Regarding the Debtors and their Subsidiaries. Set forth on Schedule 6.14, is the jurisdiction of organization, the exact legal name (and for the prior five (5) years or since the date of its formation has been) and the true and correct U.S. taxpayer identification number (or foreign equivalent, if any) of each Debtor as of the Closing Date.

**Section 6.15**    Governmental Regulation.

(a)    No Obligor or any of its Subsidiaries is subject to regulation under the Investment Company Act of 1940. No Obligor or any of its Subsidiaries is an "investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

(b)    No Obligor nor any of its Subsidiaries is an "enemy" or an "ally of the enemy" within the meaning of Section 2 of the Trading with the Enemy Act of the United States of America (50 U.S.C. App. §§ 1 *et seq.*), as amended. To its knowledge, no Obligor or any of its Subsidiaries is in violation of (a) the Trading with the Enemy Act, as amended, (b) any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto or (c) the Patriot Act. No Obligor or any of its Subsidiaries (i) is a blocked person, or (ii) to the best of its knowledge, engages in any dealings or transactions, or is otherwise associated, with any such blocked person.

34

(c)     Each Obligor and its Subsidiaries has implemented and maintains in effect policies and procedures designed to ensure compliance by such Obligor, its Subsidiaries and their respective directors, officers, employees and agents with applicable Sanctions, and such Obligor, its Subsidiaries and their respective officers and employees and, to the knowledge of such Obligor, its directors and agents, are in compliance with applicable Sanctions and are not engaged in any activity that would reasonably be expected to result in any Obligor being designated as a Sanctioned Person. None of the Obligors, their Subsidiaries and their respective Affiliates is in violation of any of the country or list based economic and trade sanctions administered and enforced        by        OFAC        that        are        described        or        referenced        at http://www.ustreas.gov/offices/enforcement/ofac/ or as otherwise published from time to time.

(d)     None of the Obligors or their Subsidiaries or, to the knowledge of each Debtor or its Subsidiaries, any of their respective directors, officers, employees or Affiliates (i) is a Sanctioned Person, (ii) has any of its assets located in a Sanctioned Country (unless approved by the DIP Lender), or (iii) derives any of its operating income from investments in, or transactions with Sanctioned Persons (unless approved by the DIP Lender). The proceeds of the Loan or other transaction contemplated by this Agreement or any other Credit Document have not been used (x) in violation of any Sanctions, (y) to fund any operations in, finance any investments or activities in or make any payments to, a Sanctioned Person or a Sanctioned Country or (z) in any other manner that would result in a violation of Sanctions by any Person (including the DIP Lender or any other Person participation in the Loan, whether as an underwriter, advisor, investor or otherwise).

(e)     Each of the Obligors and their Subsidiaries and, to the knowledge of each Debtor and its Subsidiaries, each of their respective directors, officers, employees and Affiliates, is in compliance with Anti-Corruption Laws. Each Obligor and its Subsidiaries has implemented and maintains in effect policies and procedures designed to ensure compliance by such Obligor, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws. None of the Obligor or their respective Subsidiaries has made a payment, offering, or promise to pay, or authorized the payment of, money or anything of value (a) in order to assist in obtaining or retaining business for or with, or directing business to, any foreign official, foreign political party, party official or candidate for foreign political office, (b) to a foreign official, foreign political party or party official or any candidate for foreign political office, and (c) with the intent to induce the recipient to misuse his or her official position to direct business wrongfully to such Obligor or any of its Subsidiaries or to any other Person, in violation of any Anti-Corruption Law. No part of the proceeds of the Loan or other transaction contemplated by this Agreement or any other Credit Document will violate Anti-Corruption Laws.

(f)     To the extent applicable, each Obligor and its Subsidiaries are in compliance with Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001) (as amended from time to time, the "Patriot Act").

(g)     No Obligor or any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock. No part of the proceeds of the Loan made to such Obligor will be used (i) to purchase or carry any such Margin Stock or to extend credit to others for the purpose of purchasing

35

or carrying any such Margin Stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System as in effect from time to time or (ii) to finance or refinance any (A) commercial paper issued by such Obligor or (B) any other Indebtedness, except for Indebtedness that such Obligor incurred for general corporate or working capital purposes.

Section 6.16    Employee Matters. No Debtor or any of its Subsidiaries is engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect. There is (a) no unfair labor practice complaint pending against any Debtor or any of its Subsidiaries, or to the best knowledge of each Debtor, threatened against any of them before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against any Debtor or any of its Subsidiaries or to the best knowledge of each Debtor, threatened against any of them, (b) no strike or work stoppage in existence or to the knowledge of each Debtor, threatened that involves any Debtor or any of its Subsidiaries, and (c) to the best knowledge of each Debtor, no union representation question existing with respect to the employees of any Debtor or any of its Subsidiaries and, to the best knowledge of each Debtor, no union organization activity that is taking place, except (with respect to any matter specified in clause (a), (b) or (c) above, either individually or in the aggregate) such as could not reasonably be expected to have a Material Adverse Effect.

Section 6.17    Pension Plans. (a) Except as could not reasonably be expected to have a Material Adverse Effect, each of the Debtors and their Subsidiaries are in compliance with all applicable provisions and requirements of ERISA and the Internal Revenue Code and the regulations and published interpretations thereunder with respect to each Pension Plan, and have performed all their obligations under each Pension Plan in all material respects, (b) each Pension Plan that is intended to qualify under Section 401(a) of the Internal Revenue Code has received a favorable determination letter or is the subject of a favorable opinion letter from the IRS indicating that such Pension Plan is so qualified and, to the best knowledge of the Debtors, nothing has occurred subsequent to the issuance of such determination letter that would cause such Pension Plan to lose its qualified status except where such event could not reasonably be expected to result in a Material Adverse Effect, (c) except as could not reasonably be expected to have a Material Adverse Effect, no liability to the PBGC (other than required premium payments), the IRS, any Pension Plan (other than for routine claims and required funding obligations in the ordinary course) or any trust established under Title IV of ERISA has been incurred by any Debtor, any of its Subsidiaries or any of their ERISA Affiliates, (d) except as would not reasonably be expected to result in liability to any Debtor or any of its Subsidiaries in excess of $250,000, no ERISA Event has occurred, and (e) except to the extent required under Section 4980B of the Internal Revenue Code and Section 601 et seq. of ERISA or similar state laws and except as could not reasonably be expected to have a Material Adverse Effect, no Pension Plan provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of any Debtor or any of its Subsidiaries.

Section 6.18    Contractual or Other Restrictions. Other than the Credit Documents, the DIP Term Documents, the Prepetition Term Loan Documents (as defined in the Financing Orders) and the Financing Orders, no Debtor or any of its Subsidiaries is a party to any agreement or arrangement or subject to any Applicable Law that (a) limits its ability to pay dividends to, or otherwise make Investments in or other payments to, any Debtor, (b) limits its ability to grant

36

Liens in favor of DIP Lender, or (c) otherwise limits its ability to perform the terms of the Credit Documents except as permitted hereunder

**Section 6.19**    Bankruptcy Matters.

(a)    Chapter 11 Cases. (i) The Chapter 11 Cases were commenced on the Petition Date in accordance in all material respects with all Applicable Laws and (ii) due and proper notice of the Chapter 11 Cases and any pleadings filed by the Debtors or orders entered by the Bankruptcy Court in the Chapter 11 Cases will be given as required under the Bankruptcy Code, Federal Rules of Bankruptcy Procedures, the Local Rules of the United States Bankruptcy Court for the District of Delaware, and any applicable order of the Bankruptcy Court.

(c)    Financing Orders in Effect. As of the Closing Date, the Interim DIP Order is in full force and effect and has not been reversed, vacated, stayed, modified or amended in any manner adverse to DIP Lender without the prior written consent of DIP Lender. Upon its entry, the Final DIP Order shall remain in full force and effect and not be reversed, vacated, stayed, modified or amended in any manner adverse to DIP Lender without the prior written consent of DIP Lender.

(e)    Materials Prepared in Good Faith. Each Approved Budget and all projected consolidated balance sheets, income statements and cash flow statements of Borrower delivered to DIP Lender were prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed in good faith by Borrower to be reasonable at the time of preparation and delivery of such report or projection.

**Section 6.20**    Compliance with Laws. Each Debtor and its Subsidiaries is in compliance with (a) the Patriot Act and OFAC rules and regulations as provided in Section 6.15 and (b) except such non-compliance with such other Applicable Laws that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, all other Applicable Laws. Each Debtor and its Subsidiaries possesses all certificates, authorities or permits issued by appropriate Governmental Authorities necessary to conduct the business now operated by them and the failure of which to have could reasonably be expected to have a Material Adverse Effect and have not received any notice of proceedings relating to the revocation or modification of any such certificate, authority or permit the failure of which to have or retain could reasonably be expected to have a Material Adverse Effect.

