**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re | ) ) | Chapter 11 |
| GBI SERVICES LLC., et al. | ) ) ) | Case No. 25-12089 (CTG) |
| Debtor. | ) ) |  |

**PRELIMINARY OBJECTION BY CREDITOR JACK W. NICKLAUS**
**TO DEBTORS MOTION [ECF No. 14] TO ENTER INTERIM AND**
**FINAL ORDERS ON FINANCING AND RELATED RELIEF**

Jack W. Nicklaus, by and through his undersigned counsel,[1] objects to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief* [ECF No. 14] (the "Motion").

---

[1] Undersigned counsel are mindful of this Court's local rules requiring the association of local Delaware counsel. We intend to do so and seek admission to this Court for this proceeding on a *pro hac vice* basis within the required time period proscribed by such local rules. Based upon our contention that this case presents a classic two-party dispute, it is our view that the history of these matters, as described in this Objection, are significant in the Court's analysis and determination of the so-called emergency issues presented (and will weigh upon nearly every significant legal issue that will emerge in this case through conclusion). Stated differently, the matters presented in this Objection are sufficiently important to Mr. Nicklaus' interests implicated in this case so as to ethically obligate the undersigned to preserve such objections before concluding efforts to associate with Delaware counsel in compliance with local rules.

- 1 -

## Introduction

From May 2007 through October 20, 2025, the Debtors operated their business without any inability to meet their obligations to lenders, employees, customers, and other third-parties. In fact, the Debtors' filings establish that, for the past three years, they have operated profitably while at the same time bearing the expense of three heavily contested legal proceedings which pitted Debtor Nicklaus Companies, LLC against its namesake, Jack W. Nicklaus.

The Nicklaus Companies was unsuccessful in the first two of those legal proceedings, and the third was not a charm. On October 20, 2025, a jury in Palm Beach County, Florida, rendered a verdict finding that the Nicklaus Companies had knowingly published false and defamatory statements about Mr. Nicklaus which were designed to tarnish his reputation and did. It awarded Mr. Nicklaus compensatory damages in the amount of $50 million.

Shortly thereafter, Mr. Nicklaus advised the Nicklaus Companies that he was willing to work with them to avoid the need for a bankruptcy filing that would itself harm the company and its subsidiaries. The Nicklaus Companies did not respond. It instead proceeded to incur several million dollars in professional fees and filed these bankruptcy cases without any effort to find an alternate solution.

During the relevant time periods, the Nicklaus Companies was owned and controlled by Howard P. Milstein, a diversified billionaire whose family owns New York Private Bank & Trust among other business ventures. Mr. Milstein is the Chairman and CEO of New York Private Bank & Trust and its operating entity, Emigrant Bank, one of the largest private banks in the country. Until last week, he also served as the Executive Chairman of the Nicklaus Companies.

In addition, and of particular significance here, Mr. Milstein also owns and controls PMP Nick, LLC – formerly known as Emigrant GB, LLC – which the Motion identifies as the "Prepetition Junior Term Loan Lender" but in reality is a holder of "preferred equity" in the Nicklaus Companies.

Anticipating that the Nicklaus Companies' post-trial motions in Florida would be denied, Mr. Milstein arranged for the Nicklaus Companies to borrow between $3.7 to $4 million from PMP for the purpose of employing professionals to file this bankruptcy proceeding and pursue what can only be described as blatantly improper agenda – to elevate *his* interests over all others and extinguish the legal rights of Mr. Nicklaus.

Respectfully, that should not be allowed. Certainly not on an interim basis, on one business day's notice.

Under Bankruptcy Rule 4001(c)(2), interim relief may be granted "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." The rule requires a preliminary-injunction-like showing that "not only limits the amount of credit authorized at a preliminary hearing, but also places the burden on the movant to show that no lesser means will prevent the harm that will ensue if the credit is not obtained." 9A Collier on Bankruptcy ¶ 4001.07[3] (Richard Levin & Henry J. Sommer, 16th ed.).

The Debtors have not met that extraordinary burden here; nor can they. Their proposed budget (Motion, Ex. 2) reflects that there are no shortfalls in their cash-on-hand plus operational revenues less expenses that would warrant interim DIP financing on the terms proposed. Moreover, the Motion indicates that current management left approximately $1.5 million available on a prepetition revolver while authorizing the prepetition bridge loan that is sought to be rolled up on an interim basis; and the majority of the projected funding expenditures in the first weeks of this case relate to *non*-operating cash flows, including over $2 million to pay restructuring professionals that have not sought to be employed by the estate as of the filing of this objection and will be advancing an agenda designed to benefit one stakeholder to the exclusion of others.