**Section 6.21**    Disclosure. No representation or warranty of any Debtor contained in any Credit Document or in any other documents, certificates or written statements furnished to DIP Lender by or on behalf of any Debtor or any of its Subsidiaries for use in connection with the transactions contemplated hereby (other than projections and pro forma financial information contained in such materials) contains any untrue statement of a material fact or omits to state a material fact (known to any Debtor, in the case of any document not furnished by any of them) necessary in order to make the statements contained herein or therein not misleading in any material manner in light of the circumstances in which the same were made. Any projections and pro forma financial information contained in such materials are based upon good faith estimates and assumptions believed by the Debtors to be reasonable at the time made, it being recognized by the DIP Lender that such projections as to future events are not to be viewed as facts and that

37

actual results during the period or periods covered by any such projections may differ from the projected results and that such differences may be material. There are no facts known to any Debtor (other than matters of a general economic nature) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect and that have not been disclosed herein or in such other documents, certificates and statements furnished to the DIP Lender.

**Section 6.22**   Insurance. The properties of the Debtors and their Subsidiaries are insured with financially sound and licensed insurance companies not Affiliates of such Persons, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the applicable Debtor or the applicable Subsidiary operates. The insurance coverage of the Debtors and their Subsidiaries as in effect on the Closing Date is outlined as to carrier, policy number, expiration date, type and amount on Schedule 6.22.

**Section 6.23**   Collateral Documents. The Collateral Documents are effective to create in favor of the DIP Lender, for the ratable benefit of the holders of the Obligations, a legal, valid and enforceable security interest in the Collateral identified therein, except to the extent the enforceability thereof may be limited by applicable Debtor Relief Laws affecting creditors' rights generally and by equitable principles of law (regardless of whether enforcement is sought in equity or at law), and the Collateral Documents shall create a fully perfected Lien on, and security interest in, all right, title and interest of the obligors thereunder in such Collateral, in each case prior and superior in right to any other Lien, (i) with respect to any such Collateral that is a "security" (as such term is defined in the UCC) and is evidenced by a certificate, when such Collateral is delivered to the DIP Lender with duly executed stock powers with respect thereto, (ii) with respect to any such Collateral that is a "security" (as such term is defined in the UCC) but is not evidenced by a certificate, when UCC financing statements in appropriate form are filed in the appropriate filing offices in the jurisdiction of organization of the pledgor or when "control" (as such term is defined in the UCC) is established by the DIP Lender over such interests in accordance with the provision of Section 8-106 of the UCC, or any successor provision, and (iii) with respect to any such Collateral that is not a "security" (as such term is defined in the UCC), when UCC financing statements in appropriate form are filed in the appropriate filing offices in the jurisdiction of organization of the pledgor (to the extent such security interest can be perfected by filing under the UCC).

## ARTICLE 7
## AFFIRMATIVE COVENANTS

Each Debtor covenants and agrees that so long as any obligations remain outstanding under the DIP Loan or the Financing Orders, in each case, subject to the Financing Orders or any other Bankruptcy Court order, such Debtor shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Article Article 7.

**Section 7.1**   Financial Statements and Other Reports. Borrower will deliver, or will cause to be delivered, to the DIP Lender, in form and substance satisfactory to DIP Lender:

(a)     Intentionally Omitted;

38

(b)     <u>Quarterly Financials</u>.   Upon request, the Borrower's (i) unaudited consolidated balance sheets and related unaudited statements of income, members' equity and cash flows, showing the financial condition of the Borrower and its Subsidiaries on a Consolidated Basis as of the close of such Fiscal Quarter and the results of their operations during such Fiscal Quarter and the then-elapsed portion of the Fiscal Year, and (ii) unaudited consolidating balance sheet and related unaudited consolidating statements of income, as of the close of the such Fiscal Quarter, showing separately the financial condition of the Borrower and its Subsidiaries; provided that all financial statements required by clauses (i) and (ii) above are prepared in accordance with GAAP (except that such financial statements may (i) be subject to normal year-end audit adjustments and (ii) not contain all notes thereto that may be required in accordance with GAAP);

(c)     <u>Bi-Weekly Reports</u>. Commencing on December 3, 2025, and on each Wednesday of each successive bi-weekly period thereafter, the Borrower shall provide the DIP Lender with a Bi-Weekly Report (including a Bi-Weekly Proposed Budget) and a Bi-Weekly Budget Variance Report, all in accordance with the provisions set forth in this Agreement and otherwise in the applicable Financing Orders.

(d)     <u>Information Regarding Collateral</u>. Each Debtor will furnish to the DIP Lender prior written notice of any change (i) in such Debtor's or any Obligor's legal name, (ii) in such Debtor's or any Obligor's type of legal entity, (iii) in such Debtor's Federal Taxpayer Identification Number or (iv) in such Debtor's or any Obligor's jurisdiction of incorporation, formation or organization, as applicable.

(e)     <u>Notice of Default and Material Adverse Effect</u>. Promptly upon any Authorized Officer of any Debtor obtaining knowledge (i) of any condition or event that constitutes a Default or an Event of Default or that notice has been given to any Debtor with respect thereto; (ii) that any Person has given any notice to any Debtor or any of its Subsidiaries or taken any other action with respect to any event or condition set forth in Section 9.1, or (iii) the occurrence of any Material Adverse Effect, a certificate of its Authorized Officers specifying the nature and period of existence of such condition, event or change, or specifying the notice given and action taken by any such Person and the nature of such claimed Event of Default, Default, event or condition or change, and what action the Debtors have taken, are taking and propose to take with respect thereto;

(f)     <u>ERISA</u>.   (i) Promptly upon becoming aware of the occurrence of or forthcoming occurrence of any ERISA Event, a written notice specifying the nature thereof, what action any Debtor, any of its Subsidiaries or any of their respective ERISA Affiliates has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor, the PBGC, or any other party with respect thereto; (ii) (1) promptly upon reasonable request of the DIP Lender, copies of each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by any Debtor, any of its Subsidiaries or any of their respective ERISA Affiliates with respect to each Pension Plan; and (2) promptly after their receipt, copies of all notices received by any Debtor, any of its Subsidiaries or any of their respective ERISA Affiliates from a Multiemployer Plan sponsor concerning an ERISA Event; and (iii) provide such additional information relating to the ERISA Event as the DIP Lender may reasonably request.

(g)     Reports and Proxies. To the extent any Debtor or any Subsidiary is required to file reports, registration statements, notices or proxy statements with the United States Securities and Exchange Commission or any state securities enforcement agency, deliver to DIP Lender promptly a copy of all such items sent to the stockholders or members of such Person, as applicable, or filed with such governmental agency or authority.

(h)     Other Financial Information. Deliver promptly such information regarding the operation, business affairs and financial conditions of Borrower and its Subsidiaries which the DIP Lender may request.

Each notice pursuant to clauses (e) and (f) of this Section 7.1 shall be accompanied by a statement of an Authorized Officer of Borrower setting forth details of the occurrence referred to therein and stating what action Borrower and/or the other applicable Debtor has taken and proposes to take with respect thereto. Each notice pursuant to Section 7.1(e) shall describe with particularity any and all provisions of this Agreement and any other Credit Document that have been breached, as applicable.

**Section 7.2**     Existence. Each Debtor will, and will cause each of its Subsidiaries and each other Obligor to, at all times preserve and keep in full force and effect its existence and all rights and franchises, licenses and permits material to its business, except to the extent the failure to maintain such rights, franchise, license or permits could not reasonably be expected to result in a Material Adverse Effect.

**Section 7.3**     Payment of Taxes and Claims. Each Debtor will, and will cause each of its Subsidiaries to, pay (a) all federal, state and other material Taxes imposed upon it or any of its properties or assets or in respect of any of its income, businesses or franchises before any penalty or fine accrues thereon and (b) all claims (including claims for labor, services, materials and supplies) for sums that have become due and payable and that by law have or may become a Lien upon any of its properties or assets, prior to the time when any penalty or fine shall be incurred with respect thereto; provided, no such tax or claim need be paid if it is being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as (i) adequate reserve or other appropriate provision, as shall be required in conformity with GAAP shall have been made therefor, and (ii) in the case of a tax or claim which has or may become a Lien against any of the Collateral, such contest proceedings conclusively operate to stay the sale of any portion of the Collateral to satisfy such tax or claim. Borrower will not, nor will it permit any of its Subsidiaries to, file or consent to the filing of any consolidated income tax return with any Person (other than any Borrower or any Subsidiary of Borrower).