Needless to say, the remedy of interim relief is supposed to preserve the status quo; not to allow one stakeholder to gain a foothold over others. In this case, however, the proposed interim relief is plainly designed for that improper purpose. It is intended to allow Howard P. Milstein and his entity PMP Nick LLC to jump the capital stack and credit bid a $500 million preferred equity position to the detriment of all other stakeholders.

As this Court noted in *In re Takeoff Technologies*, No. 24-11106-CTG (Bankr. D. Del.), the Court's concern when dealing with issues like interim relief "is with sufficiency of process, not with tilting the playing field in favor of achieving any ultimate economic result for the benefit of any particular constituency." [D.I. 187]   Here, if the requested interim relief is granted, the playing field will be tilted in favor of Mr. Milstein to the detriment of the other constituents.

Thus, we respectfully submit that the Court should deny that request and instead set in motion a process designed to resolve two threshold issues that should drive every other decision relating to a potential sale of the business and any DIP financing needed in connection therewith. The first issue is whether PMP Nick LLC, the successor-in-interest to Emigrant GB LLC, is a secured creditor with a "debt" owed to it of $462 million, as claimed. If PMP's interest is instead determined to be "preferred equity," as reflected in the Nicklaus Companies' own LLC Agreement, which was executed by PMP's predecessor as well as the Nicklaus Companies itself, that interest would, of course, be subordinate to Mr. Nicklaus' claim. The second issue is whether PMP's interests, however characterized, are *equitably* subordinate to a judgment in favor of Mr. Nicklaus against the Nicklaus Companies because officers and agents controlled by PMP intentionally damaged Mr. Nicklaus' reputation and the Nicklaus brand.

Mr. Nicklaus is prepared to try those issues immediately as a predicate to all else that would logically follow, and the cost to the Debtors should be nil. It is entirely a dispute between Mr. Nicklaus and PMP.

**The Debtors Have Failed to Demonstrate
a Legitimate Basis for Immediate DIP Financing**

As set forth above, under Bankruptcy Rule 4001(c)(2), the operative question is what the Debtors need to "avoid immediate and irreparable harm" so as to allow for the required fourteen days for a final hearing. The Motion has not identified any legitimate need at all.

The Debtors' filings establish that, for the last three years, they have profitably operated a business while at the same time engaging in, and paying for, three legal proceedings adverse to Mr. Nicklaus, each of which the Nicklaus Companies lost. There is no immediate financial distress which required the filing of this case or the granting of emergent relief requested in the Motion.

The Debtors' own proposed budget shows cash on hand of $740,906 and weekly operating cash flow shortfalls through December 12, 2025 which will only eat up about a third of that ($273,006). Unlike many bankruptcy cases, this one does not involve unpaid employee or vendor claims. The Debtors have a total of $200,000 in trade payables, most of which they seek to pay as "critical" vendors in another first day motion. In other words, the Debtors' own filings evidence that they can cover both the operating shortfalls and "critical" trade payables with cash on hand and still leave a sizeable cash buffer of $266,000.

It also bears noting that the costs of any appeal from the Verdict in favor of Mr. Nicklaus would not be incurred for months, as the record first needs to be compiled and transmitted to the court of appeals. It does not present an immediate and irreparable economic hardship.

Thus, we believe there is more than sufficient time for the Court to absorb a fuller record and determine how best to proceed with this case from there for the benefit of all stakeholders. There is certainly *no need* to immediately authorize a super-priority credit of $10 million to repay an insider loan of $4 million which was advanced and apparently fully utilized within 2 weeks of the petition date, and to pay professionals who have yet to be employed, all to advance a position

on behalf of one of the stakeholders – PMP – to the detriment of all others. PMP is perfectly capable of speaking for itself and paying for the speakers.

Indeed, if there were any doubt that the request for interim relief is designed to benefit PMP to the detriment of others, one need only look at the terms of the proposed DIP financing. Under those terms:

- the Debtors would be required to bear PMP's attorneys' fees and expenses in connection with these bankruptcy proceedings, the pre-petition loans, and the proposed DIP financing;

- other stakeholders, including Mr. Nicklaus, would be precluded from being given standing to pursue a claim against PMP, including a claim for recharacterization or subordination; and

- if the Debtors do not pay PMP's attorneys' fees and expenses, or if other stakeholders such as Mr. Nicklaus are given standing to bring claims against PMP, the DIP lender would be entitled to foreclose on collateral without seeking relief from the automatic stay.