**Section 7.4**     Maintenance of Business and Properties. Each Debtor will, and will cause each of its Subsidiaries to, continue the business of the Debtors and maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear excepted, all material properties used or useful in the business of any Debtor and its Subsidiaries and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof substantially in accordance with such Debtor's past business practices.

**Section 7.5**     Insurance. The Debtors will maintain or cause to be maintained, with financially sound and licensed insurers, property insurance, such public liability insurance, third

40

party property damage insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of the each Debtor and its Subsidiaries as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses, in each case in such amounts, with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons. Without limiting the generality of the foregoing, each of Borrower and its Subsidiaries will maintain or cause to be maintained replacement value casualty insurance on the Collateral under such policies of insurance, with such insurance companies, in such amounts, with such deductibles, and covering such risks as are at all times carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses. Each such policy of insurance shall (i) with respect to liability insurance, name the DIP Lender as an additional insured thereunder as its interests may appear, and (ii) in the case of each property insurance policy, contain a loss payable clause or endorsement with respect to the Collateral, reasonably satisfactory in form and substance to the DIP Lender, that names the DIP Lender as the loss payee thereunder and provides for at least thirty (30) days' prior written notice (or such shorter prior written notice as may be agreed by the DIP Lender in its reasonable discretion) to the DIP Lender of any modification or cancellation of such policy; and which, for the avoidance of doubt, in the case of being added as an additional insured with respect to such liability insurance, shall not limit the ability of the applicable insurance carrier to satisfy any claims that may be payable to a third party on behalf of any Debtor.

**Section 7.6**   <u>Inspections</u>. Each Debtor will, and will cause each of its Subsidiaries to, permit representatives and independent contractors of the DIP Lender to visit and inspect any of its properties, to conduct field audits, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the expense of Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to Borrower (and such Persons shall use commercially reasonable efforts to conduct such visits and inspections in a manner as to minimize interference in the applicable Debtors normal operations); provided, however, that so long as no Event of Default exists, Borrower shall not be obligated to pay for more than one (1) such inspection per year and that when an Event of Default exists the DIP Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of Borrower at any time during normal business hours and without advance notice.

**Section 7.7**   <u>Cash Management; Compliance with Approved Budget</u>.

(a)   After satisfaction of the Blocked Account requirements of Section 7.21, all proceeds of Collateral shall be deposited by each Debtor into the applicable Blocked Account or any account pursuant to an arrangement with such Blocked Account Bank as may be reasonably acceptable to DIP Lender. Subject to the Financing Orders, each Debtor agrees that all payments, whether by cash, check, wire transfer or any instrument or deposit in each Blocked Account shall be subject to the security interest of DIP Lender. DIP Lender assumes no responsibility for such Blocked Account, including without limitation, any claim of accord and satisfaction or release with respect to deposits accepted by any Blocked Account Bank thereunder.  Debtors shall not modify in any respect, without the prior written consent of DIP Lender, any Blocked Account Agreement or any other arrangement relating to any Blocked Account if such arrangement would

41

violate this Agreement. Unless otherwise expressly permitted in a Blocked Account Agreement, DIP Lender shall have no responsibility for the maintenance of any Blocked Account Agreement, including the payment of any fees thereunder.  DIP Lender may direct that all amounts in the Blocked Accounts be paid to an account of DIP Lender and the Debtors may not direct, and shall have no control over, the manner of disposition of funds in the Blocked Accounts.

(b)    Debtors shall comply with the Approved Budget (after giving effect to the Permitted Variances), subject to any variances approved in writing by the DIP Lender, in its sole discretion.

**Section 7.8**    Compliance with Laws. Each Debtor will comply, and shall cause each of its Subsidiaries and all other Persons, if any, on or occupying any Facilities to comply, with (a) the Patriot Act and OFAC rules and regulations, (b) all other Applicable Laws, noncompliance with, with respect to clause (b) only, could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**Section 7.9**    Use of Proceeds. Subject in all respects to the approval of the Bankruptcy Court, the Debtors will use the proceeds of the DIP Loan and Cash Collateral and the Approved Budget (a) working capital and general corporate purposes of the Borrower and its Subsidiaries, (b) bankruptcy-related costs and expenses in respect of the Chapter 11 Cases (including the Carve-Out and the Professional Fee Reserve), (c)  costs and expenses related to the DIP Loan and (d) any other purposes specifically set forth in the Approved Budget, in each case not in contravention of Applicable Laws or of any Credit Document.

**Section 7.10**    Environmental Matters.

(a)    Environmental Disclosure. Each Debtor will deliver to the DIP Lender with reasonable promptness, such documents and information as from time to time may be reasonably requested by the DIP Lender.

(b)    Hazardous Materials Activities, Etc.  Borrower shall promptly take, and shall cause each of its Subsidiaries promptly to take, any and all actions necessary to (i) cure any violation of applicable Environmental Laws by such Debtor or its Subsidiaries that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and (ii) respond to any Environmental Claim against such Debtor or any of its Subsidiaries and discharge any obligations it may have to any Person thereunder where failure to do so would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**Section 7.11**    Milestones. Borrower and its Subsidiaries each agree that they shall take all actions necessary to cause each of the following to occur:

(a)    no later than five (5) Business Days after the Petition Date, the Interim DIP Order shall be entered by the Bankruptcy Court;

(b)    no later than December 12, 2025, the Debtors shall file one or more motions seeking entry of orders authorizing and approving bid and sale procedures for all or substantially all of the Debtors' assets (the "Bidding Procedure Motion"), in form and substance reasonably acceptable to DIP Lender;

42

(c)     no later than January 9, 2026, the Final DIP Order shall be entered by the Bankruptcy Court; and

(d)     no later than January 9, 2026, the Bankruptcy Court shall have entered one or more orders, in form and substance reasonably acceptable to DIP Lender, approving the bid and sale procedures requested in the Bidding Procedure Motion following the Petition Date.

**Section 7.12**   Pledge of Personal Property Assets.

(a)     Equity Interests. Borrower shall cause one hundred percent (100%) of the issued and outstanding Equity Interests of each Guarantor and sixty five percent (65%) of the issued and outstanding Equity Interests in each Foreign Subsidiary that is directly owned by a Debtor, in each case, to be subject at all times to a first priority lien in favor of the DIP Lender, pursuant to the terms and conditions of the Collateral Documents, together with opinions of counsel and any filings and deliveries or other items reasonably requested by the DIP Lender necessary in connection therewith (to the extent not delivered on the Closing Date) to perfect the security interests therein, all in form and substance reasonably satisfactory to the DIP Lender.

(b)     Personal Property. Each Debtor shall (i) cause all of its owned and leased personal property (other than Excluded Property) to be subject at all times to first priority, perfected Liens in favor of the DIP Lender, for the benefit of the holders of the Obligations, to secure the Obligations pursuant to the terms and conditions of the Collateral Documents or, with respect to any such property acquired subsequent to the Closing Date, such other additional security documents as the DIP Lender shall reasonably request, and (ii) deliver such other documentation as the DIP Lender may reasonably request in connection with the foregoing, including, without limitation, appropriate control agreements, UCC-1 financing statements, certified resolutions and other organizational and authorizing documents of such Person, opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to above and the perfection of the DIP Lender's Liens thereunder) and other items reasonably requested by the DIP Lender necessary in connection therewith to perfect the security interests therein, all in form, content and scope reasonably satisfactory to the DIP Lender.

(c)     Landlord Consents.  Upon reasonable request by DIP Lender, the Debtors shall use commercially reasonable efforts to obtain additional landlord consents with respect to leased locations where corporate records or material amounts of personal property of any of the Debtors are maintained, which landlord consents shall be in form and substance reasonably acceptable to the DIP Lender.

(d)     Books and Records. Each Debtor will keep proper books of record and account in which full, true and correct entries shall be made of all dealings and transactions in relation to its business and activities to the extent necessary to prepare the financial statements of Borrower and its Subsidiaries, on a Consolidated Basis, in conformity with GAAP.

**Section 7.13**   Additional Subsidiaries. Within five (5) Business Days after the formation of any Subsidiary, the Debtors shall:

43

(a)    notify the DIP Lender thereof in writing, together with the (i) jurisdiction of formation, (ii) number of shares of each class of Equity Interests outstanding, (iii) number and percentage of outstanding shares of each class owned (directly or indirectly) by any Debtor or any Subsidiary and (iv) number and effect, if exercised, of all outstanding options, warrants, rights of conversion or purchase and all other similar rights with respect thereto; and

(b)    cause such Person to (i) become a Borrower or Guarantor (and an "Obligor" under (and as defined in) the Pledge and Security Agreement) by executing and delivering to the DIP Lender such assumption agreements, joinder documentation or such other documents as the DIP Lender shall deem appropriate for such purpose, and (ii) deliver to the DIP Lender documents of the types referred to in Section 5.1(b), (e) and (g), and favorable opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to in the immediately <u>foregoing clause (i)),</u> all in form, content and scope satisfactory to the DIP Lender.