Motion at pp. 5, 7-9, 21-23; Prop. DIP Credit Agr. §§ 5.1, 9.1; Prop. Interim Order ¶¶ 7(e), 13.

Respectfully, that is ridiculous and evidences that the request for interim relief is not being made in good faith. It also provides more than ample reason to question the independence of the Special Committee purportedly representing the Debtors, which recommended that interim relief. A truly independent Special Committee would not participate in a plan to use the Debtors' assets to help a wealthy insider – who until a few days ago controlled the Debtors – advance a strategy to elevate his interests above all others and extinguish the rights of an individual who was harmed by the Debtors' misconduct. It is evident that the Special Committee rubber-stamped the proposed relief without any analysis of (1) the circumstances which led to a jury finding that the Company had knowingly defamed the man whose name is on the door; (2) whether the Debtors would be benefitted by an alternate process designed to lead to a restructuring that would include Mr. Nicklaus and his family; (3) whether PMP's interest is not in fact "debt" but rather "equity."

**The Debtors' Cited Case Authorities Argue Against Their Motion**

Mr. Nicklaus agrees with Debtors' citation to *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990), although, as discussed below, business judgment is not the correct standard here. In *Ames*, which is often cited by debtors seeking authorization for DIP financing, the Court held that "[its] discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised *so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest*." Motion ¶ 20 (emphasis added).

Here, the Debtors are seeking to leverage the power of this Court to benefit Mr. Milstein and disadvantage both the estate and Mr. Nicklaus, the only non-insider unsecured creditor owed a substantial amount of money. Worse, the insider who would be benefitted by the financing is the person who ran the business which defamed Mr. Nicklaus. It would be manifestly abusive to permit that to be whitewashed away on an interim basis, on one business day's notice.

Moreover, contrary to the Debtors' suggestion, business judgment is not the correct standard where the proposed transaction involves an insider such as Mr. Milstein. Such transactions "are subjected to rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoint of the corporation and those with interests therein." *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holdings Unsecured Claims (In re Papercraft Corp.)*, 211 B.R. 813, 823 (W.D. Pa. 1997) (citation omitted), *aff'd*, 160 F.3d 982 (3rd Cir. 1998); *see also In re Latam Airlines Group, S.A.*, 620 B.R. 722 (Bankr. S.D.N.Y. 2020) (denying requests for DIP financing as a sub rosa plan and examining the requests under the entire fairness standard).

Neither Mr. Milstein nor his entity PMP have even *attempted* to make such a showing in this case.

...
...
...

**This Court's Immediate Resolution of Two Issues Will Dictate
Whether and to What Extent DIP Financing is Warranted**

As noted above, the threshold and central issues in this proceeding, which can be resolved as soon as the Court has the time to do so, pit the only material unsecured creditor, Mr. Nicklaus, against Mr. Milstein and his entity PMP.  Mr. Milstein is the Chairman and CEO of PMP, and, until last week, he was also the Executive Chairman of the Nicklaus Companies.

The threshold and central issues are whether PMP's interest in the Nicklaus Companies is "debt" or "equity," and whether that interest is equitably subordinate to unsecured creditors.  No DIP financing is necessary for the Court to resolve those issues, as the Debtors have no stake in the outcome, and Mr. Nicklaus is prepared to try the issue long before DIP financing would be required to cover operational shortfalls or a legitimate restructuring process.  In fact, the Court's ruling thereon will likely *reduce* what it will actually cost to administer these estates through a restructuring transaction or a sale.

If the Court finds that PMP's interest is not "secured debt" but rather "preferred equity," it would be possible to construct a sale proposal that would include the Debtors along with an agreement with Mr. Nicklaus and his family.  That would be beneficial for all involved, as the Debtors are worth far more with Mr. Nicklaus and his family than without them.  Mr. Nicklaus' involvement in the sale would be likely to generate the greatest sale price for all stakeholders.

If the Court were instead to find that PMP's interest is "secured debt," the only other issue that would arise is equitable subordination.  The Court would need to determine whether PMP's interest is subordinate to Mr. Nicklaus' unsecured debt because, through officers and agents controlled by PMP, the Nicklaus Companies intentionally damaged Mr. Nicklaus' reputation and the Nicklaus brand.  That issue can be resolved in the near term as well.

As to the first of those two issues, there is a veritable mountain of evidence that PMP's interest is not in fact "secured debt" and is in fact "preferred equity." Below is a brief summary of the events leading to the May 2007 transaction which resulted in the formation of the Nicklaus Companies, along with a sampling of the evidence showing that PMP's interest therein is "preferred equity." In addition, we have also included materials which bear on the issue of equitable subordination.