**Section 7.14**    <u>Sanctions and Anti-Corruption Matters</u>. Each Debtor will, and will cause each of its Subsidiaries to, conduct its businesses in compliance with Sanctions and the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 and other similar anti-corruption legislation in other jurisdictions and maintain policies and procedures designed to promote and achieve compliance with such laws.

**Section 7.15**    <u>Compliance With Credit Documents and Financing Orders</u>. Debtors shall, subject in all respects to the Financing Orders, take, or cause to be taken, all reasonably appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable law, and to execute and deliver such documents and other papers, as may be required or reasonably requested by DIP Lender to carry out the provisions of the Credit Documents and applicable Financing Orders.

**Section 7.16**    <u>Existence and Compliance With Credit Documents Contractual Obligations</u>. Debtors shall, except to the extent contemplated by the Approved Budget (subject to Permitted Variances) or otherwise consented to by DIP Lender in writing, continue, and cause to be continued, the business of the Debtors; maintain, and cause to be maintained, the Debtors' existence, rights, licenses and privileges; and comply with all post-petition material contractual obligations of the Debtors, in each case, in a manner as would not be expected to cause a Material Adverse Effect.

**Section 7.17**    <u>Telephonic Conferences</u>. Debtors shall cause (a) the Debtors' senior management to be available to conduct a telephonic conference at least once every other calendar week and (b) the Debtors' legal and financial advisors to be available to conduct a telephonic conference at least once every calendar week, in each case, at reasonable times during normal business hours and upon reasonable prior notice, if reasonably requested by DIP Lender, to discuss the Approved Budget, the Bi-Weekly Budget Variance Report, the Chapter 11 Cases, and the financial condition, performance and business affairs of the Debtors.

**Section 7.18**    <u>Pleadings For Filing</u>. Debtors shall provide copies, in substantially final form, of all first and second day motions, motions under Section 363 of the Bankruptcy Code to use, sell or lease property of the estate, motions under Section 365 of the Bankruptcy Code to

44

assume or reject any lease or contract, and any accompanying orders and exhibits at least three (3) days before filing with the Bankruptcy Court or as soon as reasonably practicable prior to filing.

**Section 7.19**    Communications from Governmental Authority. Promptly upon receipt by the Debtors of any material adverse written communications from any Governmental Authority, the Borrower will provide a copy of same to DIP Lender.

**Section 7.20**    Repayment of Prepetition Priority Bridge Loan Obligations. Subject to the terms of the applicable Financing Orders, the Debtors shall use the proceeds of the Interim DIP Loan to repay or refinance all Prepetition Priority Bridge Loan Obligations on the Closing Date.

**Section 7.21**    Post-Closing Matters. The items set forth on Schedule 7.21 shall have been satisfied within the time periods set forth on Schedule 7.21 (or such later date as may be agreed by DIP Lender in its reasonable discretion).

**ARTICLE 8**
**NEGATIVE COVENANTS**

Each Debtor covenants and agrees that so long as any obligations remain outstanding to the DIP Lender under the DIP Loan or the Financing Orders, such Debtor shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Article Article 8, in each case, subject to, and except as otherwise permitted pursuant to, (a) the Approved Budget and Permitted Variances, (b) the Financing Orders and any other orders of the Bankruptcy Court, as applicable.

**Section 8.1**    Indebtedness. No Debtor shall create, incur, assume or permit to exist any Indebtedness, other than (a) the Obligations, (b) the Prepetition Obligations, and (c) indebtedness permitted pursuant to the applicable DIP Orders.

**Section 8.2**    Liens. No Debtor shall, other than liens required or permitted by the applicable Financing Orders, create, incur, assume or suffer to exist any lien upon any of its property, assets, income or profits, whether now owned or hereafter acquired, except (a) the Carve-Out, (b) liens secured by the Prepetition Obligations, and (c) Prepetition Permitted Liens.

**Section 8.3**    No Further Negative Pledges. No Debtor shall, nor shall it permit any of its Subsidiaries to, enter into any Contractual Obligation (other than this Agreement and the other Credit Documents) that limits the ability of any Debtor or any such Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person.

**Section 8.4**    Restricted Payments. No Debtor shall, nor shall it permit any of its Subsidiaries to, make any Restricted Payment (as defined in the Prepetition Priority Bridge Loan Facility), without the prior written consent of DIP Lender.

**Section 8.5**    Burdensome Agreements. No Debtor shall, nor shall it permit any of its Subsidiaries to, enter into, or permit to exist, any Contractual Obligation that encumbers or restricts the ability of any such Person to (i) pay dividends or make any other distributions to Borrower or other Debtor on its Equity Interests or with respect to any other interest or participation in, or measured by, its profits, (ii) pay any Indebtedness or other obligation owed to Borrower or any other Debtor, (iii) make loans or advances to Borrower or any other Debtor, (iv) sell, lease or

45

transfer any of its property to Borrower or any other Debtor, (v) pledge its property pursuant to the Credit Documents or any renewals, refinancings, exchanges, refundings or extension thereof or (vi) act as a Debtor pursuant to the Credit Documents or any renewals, refinancings, exchanges, refundings or extension thereof, except (in respect of any of the matters referred to in clauses (i)-(iv) above) for this Agreement and the other Credit Documents.

**Section 8.6**    <u>Investments</u>. No Debtor shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, make or own any Investment in any Person, including any joint venture, except:

(a)    Investments in cash and Cash Equivalents and deposit accounts or securities accounts in connection therewith;

(b)    equity Investments owned as of the Closing Date in any Subsidiary;

(c)    Investments existing on the Closing Date and described on <u>Schedule 8.6</u>; and

(d)    Investments by (i) any Debtor in any other Debtor, (ii) by any Subsidiary that not a Debtor in any other Subsidiary that is not a Debtor, (iii) by any Debtor in the applicable Chinese Subsidiary in an amount not to exceed $40,000 in the aggregate during the term of this Agreement and (iv) solely with the prior written consent of DIP Lender, by any Debtor in any other Subsidiary that is not a Debtor;

(e)    Investments constituting accounts receivable, trade debt and deposits for the purchase of goods, in each case made in the ordinary course of business.

Notwithstanding the foregoing, in no event shall any Debtor make any Investment which results in or facilitates in any manner any Restricted Payment not otherwise permitted under the terms of Section 8.4.

**Section 8.7**    <u>Use of Proceeds</u>. No Debtor shall use the proceeds of the Loan except as permitted by Section 7.9.  No Debtor shall use, and each Debtor shall ensure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of the Loan (a) to refinance any commercial paper, (b) in any manner that causes or may reasonably be expected to cause the Loan or the application of such proceeds to violate any applicable Sanctions, Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal Reserve System as in effect from time to time or any other regulation thereof or to violate the Exchange Act, (c) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, or (d) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country.

**Section 8.8**    <u>Subsidiaries</u>. No Debtor shall create or acquire any ownership interest in any subsidiaries (whether direct or indirect), other than those in existence on the Petition Date.

**Section 8.9**    <u>Transfers</u>. No Debtor shall convey, sell, lease, assign, transfer or otherwise dispose of (including through a transaction of merger or consolidation) any of the Debtors'

46

property, business or assets, whether now owned or hereafter acquired, other than asset sales approved by an order of the Bankruptcy Court that is in form and substance acceptable to DIP Lender in its sole discretion, unless the sale will indefeasibly pay in full, in cash, the Obligations, the Prepetition Priority Bridge Loan Obligations and the Prepetition Junior Term Loan Obligations (solely with respect to the sale of "Collateral" (as defined in the Prepetition Junior Term Loan Documents) that the Debtors' Investigation has concluded is subject to the valid, perfected and unavoidable liens of the Prepetition Junior Term Lender and up to the value of such parties' interest in such "Collateral" as determined by an order of the Bankruptcy Court) at the closing of such sale. No Debtor shall, nor shall it permit any of its Subsidiaries to, enter into any Acquisition or transaction of merger or consolidation, or liquidate, wind-up or dissolve itself (or suffer any liquidation or dissolution), or make any Asset Sale, or acquire by purchase or otherwise (other than purchases or other acquisitions of inventory and materials and the acquisition of equipment and capital expenditures in the ordinary course of business, subject to <u>Section Section 8.10</u>) the business, property or fixed assets of, or Equity Interests or other evidence of beneficial ownership of, any Person or any division or line of business or other business unit of any Person.