Together, those materials highlight why the Court should exercise extreme caution in evaluating the Debtors' request for interim relief here. They reflect a bona fide dispute regarding the legitimacy of PMP's claimed lien that would preclude the credit bid sale it is trying to engineer. 11 U.S.C. § 363(f)(4). In fact, we respectfully submit that the evidence supports a preliminary injunction *against* PMP's claim of "debt," even though that is not a burden that Mr. Nicklaus is required to carry through this Objection.

**Summary of Some of the Pertinent Evidence Relating to
the Question of "Debt" v. "Equity" and Associated Issues**

During Mr. Nicklaus' career as a professional golfer, he formed Golden Bear International, Inc. ("GBI") and various subsidiaries to engage in certain commercial activities, including golf course design work and endorsements of businesses, products, and services. Shortly after Mr. Nicklaus retired from competitive golf in 2005, he employed advisors to value his businesses and was told that they were worth about $296 million. His then-CFO urged him to monetize a minority interest in his businesses for estate planning purposes, and he agreed.

One of the people who expressed a desire to acquire such an interest was Mr. Milstein, a self-described "diversified billionaire" whose family owns New York Private Bank & Trust as well as a variety of other business ventures. Mr. Milstein is the Chairman and CEO of New York Private Bank & Trust and its operating entity, Emigrant Bank, which is one of the largest private banks in the country. He also runs the family's other business ventures.

A deal between the Nicklaus and Milstein families was consummated in May 2007 and a new entity was formed to carry on GBI's businesses, Nicklaus Companies, LLC ("Company"). In that deal, GBI and an affiliate conveyed assets and liabilities to the Company in exchange for $145 million and "Class A" membership interests which gave those entities what was described in the Company's LLC Agreement as a 51% Fully Diluted Percentage Interest in the Company. The $145 million purchase price was funded by Emigrant Bank subsidiary Emigrant GB, LLC, which was referred to in the Purchase and Sale Agreement and the Company's LLC Agreement as the "***Investor***." Ex. A, PSA, p. 1; Ex. B, LLC Agreement, p. 1. The financing vehicle, in turn, was nominally referred to as a "Convertible Term Loan," but the parties expressly agreed that it would "be treated as outstanding ***preferred equity*** of the Company and shall constitute an Economic Interest in the Company" regardless of whether the option to formally convert the loan to equity was ever exercised. Ex. B, LLC Agreement § 3.8 (emphasis added). The parties also agreed that the $145 million would be considered a "***Capital Contribution***" to the Company which gave Emigrant GB a 49% Fully Diluted Percentage Interest in the Company from the start. *Id.* at A-1.

In fact, Mr. Milstein has testified under oath that "I'm an ***owner*** and a ***partner*** in the Nicklaus Companies," and that "***my preferred equity interest*** was [actually] worth more than half from the beginning":

> So it's true that 145 is approximately half of $300 million. On the other hand, ***what I owned and bargained for was an investment instrument*** that took the first cash flow up to 12 and a half million per year…. ***So of the economics my preferred equity interest was worth more than half from the beginning***.

Ex. C, Depo. of H. Milstein – NY Lawsuit, 09/12/22, p. 166:01-02; Ex. D, Hrg. T. of H. Milstein – NY Lawsuit, 09/30/22, p. 161:11-22 (emphasis added).

The evidence also demonstrates that, within a few years of the May 2007 transaction, the value of the Nicklaus family's interests in the Company decreased to the point that Mr. Milstein and Emigrant GB were able to gain complete control of the Company's Board of Managers and

"de facto … own[ership] [of] 100 percent of the equity in the company." <u>Exs. E-F</u>, Emails from H. Milstien re: Exercise of Special EBITDA Right and Equity Ownership, 10/06/11, 04/04/19.

Indeed, in August 2022, the Nicklaus family formally assigned their valueless interests in the Company to the Company itself, as permitted under the LLC Agreement and Delaware law, rendering Mr. Milstein's "de facto" 100% equity ownership in the Company "de jure" as well. <u>Ex. G</u>, Ltr. from J. Nicklaus Encl. Assignments of Membership Interests, 09/01/22.