**Section 8.10**   <u>Sales and Lease-Backs</u>. No Debtor shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which the Debtor or any Subsidiary (a) has sold or transferred or is to sell or to transfer to any other Person (other than a Debtor), or (b) intends to use for substantially the same purpose as any other property which has been or is to be sold or transferred by a Debtor to any Person (other than a Debtor) in connection with such lease.

**Section 8.11**   <u>Transactions with Affiliates and Insiders</u>. No Debtor shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any officer, director or Affiliate of Borrower or any their Subsidiaries on terms that are less favorable to such Borrower or such Subsidiary, as the case may be, than those that might be obtained at the time from a Person who is not an officer, director or Affiliate of Borrower or any of its Subsidiaries; <u>provided</u>, the foregoing restriction shall not apply to (a) any transaction between or among the Borrower and any of its Subsidiaries; (b) normal and reasonable compensation and reimbursement of expenses of officers and directors in the ordinary course of business; (c) the transactions described in <u>Schedule 8.11</u>; and (d) the compensation and reimbursement of expenses of the members of the Special Committee of the Board of Managers of the Borrower.

**Section 8.12**   <u>Prepetition Indebtedness</u>. No Debtor shall pay prepetition indebtedness, except (a) payments contemplated by the Financing Orders, (b) payments permitted by DIP Lender in its sole discretion and (c) payments permitted pursuant to the orders entered or to be entered by the Bankruptcy Court granting the relief requested in the motions filed with the Bankruptcy Court on or about the Petition Date and heard by the Bankruptcy Court at the initial hearing or thereafter (the "<u>First Day Orders</u>"), so long as such First Day Orders are consistent with the Approved Budget and are otherwise in form and substance reasonably acceptable to DIP Lender; provided that notwithstanding any relief granted in any First Day Order, no payment shall be made after the Closing Date to cash collateralize any surety bond or letter of credit without the prior written consent of the DIP Lender.

**Section 8.13**   Conduct of Business. From and after the Closing Date, no Debtor shall, nor shall it permit any of its Subsidiaries to, engage in any business other than the Permitted Lines of Business.

**Section 8.14**   Fiscal Year. No Debtor shall, nor shall it permit any of its Subsidiaries to change its Fiscal Year-end employed by the Debtors as of the Closing Date.

**Section 8.15**   Amendments to Organizational Agreements. No Debtor shall, nor shall it permit any of its Subsidiaries to, amend or permit any amendments to its Organizational Documents if such amendment could reasonably be expected to be materially adverse to the DIP Lender.

**Section 8.16**   Subordinated Debt. No Debtor shall, nor shall it permit any of its Subsidiaries to, make any payments under any Subordinated Debt.

**Section 8.17**   Material Contracts. No Debtor shall assume, reject, materially amend, materially modify or compromise any material term or material amount owed under a material real property lease or material contract (including any material vendor and material customer contracts) without the prior written consent of DIP Lender.

**Section 8.18**   Additional Claims. No Debtor shall create or permit to exist any other super-priority claim which is *pari passu* with or senior to the claims of DIP Lender under the DIP Loan, except for the Carve-Out and except as set forth in the applicable Financing Orders.

**Section 8.19**   Filing of Motions. No Debtor shall file any first or second day motion, motion under Section 363 of the Bankruptcy Code to use, sell or lease property of the estate, motion under section 365 of the Bankruptcy Code to assume or reject any lease or contract, or motion or application under Sections 327 or 363 of the Bankruptcy Code seeking to retain any investment banker (a "Retention Application") except where the relief requested is consistent with the Approved Budget and (other than with respect to any Retention Applications) is otherwise in form and substance reasonably acceptable to DIP Lender.

**Section 8.20**   Bid Procedures Motions. No Debtor shall file any motion to approve procedures for the sale of the Collateral that is not in form and substance reasonably acceptable to DIP Lender.

**Section 8.21**   Motions for Sale of Debtors' Assets. No Debtor shall file any motion to approve the sale of all or substantially all of the Debtors' assets that is not in form and substance reasonably acceptable to DIP Lender, unless the sale will indefeasibly pay in full, in cash, the Obligations, the Prepetition Priority Bridge Loan Obligations and the Prepetition Junior Term Loan Obligations (such consent to apply solely with respect to the sale of "Collateral" (as defined in the Prepetition Junior Term Loan Documents) that the Debtors' Investigation has concluded is subject to the valid, perfected and unavoidable liens of the Prepetition Junior Term Lender and such payment up to the value of such "Collateral" as determined by an order of the Bankruptcy Court) at the closing of such sale.

**Section 8.22**   Chapter 11 Plans. No Debtor shall file any Chapter 11 plan that is not in form and substance reasonably acceptable to DIP Lender, unless the Chapter 11 plan proposes to

48

indefeasibly pay in full, in cash the Obligations, the Prepetition Priority Bridge Loan Obligations and the Prepetition Junior Term Loan Obligations (such consent to apply solely with respect to the sale of "Collateral" (as defined in the Prepetition Junior Term Loan Documents) that the Debtors' Investigation has concluded is subject to the valid, perfected and unavoidable liens of the Prepetition Junior Term Lender and such payment up to the value of such "Collateral" as determined by an order of the Bankruptcy Court) on its effective date.

Section 8.23   Employee Incentives. No Debtor shall enter into, implement, pay, waive, supplement or amend any retention bonus, incentive payment, transaction bonus or similar arrangement(s) with any current or former directors, officers, or employees of the Debtors, to which any of the Debtors is a party to, sponsors, administers or has any liability with respect to, without the prior written consent of DIP Lender.

**ARTICLE 9**
**EVENTS OF DEFAULT; REMEDIES; APPLICATION OF FUNDS**

Section 9.1   Events of Default. If any one or more of the following conditions or events shall occur:

(a)   the entry of the entry of an interim or final order with respect the DIP Loan, granting approval of this Agreement in form or substance that is not reasonably acceptable to DIP Lender;

(b)   the failure of the Final DIP Order to have been entered by January 9, 2026;

(c)   except as provided in clause (u), failure by the Debtors to be in compliance in all material respects with provisions of this Agreement (subject to (x) a two (2) Business Day grace period for delivery of the Bi-Weekly Reports and Bi-Weekly Budget Variance Reports and (y) a three (3) Business Day grace period for compliance with Section Section 7.15 hereof);

(d)   any request made to the Bankruptcy Court by the Debtors (or the Debtors' failure to contest any request made by a third party, including by timely filing opposition papers with the Bankruptcy Court) for the reversal, modification, amendment, stay, reconsideration or vacatur of any Financing Order;

(e)   any request made to the Bankruptcy Court by the Debtors (or the Debtors' failure to contest any request made by a third party, including by timely filing opposition papers with the Bankruptcy Court) for entry of an order of the Bankruptcy Court charging any of the Collateral under section 506(c) of the Bankruptcy Code against DIP Lender;

(f)   failure of any representation or warranty to be true and correct in all material respects (or, to the extent qualified by "materiality" or Material Adverse Effect, in all respects) when made;

(g)   the filing of any application by any Debtor (other than the application for financing provided by a third party which seeks authority to pay all of the Obligations in full in cash upon the closing of such financing) for the approval of (or an order is entered by the Bankruptcy Court approving) any claim arising under Section 507(b) of the Bankruptcy Code or

49

any other provision of the Bankruptcy Code or any security, mortgage, collateral interest or other lien in any of the Chapter 11 Cases which is *pari passu* with or senior to the DIP Liens or DIP Superpriority Claims, excluding (a) the Carve-Out, (b) liens arising under the Financing Orders, liens pursuant to any other financing agreement made with the prior written consent of DIP Lender, and Prepetition Permitted Liens, or (c) as provided in the "first day" motions, that are reasonably acceptable to the DIP Lender; provided that it shall be an Event of Default to pay any cash after the Closing Date to collateralize any surety bond or letters of credit without the prior written consent of the DIP Lender;

(h)     the Debtors commence (or support) any action (other than an action permitted by the Financing Orders) against DIP Lender, the Prepetition Priority Bridge Lender or any of their agents or employees, to challenge, subordinate, recharacterize or avoid any claims or obligations arising, or liens granted, under the Credit Documents or Prepetition Priority Bridge Loan Documents or any other action against DIP Lender or Prepetition Priority Bridge Lender;

(i)     the entry of an order by the Bankruptcy Court in favor of any Creditors' Committee, any ad hoc committee or any other party in interest, (a) granting such party standing to pursue any claims against DIP Lender or the Prepetition Secured Parties, (b) sustaining an objection to claims of DIP Lender or the Prepetition Secured Parties or (c) avoiding any liens held by DIP Lender or the Prepetition Secured Parties; *provided*, that the foregoing shall not be deemed to prohibit the investigation or action by any such Debtor of any Liens pursuant to the Prepetition Junior Term Loan Facility in accordance with the terms of the applicable Financing Orders;