For reference, we also attach as Exhibits H through J the final decisions rendered in the three legal proceedings between the parties which preceded these bankruptcy filings, parts of which are directly relevant to the threshold and central issues in this case. Those decisions are:

(A)   the Final Judgment confirming an Arbitration Award which found that Mr. Nicklaus was free to compete with the Company on his own and using his publicity rights, and that Mr. Milstein had acted "malicious[ly]" in attempting to thwart that competition;

(B)   the Decision and Order on the parties' cross-motions for summary judgment in the NY lawsuit between the parties, which determined, *inter alia*, that Mr. Nicklaus retained ownership of his name and other publicity rights in connection with the May 2007 transactions, and that the Nicklaus family's assignment of their membership interests to the Company was valid; and

(C)   the Jury Verdict recently entered in Mr. Nicklaus' defamation action in Florida, which found that the Company had knowingly published false statements of fact about Mr. Nicklaus that were designed to tarnish his reputation as a person and a professional.

We believe the Court should have the opportunity to fully consider the foregoing rulings along with all of the pertinent evidence before determining whether and on what terms DIP financing should be permitted here.

The Court should therefore deny the Motion on an interim basis and approve only the use of the available cash to pay the critical vendor and fund the operating shortfalls pending a final hearing in the coming weeks.

**Other Objections to Non-Monetary Relief**

Mr. Nicklaus also has grave concerns regarding the proposed non-monetary relief and whether these costs should be borne by the estate on an interim or final basis. In particular, he is concerned about the following issues:

*Challenge Period.* The proposal makes little sense in light of the circumstances presented here. It attempts to fit a round peg into a square hole. The Debtors' own testimony in support of the Motion reflects that Mr. Nicklaus is the only material creditor here with a sufficient economic stake to make such a challenge and the evidence to prove it. There will likely be no committee because the Debtors are seeking to pay all "critical" vendors, and who would appoint a committee for $200,000 of trade payables in a case like this in any event? This is a two party dispute, and Mr. Nicklaus should be given immediate standing to challenge the liens and underlying obligations. He is prepared to try those issues now.

*Case Milestones.* Hand in glove with the proposed challenge period are the objectionable proposed case milestones. Namely, an expedited sale process when the threshold issue of debt versus equity has not been resolved for the benefit of the market. Stated differently, it logically follows that more people will be interested when they are informed about the size of the potential credit bid at such sale, and the treatment of the insider claims.

There are also a number of other non-monetary costs associated with the proposed DIP financing that are patently objectionable – for example, stipulations, releases, liens on proceeds of avoidance actions, and a broad equities of the case waiver. The appearance of these bells and whistles in this context should drive home the point that this is not an entirely fair process as required under the applicable standard.

**Conclusion**

The Motion should be denied outright. Mr. Milstein was in control of the Debtors when the Nicklaus Companies defamed its namesake and should not now be rewarded with the relief being sought in his favor. He should not be permitted to weaponize the bankruptcy process to his benefit, either through an immediate elevation and affirmation of his entity's prepetition interests, or by allowing him to dictate how and when the sale process, if any, should unfold. If he chooses to fund operational shortfalls on an administrative priority basis as the Bankruptcy Code contemplates, or to fund retainers for professionals that are approved and examined by the Court, that would be acceptable. The Motion presently before the Court is not. To grant Mr. Milstein control of a sale process along with an affirmation of an outsized lien on the assets, will of course, chill the process; and if he is not prepared to fund expenses on an administrative priority basis, that should inform the Court and stakeholders about the true prospects of that process.

The Court should, at most, simply approve the use of the available cash to pay the critical vendors and to fund the operating shortfalls pending a final hearing on the Motion in the near term.

WHEREFORE, Mr. Nicklaus respectfully requests that the Court enter an Order as follows: (i) sustaining this Objection; (ii) denying the Motion, on an interim basis, or providing for such other relief consistent with Bankruptcy Rule 4001(c)(2); (iii) scheduling a final hearing on the Motion; (iv) directing the Special Committee and Advisors (defined in the Motion) to expedite responses to reasonable discovery requests from Mr. Nicklaus relating to the proposed budget and associated issues in preparation for the final hearing; and (v) granting such other and further relief as the Court deems just and proper under the circumstances presented by this case.

Dated: November 25, 2025                Respectfully submitted,

**STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.**

150 West Flagler Street, Suite 2200
Miami, Florida 33131
Phone: (305) 789-3200
Fax: (305) 789-3395

By: */s/ Eugene E. Stearns*
    Eugene E. Stearns
    estearns@stearnsweaver.com
    Matthew W. Buttrick
    mbuttrick@stearnsweaver.com
    Cecilia D. Simmons
    csimmons@stearnsweaver.com
    Albert D. Lichy
    alichy@stearnsweaver.com
    Drew M. Dillworth
    ddillworth@stearnsweaver.com
    Eric J. Silver
    esilver@stearnsweaver.com

*Counsel for Jack W. Nicklaus*