(j)     any Debtor commences (or supports) any action (other than an action permitted by the Financing Orders) against the Prepetition Junior Term Lender or any of its agents or employees, to challenge, subordinate, recharacterize or avoid any claims or obligations arising, or liens granted, under the Prepetition Junior Term Loan Documents or any other action against any Prepetition Junior Lender; *provided*, that the foregoing shall not apply to any action by the Debtor to avoid any liens held by the Prepetition Junior Term Lender;

(k)     (a) the Debtors file any pleading in any court (or fail to contest any pleading filed by a third party in any court, including by timely filing opposition papers with the Bankruptcy Court) seeking entry of an order to revoke, reverse, stay, vacate, amend, supplement or otherwise modify any Credit Document, or the disallowance of any Obligations, in whole or in part, unless otherwise agreed to by DIP Lender, or (b) any material provision of any Credit Document, or any other order of the Bankruptcy Court approving the Debtors' use of Cash Collateral (as defined in the Financing Orders), shall for any reason cease to be valid and binding;

(l)     without the prior written consent of DIP Lender, the filing with the Bankruptcy Court of a motion seeking approval of a sale of all or substantially all assets of the Debtors under Section 363 of the Bankruptcy Code that does not provide for payment in full of all Obligations, all Prepetition Priority Bridge Loan Obligations, and the Prepetition Junior Term Loan Obligations (such consent to apply solely with respect to the sale of "Collateral" (as defined in the Prepetition Junior Term Loan Documents) that the Debtors' Investigation has concluded is subject to the valid, perfected and unavoidable liens of the Prepetition Junior Term Lender and such payment up to the value of such "Collateral" as determined by an order of the Bankruptcy Court);

50

(m)    the appointment in any of the Chapter 11 Cases of a trustee, receiver, examiner or responsible officer with enlarged powers (beyond those set forth in Sections 1106(a)(3) and (a)(4) of the Bankruptcy Code) relating to the operation of the business of any Debtor;

(n)    the granting of any motion filed by a creditor or other party in interest seeking relief from the automatic stay in the Chapter 11 Cases with respect to any portion of the Collateral with an aggregate value in excess of $250,000 other than a motion seeking relief from the automatic stay that seeks only to recover from, or enforce rights or remedies with respect to, proceeds of insurance policies;

(o)    termination of the Interim DIP Order or the Final DIP Order, as applicable, other than as a result of the satisfaction in full of the Obligations;

(p)    the conversion of any Chapter 11 Case into a case pursuant to Chapter 7 of the Bankruptcy Code;

(q)    the termination of any of the Debtors' exclusive right to propose a plan of reorganization under Chapter 11 of the Bankruptcy Code;

(r)    a dismissal of any of the Chapter 11 Cases;

(s)    without the prior written consent of DIP Lender, a request by the Debtors to use cash collateral or to obtain financing under Section 364 of the Bankruptcy Code (other than the DIP Loan), unless such financing would indefeasibly repay in full in cash all obligations under the DIP Loan upon consummation thereof;

(t)    the filing of any motion seeking approval of a sale of any Collateral (other than any sale permitted under Article Article 8 hereof);

(u)    failure to pay (A) principal in full when due, including without limitation, on the Maturity Date, or (B) interest or other Obligations in full within three (3) Business Days after the same becomes due; or

(v)    failure to timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order: (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code); (ii) converting the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code; or (iii) dismissing the Chapter 11 Cases.

**Section 9.2**    <u>Remedies</u>. Upon the occurrence and during the continuance of any Event of Default, DIP Lender shall be automatically relieved of any obligation to make additional DIP Loan proceeds available hereunder and, subject in all respects to the Financing Orders, upon written notice to Borrower by DIP Lender (A) each of the following shall immediately become due and payable, in each case without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by each of the Debtors: (I) the unpaid principal amount of and accrued interest on the DIP Loan, and (II) all other Obligations; and (B) DIP Lender may enforce any and all Liens and security interests created pursuant to Collateral Documents.

51

Notwithstanding anything herein or otherwise to the contrary, any Event of Default occurring hereunder shall continue to exist (and shall be deemed to be continuing) until such time as such Event of Default has been cured to the satisfaction of DIP Lender or waived in writing in accordance with the terms of this Agreement.

Section 9.3    Application of Funds. After the exercise of remedies provided for in Section 9.2 (or after the Loan has automatically become immediately due and payable), any amounts received on account of the Obligations shall be applied by DIP Lender to the Obligations in accordance with the waterfall established in Section Section 2.9.

## ARTICLE 10
## MISCELLANEOUS

Section 10.1    Notices; Effectiveness; Electronic Communications.

(a)    Notices Generally. All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by electronic mail), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three (3) Business Days after being deposited in the mail, postage prepaid, or, in the case of electronic mail notice, upon confirmation of delivery, addressed as follows in the case of Borrower and DIP Lender, or to such other address as may be hereafter notified by the respective parties hereto:

If to Debtors:

Nicklaus Companies, LLC
3801 PGA Boulevard, Suite 565
Palm Beach Gardens, Florida 33410
Attention: Jim Schnare
Email: jim.schnare@nicklaus.com

With a copy (which shall
not constitute notice) to:

Weil Gotshal & Manges LLP
767 5th Avenue
New York, New York 10153
Attention: Ronit Berkovich and Tom Hashagen
Telephone: (212) 310-8180
Email: Ronit.Berkovich@weil.com;
tom.hashagen@weil.com

With a copy (which shall
not constitute notice) to:

Weil Gotshal & Manges LLP
1395 Brickell Avenue #1200
Miami, Florida 33131
Attention: David J. Cohen
Telephone: (305) 577-3128
Email: DavidJ.Cohen@weil.com

With a copy (which shall

52

| | |
|---|---|
| not constitute notice) to: | Richards, Layton & Finger, P.A.<br>920 North King Street<br>Wilmington, Delaware 19801<br>Attention: Zachary I. Shapiro<br>Telephone: (302) 652-7819<br>Email: Shapiro@rlf.com |
| If to DIP Lender: | FundNick LLC<br>22 Vanderbilt, 14th Floor<br>New York, New York 10017<br>Attention: Kevin M. Buckley<br>Email: kbuckley@milprop.com |
| With a copy (which shall<br>not constitute notice) to: | Maynard Nexsen PC<br>1901 Sixth Ave N, Suite 1700<br>Birmingham, Alabama 35203<br>Attention: David R. Kinman<br>Telephone: (205) 254-1092<br>Email: DKinman@maynardnexsen.com |
| With a copy (which shall<br>not constitute notice) to: | Young Conaway Stargatt & Taylor, LLP<br>Rodney Square, 1000 North King Street<br>Wilmington, Delaware 19801<br>Attention: Michael Nestor & Ryan Bartley<br>Telephone: (302) 571-6699; (302) 571-5007<br>Email: mnestor@youngconaway.com;<br>rbartley@youngconaway.com |

(b)      Electronic Communications. Notices and other communications to DIP Lender hereunder may be delivered or furnished by electronic communications (including email). DIP Lender or Borrower may, in their discretion, agree to accept notices and other communications to it hereunder by electronic communications; provided, that approval of such procedures may be limited to particular notices or communications. Unless DIP Lender otherwise prescribes, notices and other communications sent to an email address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email or other written acknowledgment); provided, that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient.

(c)      Change of Address, Etc.  Any party hereto may change its address or email address for notices and other communications hereunder by notice to the other parties hereto.

**Section 10.2**   Expenses; Indemnity; Damage Waiver; Release.

53

(a)    Costs and Expenses. The Debtors shall pay (i) all reasonable and documented out-of-pocket professional fees, cost and expenses incurred by DIP Lender and its Affiliates (on account of the reasonable and documented out-of-pocket fees, charges and disbursements of the Lender Professionals of the DIP Lender) relating to the Chapter 11 Cases, this Agreement and the DIP Loan and (ii) all reasonable and documented out-of-pocket expenses incurred by DIP Lender (on account of the reasonable and documented out-of-pocket fees, charges and disbursements of the Lender Professionals of the DIP Lender) in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Credit Documents, including its rights under this Section, or (B) in connection with the Loan made hereunder, including all such reasonable and documented out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of the Loan; in each case, subject to the terms of the applicable Financing Orders, including any required notice and objection periods set forth in the applicable Financing Order; *provided*, that such payment shall be payable upon receipt by Borrower of a summary invoice and without the requirement for Bankruptcy Court approval. A copy of each such summary invoice without narratives or individual billers, for fees, costs and expenses of the DIP Lender shall be provided by the DIP Lender to the Debtors, the U.S. Trustee and counsel to the creditors committee (if any).

(b)    Indemnification by the Debtors. The Debtors shall indemnify DIP Lender (and any sub-agent thereof) and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the reasonable out-of-pocket fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any Person (including any Obligor) other than such Indemnitee or its Related Parties arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Credit Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) the Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by any Debtor, or any Environmental Liability related in any way to Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by Borrower or any of its Subsidiaries, and regardless of whether any Indemnitee is a party thereto, provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee, (y) result from a claim brought by any Debtor against an Indemnitee for a material breach of such Indemnitee's obligations hereunder or under any other Credit Document, if such Debtor has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction, or (z) arise out of any investigation, litigation or proceeding that does not involve an act or omission by Borrower or any Subsidiary of Borrower and arises solely from a dispute among Indemnitees (except when and to the extent that one of the parties to such dispute was acting in its capacity as an agent, arranger, bookrunner or other agency capacity and, in such case, excepting only such party). This Section shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

54

(c)    <u>Waiver of Consequential Damages, Etc.</u>  To the fullest extent permitted by Applicable Law, none of the Debtors shall assert, and each hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Credit Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, the Loan or the use of the proceeds thereof. No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby.

(d)    <u>Payments</u>. All amounts due under this Section shall be payable promptly, but in any event within ten (10) Business Days after written demand therefor (including delivery of copies of applicable invoices, if any).

(e)    <u>Release</u>. Subject in all respects to the Financing Orders, each of the Debtors and the Debtors' estates, on its and their own behalf and on behalf of its and their respective past, present and future predecessors, heirs, successors, subsidiaries, and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the DIP Lender (solely in its capacity as such) and each of its respective affiliates, subsidiaries, and Representatives (each solely in their respective capacities as such) (collectively, the "**DIP Released Parties**"), from any and all (a) obligations and liabilities to the Debtors (and their successors and assigns) and (b) claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract or tort or under any state or federal law or otherwise, in each case arising out of or related to (as applicable) the Prepetition Priority Bridge Loan Documents, the Prepetition Junior Term Loan Documents, the Credit Documents, the obligations owing and the financial obligations made under each of them, the negotiation of each of them and of the transactions and agreements reflected by each of them, in each case that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter can or may have against any of the DIP Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the entry of the Interim DIP Order. For the avoidance of doubt, nothing in this release shall relieve the DIP Lender or the Debtors of their Obligations under the DIP Loan Documents from and after the date of the entry of the Interim DIP Order.

(f)    <u>Survival</u>. The provisions of this Section shall survive termination of the Commitments hereunder and repayment, satisfaction and discharge of the Loan and Obligations hereunder.

**Section 10.3**    <u>[Reserved]</u>.

**Section 10.4**   Amendments and Waivers. Except as otherwise expressly provided herein or therein, no provision of any Credit Document may be amended other than by an instrument in writing signed by DIP Lender and the Debtors.

**Section 10.5**   Successors and Assigns. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) neither Borrower nor any other Debtor may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of DIP Lender and (ii) the DIP Lender may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of Borrower (such consent not to be unreasonably withheld, conditioned or delayed); provided, that in the case of this clause (ii), such consent shall not be required at any time that an Event of Default has occurred and is continuing.

**Section 10.6**   Independence of Covenants. All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

**Section 10.7**   Survival of Representations, Warranties and Agreements.   All representations, warranties and agreements made herein shall survive the execution and delivery hereof and the making of the Loan. Notwithstanding anything herein or implied by law to the contrary, the agreements of each Debtor set forth in Section 10.2, Section 10.3, and Section 10.10 shall survive the payment of the Loan.

**Section 10.8**   No Waiver; Remedies Cumulative. No failure or delay on the part of any DIP Lender in the exercise of any power, right or privilege hereunder or under any other Credit Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege. The rights, powers and remedies given to DIP Lender hereby are cumulative and shall be in addition to and independent of all rights, powers and remedies existing by virtue of any statute or rule of law or in any of the other Credit Documents. Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

**Section 10.9**   Marshalling; Payments Set Aside. DIP Lender shall not be under any obligation to marshal any assets in favor of any Debtor or any other Person or against or in payment of any or all of the Obligations. To the extent that any Debtor makes a payment or payments to DIP Lender, DIP Lender may enforce any security interests or exercise their rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any Debtor Relief Law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or

related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

**Section 10.10** <u>Severability</u>. In case any provision in or obligation hereunder or the Loan, Note or other Credit Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**Section 10.11** [<u>Intentionally omitted</u>].

**Section 10.12** <u>Headings</u>. Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

**Section 10.13** <u>Applicable Laws.</u>

(a)     <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the law of the State of New York.

(b)     <u>Submission to Jurisdiction</u>. Each party hereto irrevocably and unconditionally submits, for itself and its property, (i) to the exclusive jurisdiction of the Bankruptcy Court and (ii) if the Bankruptcy Court does not have jurisdiction, to the nonexclusive jurisdiction of the courts of the State of New York, sitting in New York County, New York and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Credit Document, or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York state court or, to the fullest extent permitted by Applicable Law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or in any other Credit Document shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement or any other Credit Document against any Debtor or its properties in the courts of any jurisdiction.

(c)     <u>Waiver of Venue</u>. Each party hereto irrevocably and unconditionally waives, to the fullest extent permitted by Applicable Law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other Credit Document in any court referred to in subsection (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by Applicable Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     <u>Service of Process</u>. Each party hereto irrevocably consents to service of process in the manner provided for notices in Section 10.1. Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by Applicable Law.

**Section 10.14** WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**Section 10.15** Confidentiality. DIP Lender agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its Related Parties (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by Applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Credit Document or any action or proceeding relating to this Agreement or any other Credit Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in (including, for purposes hereof, any new DIP Lenders invited to join hereunder on an increase in the Loan and Loan Commitments hereunder, whether by way of amendment or otherwise), any of its rights or obligations under this Agreement or (ii) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to Borrower or their obligations, this Agreement or payments hereunder, (g) on a confidential basis to (i) any rating agency in connection with rating Borrower or their Subsidiaries or the credit facilities provided for herein, or (ii) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers or other market identifiers with respect to the credit facilities provided for herein, (h) with the consent of Borrower or (i) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to DIP Lender, or any of their respective Affiliates on a nonconfidential basis from a source other than Borrower.

For purposes of this Section, "Information" means all information received from Borrower or any of its Subsidiaries relating to Borrower or any of its Subsidiaries or any of their respective businesses, other than any such information that is available to DIP Lender on a nonconfidential basis prior to disclosure by Borrower or any of its Subsidiaries; provided that, in the case of information received from Borrower or any of its Subsidiaries after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to

58

maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

DIP Lenders acknowledges that (i) the Information may include material non-public information concerning Borrower or any Subsidiary of Borrower, as the case may be, (ii) it has developed compliance procedures regarding the use of material non-public information and (iii) it will handle such material non-public information in accordance with Applicable Law, including United States federal and state securities laws.

**Section 10.16** Usury Savings Clause. Notwithstanding any other provision herein, the aggregate interest rate charged or agreed to be paid with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under Applicable Laws shall not exceed the Highest Lawful Rate. If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the aggregate outstanding amount of the Loan made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect. In addition, if when the Loan made hereunder is repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, Borrower shall pay to DIP Lender an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect. Notwithstanding the foregoing, it is the intention of DIP Lender and each of the Debtors to conform strictly to any applicable usury laws. Accordingly, if DIP Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at such DIP Lender's option be applied to the aggregate outstanding amount of the Loan made hereunder or be refunded to each of the applicable Debtors. In determining whether the interest contracted for, charged, or received by DIP Lender exceeds the Highest Lawful Rate, such Person may, to the extent permitted by Applicable Laws, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest, throughout the contemplated term of the Obligations hereunder.

**Section 10.18** Counterparts; Integration; Effectiveness. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Credit Documents, and any separate letter agreements with respect to fees payable to DIP Lender, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Article Article 5, this Agreement shall become effective when it shall have been executed by DIP Lender and when DIP Lender shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by

59

telecopy or other electronic imaging means (e.g. "pdf" or "tif" format) shall be effective as delivery of a manually executed counterpart of this Agreement.

**Section 10.19** <u>No Advisory of Fiduciary Relationship</u>. In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Credit Document), each of the Debtors acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (a)(i) the arranging and other services regarding this Agreement provided by DIP Lender, are arm's-length commercial transactions between the Debtors, on the one hand, and DIP Lender, on the other hand, (ii) the Debtors have consulted their own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (iii) each of the Debtors is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Credit Documents; (b)(i) DIP Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not and will not be acting as an advisor, agent or fiduciary, for any Debtor or any of their Affiliates or any other Person and (ii) DIP Lender does not have any obligation to any Debtor or any of their Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Credit Documents; and (c) DIP Lender and its respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Debtors and their Affiliates, and DIP Lender does not have any obligation to disclose any of such interests to any Debtor or its Affiliates. To the fullest extent permitted by law, each of the Debtors hereby waives and releases, any claims that it may have against DIP Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

**Section 10.20** <u>Electronic Execution of Assignments and Other Documents</u>. The words "execution," "signed," "signature," and words of like import in this Agreement or in any amendment, waiver, modification or consent relating hereto shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Laws, including the Federal Electronic Signatures in Global and National Commerce Act, the or any other similar state laws based on the Uniform Electronic Transactions Act.

**Section 10.21** <u>USA PATRIOT Act</u>. DIP Lender hereby notifies each of the Debtors that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each of the Debtors, which information includes the name and address of each of the Debtors and other information that will allow DIP Lender to identify each of the Debtors in accordance with the Patriot Act.

**[SIGNATURES ON FOLLOWING PAGES]**

[Signature Page to Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement]


**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**BORROWER:**

**NICKLAUS COMPANIES, LLC,** a Delaware
limited liability company

_____
By:
Its:

**GUARANTORS:**

**NICKLAUS DESIGN, LLC**
**GBI SERVICES, LLC**
**JACK NICKLAUS GOLF CLUB, LLC**
**NICKLAUS GOLF EQUIPMENT COMPANY,**
**L.C.**
**NICKLAUS BRANDS, LLC**
**NICKLAUS INTERNATIONAL BRAND**
**MANAGEMENT, LLC**
**NJ1N-V, LLC**
**NICKLAUS REAL ESTATE LICENSING, LLC**
**NICKLAUS ADVISORY, LLC**
**NICKLAUS INTERACTIVE, LLC**
**NICKLAUS PROJECT MANAGEMENT**
**SERVICES, LLC,**
each a Florida limited liability company

_____
By:
Its:

[Signature Page to Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement]

**DIP LENDER**:

**FUNDNICK LLC**, a Delaware limited liability company

By: _____

Its:

**SCHEDULE 7.21**

**POST-CLOSING MATTERS**

     1.    **Personal Property Collateral.** On or before December 12, 2025 (or such later date as DIP Lender may agree to in writing; _provided_, no such extension shall be unreasonably withheld), receipt by DIP Lender of the following, including security agreements, executed by Debtors in favor of DIP Lender with respect thereto:

     (a)    <u>UCC Financing Statements</u>. Such UCC financing statements necessary or appropriate to perfect the security interests in the personal property collateral, as determined by DIP Lender.

     (b)    <u>Intellectual Property Filings</u>. Such patent, trademark and copyright notices, filings and recordations necessary or appropriate to perfect the security interests in intellectual property and intellectual property rights, as determined by DIP Lender.

     (c)    <u>Pledged Equity Interests</u>. Original certificates evidencing certificated Equity Interests pledged as collateral, if any, together with undated stock transfer powers executed in blank.

     (d)    <u>Other Security Documents</u>. All security documents with respect to the aircraft or other forms of specialty collateral not covered by the foregoing.

     2.    **Blocked Account Agreements.** Within thirty (30) days of the Closing Date (or such later date as DIP Lender may agree to in writing; _provided_, no such extension shall be unreasonably withheld) Debtors shall deliver, or cause to be delivered, executed Blocked Account Agreements for each Deposit Account, Securities Account, or Commodity Account (each as defined in accordance with the UCC), as applicable, deemed necessary by DIP Lender.

# APPENDIX A

## <u>COMMITMENTS</u>

Interim DIP Loan Commitment: $10,000,000.00


Final DIP Loan Commitment: $7,000,000.00

**<u>Exhibit 2</u>**

**Initial DIP Budget**

| ($ in USD) | Week No: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | | 13-Wk |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Week Ending: | 28-Nov | 5-Dec | 12-Dec | 19-Dec | 26-Dec | 2-Jan | 9-Jan | 16-Jan | 23-Jan | 30-Jan | 6-Feb | 13-Feb | 20-Feb | | 13-Wk |
| | Act / Fcst: | Fcst. | Fcst. | Fcst. | Fcst. | Fcst. | Fcst. | Fcst. | Fcst. | Fcst. | Fcst. | Fcst. | Fcst. | Fcst. | | Fcst. |
| **Receipts** | | | | | | | | | | | | | | | | |
| Receipts | | $ 70,475 | $ 95,800 | $ 119,751 | $ 215,551 | 215,551 | $ 387,049 | $ 267,299 | $ 267,299 | $ 387,049 | $ 370,208 | $ 665,624 | $ 535,624 | $ 56,248 | $ | 3,653,528 |
| Operating Disbursements | | (79,252) | (309,815) | (169,966) | (1,176,250) | (144,966) | (283,729) | (248,553) | (1,226,135) | (202,986) | (522,186) | (341,779) | (1,019,940) | (96,855) | | (5,822,412) |
| **Operating Cash Flow** | | **$ (8,777)** | **$ (214,014)** | **$ (50,215)** | **$ (960,699)** | **70,585** | **$ 103,320** | **$ 18,746** | **$ (958,836)** | **$ 184,063** | **$ (151,978)** | **$ 323,845** | **$ (484,316)** | **$ (40,607)** | **$** | **(2,168,885)** |
| **Non-Operating Cash Flows** | | | | | | | | | | | | | | | | |
| Restructuring Professionals / UST | | (1,553,294) | (497,692) | (552,692) | (902,692) | (477,692) | (291,954) | (611,745) | (981,564) | (775,825) | (1,015,825) | (1,295,848) | (127,075) | (1,321,250) | | (10,405,147) |
| Other Non-Operating Disbursements | | (232,200) | (285,500) | (20,000) | (20,000) | (20,000) | (48,500) | (20,000) | (20,000) | - | - | - | - | - | | (666,200) |
| **Total Non-Operating Cash Flows** | | **$ (1,785,494)** | **$ (783,192)** | **$ (572,692)** | **$ (922,692)** | **$ (497,692)** | **$ (340,454)** | **$ (631,745)** | **$ (1,001,564)** | **$ (775,825)** | **$ (1,015,825)** | **$ (1,295,848)** | **$ (127,075)** | **$ (1,321,250)** | **$** | **(11,071,347)** |
| **Net Cash Flow** | | **$ (1,794,271)** | **$ (997,206)** | **$ (622,908)** | **$ (1,883,392)** | **$ (427,107)** | **$ (237,133)** | **$ (612,999)** | **$ (1,960,400)** | **$ (591,762)** | **$ (1,167,803)** | **$ (972,003)** | **$ (611,391)** | **$ (1,361,857)** | **$** | **(13,240,232)** |
| Beginning Cash | | 740,906 | 5,216,635 | 4,219,429 | 3,596,521 | 1,713,129 | 1,286,022 | 1,048,889 | 7,435,890 | 5,475,490 | 4,883,728 | 3,715,925 | 2,743,922 | 2,132,531 | | 740,906 |
| (+/-) Net Cash Flow | | (1,794,271) | (997,206) | (622,908) | (1,883,392) | (427,107) | (237,133) | (612,999) | (1,960,400) | (591,762) | (1,167,803) | (972,003) | (611,391) | (1,361,857) | | (13,240,232) |
| (+/-) Funding / (Payment) | | 6,270,000 | - | - | - | - | - | 7,000,000 | - | - | - | - | - | - | | 13,270,000 |
| **Ending Cash** | | **$ 5,216,635** | **$ 4,219,429** | **$ 3,596,521** | **$ 1,713,129** | **$ 1,286,022** | **$ 1,048,889** | **$ 7,435,890** | **$ 5,475,490** | **$ 4,883,728** | **$ 3,715,925** | **$ 2,743,922** | **$ 2,132,531** | **$ 770,674** | **$** | **770,674** |
| Beginning DIP Availability | | 17,000,000 | 7,000,000 | 7,000,000 | 7,000,000 | 7,000,000 | 7,000,000 | 7,000,000 | - | - | - | - | - | - | | 17,000,000 |
| Bridge Loan Repayment | | (3,730,000) | - | - | - | - | - | - | - | - | - | - | - | - | | (3,730,000) |
| (+/-) DIP Payment / (Draws) | | (6,270,000) | - | - | - | - | - | (7,000,000) | - | - | - | - | - | - | | (13,270,000) |
| **Ending DIP Availability** | | **$ 7,000,000** | **$ 7,000,000** | **$ 7,000,000** | **$ 7,000,000** | **$ 7,000,000** | **$ 7,000,000** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$** | **-** |